BRYAN SCHWARTZ LAW, P.C.
Bryan Schwartz (SBN 209903)
Sam Goity (SBN 359678)
180 Grand Avenue, Suite 1380
Oakland, CA 94612
Tel. (510) 444-9300
Fax (510) 444-9301
Email: bryan@bryanschwartzlaw.com
        sam@bryanschwartzlaw.com

DEMOCRACY FORWARD FOUNDATION
Sarah Goetz*
Ayesha Khan*
Elena Goldstein*
P.O. Box 34553
Washington, D.C. 20043
Tel. (202) 448-9090
sgoetz@democracyforward.org
akhan@democracyforward.org
egoldstein@democracyforward.org

AMERICANS UNITED FOR SEPARATION
OF CHURCH & STATE
Amy Tai*
Rebecca S. Markert*
Jenny Samuels*
Elias Daiute*
1310 L Street NW, Suite 200
Washington, D.C. 20005
Tel. (202) 466-3234
tai@au.org
markert@au.org
samuels@au.org
daiute@au.org

* Appearing *pro hac vice*

*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

NATIONAL FEDERATION OF FEDERAL EMPLOYEES, et al.,

    Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF AGRICULTURE, and

BROOKE L. ROLLINS, Secretary of Agriculture, in her official capacity,

    Defendants.

Case No. 3:26-cv-04406-LB

**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION AND STAY UNDER 5 U.S.C. § 705 WITH MEMORANDUM OF POINTS AND AUTHORITIES**

Date:  August 27, 2026
Time: 9:30 a.m.
Place: Courtroom B – 15th Floor
      450 Golden Gate Avenue
      San Francisco, CA 94102

## NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION AND STAY UNDER 5 U.S.C. § 705

PLEASE TAKE NOTICE that on August 27, 2026 at 9:30 a.m., or as soon thereafter as the matter may be heard by the Honorable Laurel Beeler in Courtroom B, 15th Floor, U.S. District Court for the Northern District of California, San Francisco Courthouse, Plaintiffs, National Federation of Federal Employees, Lanette Dietrich, Thomas MaGee, Ashley Miller, Anne Poopatanapong, Ethan Roberts, and Jennifer Wolfe (collectively, "Plaintiffs"), will and hereby do move this Court for a preliminary injunction, pursuant to Rule 65 of the Federal Rules of Civil Procedure. Plaintiffs seek to have the Court enjoin Defendants U.S. Department of Agriculture ("USDA") and Brooke L. Rollins, in her official capacity as the Secretary of Agriculture, and their officers, agents, attorneys, and any other persons who are in active concert or participation with them (collectively, "Defendants") from sending or otherwise communicating messages that proselytize, promote, or favor any particular religion during the pendency of this litigation. Plaintiffs also seek a stay under the Administrative Procedure Act, 5 U.S.C. § 705 to preliminarily set aside Defendants' policy of issuing messages that proselytize, promote, or favor any particular religion to USDA employees. This motion is based on this Notice and Memorandum of Points and Authorities, declarations and exhibits, records on file in this action, and any other written or oral evidence or argument as may be presented at or before the time this motion is heard by the Court.

Dated: July 22, 2026

Respectfully submitted,

/s/ Bryan Schwartz

Bryan Schwartz (SBN 209903)
Sam Goity (SBN 359678)
BRYAN SCHWARTZ LAW, P.C.
180 Grand Avenue, Suite 1380
Oakland, CA 94612

Tel. (510) 444-9300
Fax (510) 444-9301
bryan@bryanschwartzlaw.com
sam@bryanschwartzlaw.com

Amy Tai*
Rebecca S. Markert*^
Jenny Samuels*
Elias Daiute*
AMERICANS UNITED FOR SEPARATION
OF CHURCH & STATE
1310 L Street NW, Suite 200
Washington, D.C. 20005
Tel. (202) 466-3234
tai@au.org
markert@au.org
samuels@au.org
daiute@au.org

Sarah Goetz*
Ayesha Khan*
Elena Goldstein*
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
Tel. (202) 448-9090
sgoetz@democracyforward.org
akhan@democracyforward.org
egoldstein@democracyforward.org

* Appearing *pro hac vice*.
^ Admitted to practice in Wisconsin; not a
member of the D.C. bar.

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

Page(s)

INTRODUCTION................................................................................................................1

FACTUAL BACKGROUND ...............................................................................................2

LEGAL STANDARD ..........................................................................................................6

ARGUMENT .......................................................................................................................7

I.    Plaintiffs are likely to succeed on the merits of their Establishment Clause claim.................7

    A.    The Founders were concerned with government officials abusing their authority to pressure conformity with a favored religion. ............................7

    B.    The Secretary's proselytizing messages are unconstitutionally coercive because they abuse her position of authority over a captive audience and weaponize social pressure. ........................................................9

    C.    The Secretary's proselytizing messages express a denominational preference. ....................................................15

    D.    There is no longstanding historical practice supporting the Secretary's conduct. ....................................................17

II.    Plaintiffs are likely to succeed on the merits of their Administrative Procedure Act claims..........................................19

    A.    Defendants' practice and policy of sending proselytizing religious messages is reviewable final agency action. ....................19

    B.    Defendants' policy is arbitrary and capricious..............................22

    C.    Defendants' policy is contrary to constitutional right. ..................24

III.    The remaining preliminary injunction factors weigh heavily in Plaintiffs' favor.................24

CONCLUSION...................................................................................................................25

## TABLE OF AUTHORITIES

**Cases**                                                                                           **Page(s)**

*AFGE v. Trump,*
    139 F.4th 1020 (9th Cir. 2025)...................................................................................21

*AFGE v. OPM,*
    777 F. Supp. 3d 253 (S.D.N.Y. 2025) .................................................................21, 22

*All. for the Wild Rockies v. Cottrell,*
    632 F.3d 1127 (9th Cir. 2011) ......................................................................................6

*Anderson v. Laird,*
    466 F.2d 283 (D.C. Cir. 1972)....................................................................................14

*Baird v. Bonta,*
    81 F.4th 1036 (9th Cir. 2023) .................................................................................6, 24

*Batterton v. Marshall,*
    648 F.2d 694 (D.C. Cir. 1980)....................................................................................20

*Bennett v. Spear,*
    520 U.S. 154 (1997) .....................................................................................20, 21, 22

*Biden v. Texas,*
    597 U.S. 785 (2022) ...................................................................................................22

*Cath. Charities Bureau, Inc. v. Wis. Lab. & Indus. Rev. Comm'n,*
    605 U.S. 238 (2025) ...............................................................................7, 15, 16, 17, 25

*Cole v. Oroville Union High Sch. Dist.,*
    228 F.3d 1092 (9th Cir. 2000) ....................................................................................12

*Ctr. for Biological Diversity v. Haaland,*
    58 F.4th 412 (9th Cir. 2023)........................................................................................20

*DHS v. Regents of the Univ. of Cal.,*
    591 U.S. 1 (2020) .......................................................................................................23

*Engel v. Vitale,*
    370 U.S. 421 (1962) .........................................................................................10, 11, 15

*Epperson v. Arkansas,*
    393 U.S. 97 (1968) ......................................................................................................15

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ...................................................................................................23

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.,*
    82 F.4th 664 (9th Cir. 2023)...............................................................................6, 24, 25

*Franklin v. Massachusetts,*
   505 U.S. 788 (1992) ..................................................................................................................22

*Her Majesty the Queen in Right of Ont. v. EPA,*
   912 F.2d 1525 (D.C. Cir. 1990)................................................................................................21

*Immigrant Defs. Law Ctr. v. Noem,*
   145 F.4th 972 (9th Cir. 2025) .....................................................................................................6

*Indus. Safety Equip. Ass'n v. EPA,*
   837 F.2d 1115 (D.C. Cir. 1988).................................................................................................20

*Inouye v. Kemna,*
   504 F.3d 705 (9th Cir. 2007) .....................................................................................................12

*Ipsen Biopharmaceuticals, Inc. v. Azar,*
   943 F.3d 953 (D.C. Cir. 2019)...................................................................................................20

*Kennedy v. Bremerton Sch. Dist.,*
   597 U.S. 507 (2022) ...................................................................................................7, 9, 10, 13

*Lee v. Weisman,*
   505 U.S. 577 (1992) ...................................................................................................1, 10, 12, 14

*Marrero-Méndez v. Calixto-Rodríguez,*
   830 F.3d 38 (1st Cir. 2016) .......................................................................................................11

*Marsh v. Chambers,*
   463 U.S. 783 (1983) .............................................................................................................16, 17

*Mellen v. Bunting,*
   327 F.3d 355 (4th Cir. 2003) .....................................................................................................14

*Milwaukee Deputy Sheriffs Ass'n v. Clarke,*
   513 F. Supp. 2d 1014 (E.D. Wis. 2007),
   *aff'd on other grounds,* 588 F.3d 523 (7th Cir. 2009).........................................................10, 11

*M-J-M-A v. Hermosillo,*
   822 F. Supp. 3d 1147 (D. Or. 2026)..........................................................................................22

*Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins.
   Co.,*
   463 U.S. 29 (1983) .....................................................................................................................22

*Norton v. S. Utah Wilderness All.,*
   542 U.S. 55 (2004) .....................................................................................................................21

*Ohio v. EPA,*
   603 U.S. 279 (2024) ...................................................................................................................22

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.,*
   465 F.3d 977 (9th Cir. 2006)......................................................................................................20

*Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Airforce*,
  128 F.4th 1089 (9th Cir. 2025)................................................................................20

*R.I.L.–R v. Johnson*,
  80 F. Supp. 3d 164 (D.D.C. 2015)...........................................................................21

*Rodriguez v. Robbins*,
  715 F.3d 1127 (9th Cir. 2013) .................................................................................25

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
  592 U.S. 14 (2020)...................................................................................................24

*Roman v. Wolf*,
  977 F.3d 935 (9th Cir. 2020) .....................................................................................6

*Santa Fe Indep. Sch. Dist. v. Doe*,
  530 U.S. 290 (2000) ..........................................................................10, 12, 14, 17

*Sch. Dist. v. Schempp*,
  374 U.S. 203 (1963) ..........................................................................................15, 16

*Thakur v. Trump*,
  176 F.4th 1187 (9th Cir. 2026).................................................................................25

*Torcaso v. Watkins*,
  367 U.S. 488 (1961) .................................................................................................10

*Town of Greece, N.Y. v. Galloway*,
  572 U.S. 565 (2014) ...............................................................13, 16, 17, 18

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
  578 U.S. 590 (2016) ...........................................................................................20, 22

*Venters v. City of Delphi*,
  123 F.3d 956 (7th Cir. 1997)........................................................................10, 11, 12

*Watson v. Jones*,
  80 U.S. (13 Wall.) 679 (1872)..................................................................................15

*Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*,
  5 F.4th 997 (9th Cir. 2021).......................................................................................21

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001) .................................................................................................20

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ........................................................................................................6

**Statutes**

5 U.S.C. § 551 ...........................................................................................................19

5 U.S.C. § 704 ................................................................................................................................20

5 U.S.C. § 705 .....................................................................................................................2, 6, 25

5 U.S.C. § 706 .........................................................................................................................22, 24


**Constitutional Provisions**

U.S. Const. amend. I...........................................................................................................................7

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

To build a country where religious freedom thrives for all, this nation's Founders adopted the Establishment Clause of the First Amendment of the U.S. Constitution to prevent religion from corrupting government and government from corrupting religion. Based on their experiences with governmentally established religion, the Founders knew all too well that "in the hands of government what might begin as a tolerant expression of religious views may end in a policy to indoctrinate and coerce." *Lee v. Weisman*, 505 U.S. 577, 591–92 (1992). Thus, the Establishment Clause stands for two bedrock principles: Government cannot coerce religious conformity; and it must not express denominational preferences. Betraying both of these constitutional promises, Defendants U.S. Department of Agriculture ("USDA") and Secretary Brooke L. Rollins have been misusing the Office of the Secretary to send proselytizing messages imposing the Secretary's explicitly Christian beliefs and theology on the entirety of the USDA workforce.

In her Easter email to all USDA employees, for example, Secretary Rollins sermonized about "the foundation of our faith" and "the foot of the Cross on Good Friday," likening her employees to "the very first disciples to encounter our risen Lord . . . almost two thousand years ago."[1] In recent weeks and months, Defendants have maintained their unconstitutional religious proselytizing. In response to the filing of this action, the Secretary announced on her official X account, "It's just another opportunity to remind everyone: He is Risen."[2] And in Memorial Day and Independence Day emails, Secretary Rollins again proselytized, quoting scripture and invoking "our Creator."[3]

As a result, Plaintiffs[4]—a group of multifaith and nonreligious USDA employees in agencies

---

[1] Declaration of Ashley Miller ("Miller Decl.") ¶ 5, Ex. D.
[2] Declaration of Elias Daiute ("Daiute Decl.") ¶ 4, Ex. B.
[3] Miller Decl. ¶ 5, Exs. E-F.
[4] For the purposes of this motion, when discussing the experience of USDA employees, "Plaintiffs" is used collectively to refer to the six individual plaintiffs in this action (who are not members of

across the country and NFFE, a national labor union representing more than 19,000 USDA employees with diverse religious beliefs—feel pressured to share in the Secretary's religious beliefs, excluded and unwelcome in the workplace, and fearful of the consequences for expressing different beliefs. Absent preliminary relief, the Secretary will continue marking future holidays, with Christmas as the next major one, as "another opportunity" to send proselytizing messages that coerce and exclude Plaintiffs and the rest of the USDA workforce required to read them.

The Establishment Clause prohibits Defendants' coercion and promotion of the Secretary's religious beliefs, and the Administrative Procedure Act bars Defendants' unlawful and irrational policy of religious proselytizing. Plaintiffs are therefore likely to succeed in challenging Defendants' action, which is causing irreparable harm to Plaintiffs and other USDA employees. These factors, plus the balance of equities and public interest, tilt strongly in favor of preliminarily enjoining Defendants from sending proselytizing messages to USDA employees during the pendency of litigation, and temporarily setting aside Defendants' policy under 5 U.S.C. § 705.

## FACTUAL BACKGROUND

Since Secretary Rollins was sworn in as Secretary of Agriculture on February 13, 2025, she has engaged in an escalating pattern of subjecting all USDA employees to proselytizing Christian messages communicated through the Office of the Secretary. At first, the religious messages appeared non-denominational. Last year, using the Office of the Secretary email address, Secretary Rollins sent emails on Independence Day and Thanksgiving that invoked God to USDA's 100,000 employees.[5]

In a Christmas message on December 23, 2025, Secretary Rollins escalated her religious sermonizing. From the Office of the Secretary email account, she sent an email expressly addressed to "All USDA Employees" with the subject line "Merry Christmas from Secretary Rollins."[6] The

NFFE), as well as members of Plaintiff NFFE who are USDA employees.

[5] *See* Miller Decl. ¶ 5, Exs. A, B.

[6] *Id.* ¶ 6, Ex. C.

email contained a video message from the Secretary where she preached that "[t]he spirit of generosity flows from the very first Christmas when God gave *us* the greatest gift possible, the gift of his Son and *our* Savior Jesus Christ, who came to free *us* from our sins and open the door to eternal life. This is the reason for the season . . . ."[7] The Secretary's use of the word "our" and repeated use of the word "us" reflected the view that the email's audience shared or should share the Secretary's Christian beliefs.[8] The message did not acknowledge Hanukkah or other December holidays, in that communication or any other.[9]

On April 5, 2026, the Secretary's proselytizing escalated further. In another email expressly addressed to "All USDA Employees" (the "Easter Sermon"), Secretary Rollins wrote:

> Team USDA,
>
> Happy Easter – He is Risen indeed!
>
> Today *we* celebrate the greatest story ever told, the foundation of *our* faith, and the abiding hope of all mankind.
>
> From the foot of the Cross on Good Friday to the stone rolled away from the now empty tomb, sin has been destroyed. Jesus has been raised from the dead. And God has granted *each of us* victory and new life. And where there is life — risen life— there is hope.
>
> No matter the very real trials and hardships *we* face, fear and sin and death do not get the last word. Because on Easter morning, "Hell took a body, and discovered God. It took earth, and encountered Heaven. It took what it saw, and was overcome by what it did not see." Now that is reason to rejoice!
>
> And so like the very first disciples to encounter *our* risen Lord in the Upper Room almost two thousand years ago, this Easter let *us* too be alive with hope, full of Paschal joy, and confident in the mission *each of us* has been called for.
>
> Please know how amazed and grateful I am for the hard work each of you do to support our shared mission here at USDA. I hope you and your loved ones have a truly blessed and happy Easter. May God continue to bless you, your families, and

---

[7] *Id.* ¶ 6 (emphases added).

[8] *See, e.g.*, *id.* ¶ 11; Declaration of Anne Poopatanapong ("Poopatanapong Decl.") ¶ 11; Declaration of Ethan Roberts ("Roberts Decl.") ¶ 12.

[9] *See, e.g.*, Miller Decl. ¶ 7.

our exceptional country, One Nation, Under God.[10] The top of the email featured an illustration of a stone rolled away from Jesus's tomb and "Christ is Risen" written above the image.[11] Although she sent the Easter Sermon during Passover, one of the most important Jewish holidays, Secretary Rollins failed even to acknowledge that holiday.[12]

The Secretary's biblical references to Jesus being "raised from the dead," "the foot of the Cross on Good Friday," and "the very first disciples to encounter our risen Lord in the Upper Room," among other religious stories that the Secretary evangelizes as fact, alongside phrases such as "the foundation of *our* faith" and "God has granted each of *us*," convey to USDA employees that the agency expects everyone to share in her particular brand of Christianity.[13] The Secretary's references to USDA's mission, together with her urging that "this Easter let us too be alive with hope, full of Paschal joy, and confident in the mission each of us has been called for," signal to USDA employees that the Secretary is turning USDA's mission to serve the American people into a mission to serve Christ.[14]

Since Plaintiffs initiated this lawsuit on May 13, 2026, *see* Compl., ECF No. 1, the Secretary has only doubled down on her proselytizing messages and continued to infuse even non-Christian holidays with Christian messaging. In a post on X, Secretary Rollins wrote that the lawsuit was "just another opportunity to remind everyone: He is Risen."[15] And a USDA spokesperson said in response to the lawsuit that "[USDA and the Secretary] will keep the plaintiffs in our prayers during this process."[16] The Secretary linked a news article containing the spokesperson's remarks on X.[17] For Memorial Day and Independence Day this year, the Secretary sent agency-wide emails from the

---

[10] *Id.* ¶ 5, Ex. D (emphasis added).
[11] *Id.*, Ex. D
[12] *Id.* ¶ 7.
[13] *See, e.g., id.* ¶ 11; Poopatanapong Decl. ¶ 11; Roberts Decl. ¶ 12.
[14] Miller Decl. ¶ 10, Ex. D.
[15] Daiute Decl. ¶ 4, Ex. B.
[16] *Id.* ¶ 3, Ex. A.
[17] *Id.* ¶ 4, Ex. B.

Office of the Secretary quoting scripture. In the May 25, 2026 Memorial Day email to "Team USDA," Secretary Rollins stated, "[W]e can take comfort that [the heroes we honor today] are safely at rest by trusting in the words of Almighty God," and quoted a Bible verse: "'I give unto them eternal life, that they shall never perish.' -John 10:28."[18] In her July 4, 2026, Independence Day email, she declared: "Scripture teaches us that 'where the Spirit of the Lord is, there is freedom' (2 Corinthians 3:17). Freedom is a great gift from our Creator, but it is a fragile thing."[19]

The Secretary's practice and policy of sending proselytizing messages runs against USDA's own guidance on religious communications. In November 2025, USDA adopted a policy that purports to protect workers from religious coercion, instructing that USDA officials "[c]annot use official authority to pressure subordinates" regarding their religious beliefs and that they "[m]ust stop if a colleague asks [them] to stop."[20] The Secretary has repeatedly contravened this guidance by using her official authority to pressure her subordinates—the entire USDA workforce—to share in her beliefs.

As a result of the Secretary's religious messages, Plaintiffs feel pressured to believe in the Secretary's faith and to act as if they share her faith to avoid being singled out, and potentially losing their jobs, for being nonreligious or having a different faith.[21] The Secretary's religious messages have caused Plaintiffs to feel alienated and like unwelcome outsiders at USDA.[22] Plaintiffs cannot avoid the Secretary's religious communications, which are sent from the same email address that is used to share agency-wide information related to human resources, agency policies, and other

---

[18] Miller Decl. ¶ 5, Ex. E.
[19] *Id.* ¶ 5, Ex. F.
[20] *See* Daiute Decl. ¶ 6, Ex. D (USDA Secretary's Memorandum 1078-019).
[21] *See, e.g.*, Declaration of Lanette Dietrich ("Dietrich Decl.") ¶¶ 11, 16; Declaration of Thomas MaGee ("MaGee Decl.") ¶¶ 3, 13, 14; Miller Decl. ¶¶ 3, 14; Poopatanapong Decl. ¶¶ 3, 12; Roberts Decl. ¶¶ 3, 16; Declaration of Jennifer Wolfe ("Wolfe Decl.") ¶¶ 3, 10, 15.
[22] *See, e.g.*, Dietrich Decl. ¶¶ 12, 17; MaGee Decl. ¶¶ 11–12; Miller Decl. ¶¶ 13–15; Poopatanapong Decl. ¶¶ 10–12; Roberts Decl. ¶¶ 11–13; Wolfe Decl. ¶¶ 14–15; Declaration of NFFE ("NFFE Decl.") ¶¶ 11, 15, 22.

important matters.[23] As USDA employees, Plaintiffs are expected to read all communications from the Secretary.[24] Indeed, when Plaintiff Lanette Dietrich requested to stop receiving the Secretary's proselytizing messages, a USDA supervisor told her that she could not opt out of the religious communications and warned that further elevating her objections would result in "trouble."[25]

## LEGAL STANDARD

Plaintiffs are entitled to a preliminary injunction and a stay under Section 705 of the APA if they show that: (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm absent the preliminary injunction," (3) "the balance of equities tips in [their] favor," and (4) "a preliminary injunction is in the public interest." *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (citing *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)); *Immigrant Defs. Law Ctr. v. Noem*, 145 F.4th 972, 995–96 (9th Cir. 2025) (same factors govern issuance of a preliminary injunction and a Section 705 stay). "Where the government is a party to a case in which a preliminary injunction is sought, the balance of the equities and public interest factors merge." *Roman v. Wolf*, 977 F.3d 935, 940–41 (9th Cir. 2020).

The Ninth Circuit applies a "sliding scale" approach such that "[w]hen the balance of equities 'tips sharply in the plaintiff's favor,'" as it does here, "the plaintiff must raise only 'serious questions' on the merits—a lesser showing than likelihood of success." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 684 (9th Cir. 2023) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32, 1135 (9th Cir. 2011)).

---

[23] *See, e.g.*, Dietrich Decl. ¶¶ 3; 13–16; MaGee Decl. ¶¶ 4, 6; Miller Decl. ¶ 4, 9; Poopatanapong Decl. ¶¶ 4, 6; Roberts Decl. ¶¶ 4, 6; Wolfe Decl. ¶¶ 4, 6.
[24] *See, e.g.*, Dietrich Decl. ¶ 13; MaGee Decl. ¶ 6; Miller Decl. ¶ 9; Poopatanapong Decl. ¶ 6; Roberts Decl. ¶ 6; Wolfe Decl. ¶ 6; NFFE Decl. ¶ 8.
[25] Dietrich Decl. ¶ 14, Ex. A.

**ARGUMENT**

**I.     Plaintiffs are likely to succeed on the merits of their Establishment Clause claim.**

The Establishment Clause provides that the government "shall make no law respecting an establishment of religion." U.S. Const. amend. I. As the Supreme Court has made clear, "the Establishment Clause must be interpreted by reference to historical practices and understandings." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 535 (2022) (quotations omitted). "The line that courts and governments must draw between the permissible and the impermissible has to accord with history and faithfully reflect the understanding of the Founding Fathers." *Id.* at 535–36 (citation modified). From this "historically sensitive understanding of the Establishment Clause" emerge two key "hallmarks of religious establishments," *id.* at 537: governmental coercion of religion, *see id.*, and "denominational preference," *Cath. Charities Bureau, Inc. v. Wis. Lab. & Indus. Rev. Comm'n*, 605 U.S. 238, 248 (2025). The Secretary's proselytizing messages therefore violate the Establishment Clause for two independently sufficient reasons: They are coercive, and they express an official denominational preference. And the Secretary's messages are not saved by reference to historical practices, for they do not "accord" with a historical understanding of the Establishment Clause. *Kennedy*, 572 U.S. at 536. Consequently, Plaintiffs are likely to succeed on the merits of their Establishment Clause claim.

**A. The Founders were concerned with government officials abusing their authority to pressure conformity with a favored religion.**

The Founders drafted and ratified the Establishment Clause and Free Exercise Clause of the First Amendment (the "Religion Clauses") to vindicate four fundamental constitutional promises: avoiding religious conflict; protecting the equality of all citizens; discouraging government-imposed restraints on belief; and protecting the integrity of rights of conscience. Declaration of John A. Ragosta ("Ragosta Decl.") ¶¶ 12, 37–57.

The Founders understood that government officials violate these promises if they abuse their authority and pressure conformance with a favored religion. Thomas Jefferson and James Madison, who are widely regarded as the two Founders most instrumental in the drafting and ratification of the Religion Clauses, *id.* ¶¶ 58–66, were adamant that government officials should not promote religion, even in an advisory capacity, *id.* ¶¶ 70–80. Some of their concerns sounded in the coercive risks that such involvement would carry: Jefferson explained that official action amounting to "recommendation" of prayer, even without the backing of legal force, was no "less a *law* of conduct for those to whom it is directed." *Id.* ¶ 70. Similarly, Madison wrote that even a practice of governmental "recommendation[] only" concerning religion "naturally terminates in a conformity to the creed of the major[ity]." *Id.* ¶ 77. These principles led Madison to conclude that "[a]n advisory Gov[ernmen]t is a contradiction in terms." *Id*. "The members of a [government] . . . . can not . . . issue decrees or injunctions addressed to the faith or the Consciences of the people." *Id.* ¶ 75. These warnings also served to indicate the broad view of coercion the Founders took—rather than being limited to direct compulsion through "fine & imprisonment," the Founders considered coercion to include indirect "proscription . . . in public opinion." *Id.* ¶ 70 (quoting Jefferson).

The Founders were equally concerned with the risks posed by government officials expressing denominational preferences. One acute concern was that such preferences would lead to the same sectarian conflict that had threatened the American colonies. *Id.* ¶¶ 38–42. Madison characterized this concern in no uncertain terms: "Torrents of blood have been spilt in the old world, by vain attempts of the secular arm, to extinguish Religious discord, by proscribing all difference in Religious opinion." *Id.* ¶¶ 28, 42. Founding-era religious dissenters similarly hoped that preventing the government from taking sides in religious disputes would avoid "plagues of jarring interests." *Id.* ¶ 41. Just as pressing was the need to protect the equality of all citizens: As Madison wrote, "Who does not see that the

same authority which can establish Christianity, in exclusion of all other Religions, may establish with the same ease any particular sect of Christians, in exclusion of all other Sects?" and "Such a Government will be best supported by protecting every Citizen in the enjoyment of his Religion with the same equal hand which protects his person and his property; by neither invading the equal rights of any Sect, nor suffering any Sect to invade those of another." *Id.* ¶¶ 28, 47. Still another concern was that denominational preferences would threaten the integrity of religious institutions, and thereby undermine rights of conscience. Virginia's 1785 Statute for Establishing Religious Freedom, drafted by Jefferson, commented that government support of religion "tends . . . to corrupt the principles of that *very* religion it is meant to encourage, by bribing, with a monopoly of worldly honours and emoluments, those who will externally profess and conform to it." *Id.* ¶¶ 32, 53. Madison similarly stated, "The Religion then of every man must be left to the conviction and conscience of every man; and it is the right of every man to exercise it as these may dictate. . . . [E]cclesiastical establishments, instead of maintaining the purity and efficacy of Religion, have had a contrary operation." *Id.* ¶¶ 28, 53.

In sum, the Founders were deeply concerned with religious messaging by government officials. Their concerns—grounded in coercion and denominational preference—motivated the adoption of the Religion Clauses, which were intended to ensure that government neither pressures religious participation nor signals that some faiths stand closer to civic power than others.

### B. The Secretary's proselytizing messages are unconstitutionally coercive because they abuse her position of authority over a captive audience and weaponize social pressure.

Governmental coercion of religion is one of the "foremost hallmarks of religious establishments the framers sought to prohibit when they adopted the First Amendment." *Kennedy*, 597 U.S. at 537. As history extensively indicates, the Founders were particularly concerned with the possibility that

government officials would abuse their position of authority to pressure conformance with a favored religion. Ragosta Decl. ¶¶ 15, 73–75. Consistent with that understanding, a long line of Supreme Court cases, up to and including *Kennedy*, has repeatedly affirmed the principle that when government throws its weight behind a particular religious view, it inherently exerts coercive pressure to conform to that view. That coercion is present when the speaker occupies a position of power over a captive audience and in an environment where there are social pressures. *See, e.g.*, *Engel v. Vitale*, 370 U.S. 421, 431 (1962); *Lee*, 505 U.S. at 591–92 (1992); *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 311–13 (2000); *Kennedy*, 597 U.S. at 537, 542. Accordingly, in determining whether government conduct is unconstitutionally coercive, courts consider three related factors: power imbalance; captive audiences; and environments that engender heightened social pressures. All three are present here.

**Power Imbalance.** The Supreme Court has long observed the powerful coercive forces at play when there is a power imbalance such that "the power [and] prestige of the Federal Government [are] used to control, support or influence" the religion of its citizens. *Engel*, 370 U.S. at 429–30. That power imbalance is particularly concerning in government workplaces between government officials and their employees. *See, e.g.*, *Milwaukee Deputy Sheriffs Ass'n v. Clarke*, 513 F. Supp. 2d 1014, 1021 (E.D. Wis. 2007) ("[C]oercion [cases] typically deal with populations over which government exercises particularly strong control[, such as] . . . public employees." (citing *Venters v. City of Delphi*, 123 F.3d 956, 970 (7th Cir. 1997)), *aff'd on other grounds*, 588 F.3d 523 (7th Cir. 2009)); *see also Torcaso v. Watkins*, 367 U.S. 488, 495–96 (1961) (coercive to condition public employment on willingness to subscribe to particular religious belief). Indeed, the religious beliefs of government employees should not be "subjected to the pressures of government for change each time a new political administration is elected to office." *Engel*, 370 U.S. at 430.

Employer-employee relationships are inherently coercive, and, as public employees, Plaintiffs

are "particularly vulnerable to employer coercion given their strict chain of command."[26] *Milwaukee Deputy Sheriffs Ass'n*, 513 F. Supp. 2d at 1021. In *Venters*, for example, a police chief's repeated religious overtures to a radio dispatcher under his supervision violated the Establishment Clause and the court noted that the dispatcher "endured it for a period of time without objection in view of the fact that [the police chief] was her supervisor." 123 F.3d at 970. And in *Marrero-Méndez v. Calixto-Rodríguez*, a police supervisor engaged in unconstitutional coercion when he used his role as a "state official at a state function" to "order[] a subordinate" to observe group prayers "against his will." 830 F.3d 38, 46, 47 (1st Cir. 2016).

Here, Secretary Rollins sits at the top of Plaintiffs' chain of command and oversees matters that profoundly affect USDA's workforce and that may have significant effects on Plaintiffs' careers and families.[27] She has the capability to fire and demote them, and threaten the livelihoods on which many have depended for decades.[28] The power the Secretary exercises over Plaintiffs is precisely the kind of control that courts have repeatedly recognized in finding religious coercion.

The magnitude of the Secretary's power as a cabinet secretary—overseeing 100,000 employees and reporting directly to the President of the United States—is significant. As the head of a federal agency, Secretary Rollins carries "the power [and] the prestige of the Federal Government" whenever she communicates to her employees. *Engel*, 370 U.S. at 429. With that prestige comes the ability to mandate "some degree of proscription . . . in public opinion." Ragosta Decl. ¶ 71 (quoting Jefferson).

---

[26] This Administration has shown no compunction against firing or disciplining federal workers perceived to disagree with it. *See, e.g.*, Kanishka Singh, *US EPA Fires Some Employees Who Signed Letter Criticizing Trump Administration*, Reuters (Aug. 29, 2025), https://www.reuters.com/legal/litigation/us-epa-fires-some-employees-who-signed-letter-criticizing-trump-administration-2025-08-29/; Alan Feuer, *An F.B.I. Trainee Hung a Pride Flag Near His Desk. He Says He Was Fired for It*, N.Y. Times (Nov. 19, 2025), https://www.reuters.com/legal/litigation/us-epa-fires-some-employees-who-signed-letter-criticizing-trump-administration-2025-08-29/.

[27] *See, e.g.*, Dietrich Decl. ¶¶ 3, 18; MaGee Decl. ¶ 3; Miller Decl. ¶ 3; Poopatanapong Decl. ¶ 3; Roberts Decl. ¶ 3; Wolfe Decl. ¶ 3.

[28] *See, e.g.*, Poopatanapong Decl. ¶¶ 2–3.

Because Secretary Rollins' official communications bear the imprimatur of the federal government, they are no "less a *law* of conduct for those to whom [they are] directed" than if they directly compelled religious observance. *Id.* ¶ 70 (quoting Jefferson). In other words, her communications are not ordinary workplace commentary. They are directives from one of the highest-ranking officials in the federal government—and the very highest at USDA.

**Captive Audience.** Secretary Rollins' authority over her workforce also renders Plaintiffs a captive audience. Courts are especially vigilant against coercion when religious messaging is directed to a captive audience. When the recipient—such as a student, employee, or parolee—cannot avoid encountering the government-sponsored religious messaging, the risk of coercion is acute. *See, e.g.*, *Venters*, 123 F.3d at 970 (employees required to endure religious lectures from employer); *Inouye v. Kemna*, 504 F.3d 705, 712–13 (9th Cir. 2007) (parolees who must attend religion-based treatment programs). An Establishment Clause violation is more likely where "subtle coercive pressures exist" and where an employee has "no real alternative which would have allowed her to avoid . . . . participation." *Lee*, 505 U.S. at 588; *see also Cole v. Oroville Union High Sch. Dist.*, 228 F.3d 1092, 1101–04 (9th Cir. 2000).

Here, the Secretary's captive audience is not one local government employee; it is the entire USDA workforce across the country. The Secretary's position enables her to impose her religious beliefs on every employee by broadcasting sermons and scripture over the agency's email system, like the prayer broadcasted over the school's public-address system to a captive audience that the Supreme Court found unconstitutionally coercive in *Santa Fe*, 530 U.S. at 307. As USDA employees, Plaintiffs are required to read communications from the Secretary to perform their jobs effectively.[29] Communications from the Secretary are infrequent and typically include information about major

---

[29] *See, e.g.*, Dietrich Decl. ¶ 13; MaGee Decl. ¶ 6; Miller Decl. ¶ 9; Poopatanapong Decl. ¶ 6; Roberts Decl. ¶ 6; Wolfe Decl. ¶ 6; NFFE Decl. ¶ 8.

programs or other announcements relevant to Plaintiffs' jobs.[30] Secretary Rollins has, for example, emailed her employees about plans to reorganize much of the agency and require employees to relocate; significant changes to USDA's civil-rights program; closure of a USDA building; plans for a government shutdown; and the Deferred Resignation Program, which offered many employees an exit from federal service.[31] Employees are therefore compelled to confront the Secretary's evangelizing messages as a condition of staying informed about their jobs. Indeed, when Plaintiff Dietrich attempted to opt out of the Secretary's religious communications, she was told by her superior that she could not opt out and that escalating her demand would "create trouble" for her.[32] Such an imposition of religious messaging on a captive audience is unconstitutional coercion.[33]

Because the Secretary directs her messages to a captive audience, this case differs from those in which courts declined to find coercion because there was no captive audience. In *Kennedy*, for example, the Supreme Court held that a football coach's prayers after a game were not coercive because they "were not publicly broadcast or recited to a captive audience." 597 U.S. at 542. And in *Town of Greece v. Galloway*, the Court held that legislative prayers at the beginning of town board meetings were not coercive to members of the public because "[n]othing in the record suggests that members of the public are dissuaded from leaving the meeting room during the prayer." 572 U.S. 565, 590 (2014). Here, by contrast, the Secretary broadcasts her religious beliefs to a captive audience of 100,000 employees who must read her emails and therefore have no choice but to receive her

---

[30] *See* Miller Decl. ¶¶ 4, 9; Wolfe Decl. ¶ 6.

[31] Miller Decl. ¶ 4.

[32] Dietrich Decl. ¶ 14.

[33] The Secretary's use of the official USDA email also forecloses any argument that she was engaged in private speech. *See, e.g.*, *Kennedy*, 597 U.S. at 529 (concluding that coach's prayer after a game was private, not government, speech because he was not "engaged in speech ordinarily within the scope of his duties as a coach" (citation modified)). While the Secretary is entitled to her personal religious beliefs, delivering a Christian sermon on behalf of USDA, via its email system, is not mere personal expression.

proselytizing messages.

**Social Pressure.** Finally, Secretary Rollins' declaration of her religious beliefs—and indication of her assumption that her beliefs are universally shared—to every employee through official channels set the tone at USDA and put social pressure on Plaintiffs. Reflecting the Founders' concerns, courts have recognized that indirect coercion arises when government officials weaponize social pressure in favor of their preferred religion. *See, e.g.*, *Santa Fe*, 530 U.S. at 312 ("[T]he government may no more use social pressure to enforce orthodoxy than it may use more direct means." (quoting *Lee*, 505 U.S. at 594)); *Lee*, 505 U.S. at 593 ("[P]ressure, though subtle and indirect, can be as real as any overt compulsion."); *Anderson v. Laird*, 466 F.2d 283, 296 (D.C. Cir. 1972) ("[P]eer group pressure to conform to established practices is a forceful form of coercion."); *Mellen v. Bunting*, 327 F.3d 355, 371 (4th Cir. 2003) (cadets "uniquely susceptible to coercion" in part because of expectations of "obedience and conformity").

Plaintiffs have worked under the leadership of multiple administrations and, prior to Secretary Rollins, have never been subjected to pressure to share in a Secretary's religious beliefs.[34] By emphasizing "we," "us," and "our," for example, the Secretary's emails employ "social pressure to enforce orthodoxy," which is no less coercive than "direct means." *Lee*, 505 U.S. at 594. For example, Plaintiff Miller, who is a Humanist and an atheist, feels that the Secretary's evangelizing compels them to "hide who [they are] and pressure[s] [them] to act as if [they] share the Secretary's beliefs."[35] Plaintiff Poopatanapong, a Buddhist, experiences the Secretary's proselytization as "pressure to strip away [her] identity and individuality," either having to "hide who [she is] or risk losing a job to which [she is] deeply committed."[36] The social pressure Plaintiffs have experienced as a result of the

---

[34] *See, e.g.*, Dietrich Decl. ¶ 6; MaGee Decl. ¶ 9; Miller Decl. ¶ 8; Poopatanapong Decl. ¶ 9; Roberts Decl. ¶ 10; Wolfe Decl. ¶ 9.

[35] Miller Decl. ¶ 14.

[36] Poopatanapong Decl. ¶ 12; *see also* Dietrich Decl. ¶ 16; MaGee Decl. ¶ 13; Roberts Decl. ¶ 14; Wolfe Decl. ¶ 15; NFFE Decl. ¶¶ 10, 11, 15, 16, 18, 22.

Secretary and USDA promoting and imposing Christianity on them is the type of coercive conduct the Founders rejected. *See, e.g.*, *Sch. Dist. v. Schempp*, 374 U.S. 203, 221 (1963) (Establishment Clause claim "does not depend upon any showing of direct governmental compulsion").

### C. The Secretary's proselytizing messages express a denominational preference.

The denominational favoritism in the Secretary's proselytizing messages creates another, independent violation of the Establishment Clause. The Founders "knew . . . that one of the greatest dangers to the freedom of the individual to worship in his own way lay in the Government's placing its official stamp of approval upon one particular kind of prayer or one particular form of religious services." *Engel*, 370 U.S. at 429. In keeping with that history, the Supreme Court has long held that a guiding principle of the Establishment Clause is neutrality: Government may not express favoritism for one religion over other religions, or religion over nonreligion. *See Epperson v. Arkansas*, 393 U.S. 97, 104 (1968). The Court recognized that foundational principle as early as 1872, *see id.* ("The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect.'" (quoting *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 728 (1872))), and as recently as last year, *Cath. Charities*, 605 U.S. at 247 ("The clearest command of the Establishment Clause is that the government may not officially prefer one religious denomination over another." (citation modified)). The government "must be neutral in matters of religious theory, doctrine, and practice[,] . . . and it may not aid, foster, or promote one religion or religious theory against another or even against the militant opposite." *Epperson*, 393 U.S. at 103–04. "[A]ny state-sponsored denominational preference [is subject to] strict scrutiny." *Cath. Charities*, 605 U.S. at 242.

The Secretary's explicitly proselytizing messages to 100,000 federal employees are "textbook denominational discrimination," *Cath. Charities*, 605 U.S. at 248, and the government cannot articulate a compelling government interest to satisfy strict scrutiny. The messages "effect [a]

favoritism among sects . . . [and] work deterrence of [other] religious belief[s]." *Larson v. Valente*, 456 U.S. 228, 246 (1982) (quoting *Schempp*, 374 U.S. at 305 (Goldberg, J., concurring)). They amount to a "practice" that "over time is . . . 'exploited to proselytize" and "advance . . . one . . . faith or belief.'" *Town of Greece,* 572 U.S. at 583 (quoting *Marsh v. Chambers*, 463 U.S. 783, 794–95 (1983)). Since the Secretary took office, the Secretary's religious messages have escalated in proselytizing language, particularly on Christian holidays, without any acknowledgment—let alone celebration—of holidays from other religions. She abuses her authority to email all 100,000 of her subordinates to proselytize and expressly promote and favor Christianity. Such practices are outside our nation's "tradition" and violate the Establishment Clause. *Id.*

On behalf of USDA, the Secretary has conveyed to Plaintiffs that USDA's mission has become a Christian one. By comparing federal employees to "the very first disciples to encounter our risen Lord in the Upper Room almost two thousand years ago" and calling on those employees to carry out "the mission each of us has been called for" with "Paschal joy," the Secretary is portraying the agency's work as a mission to serve her particular Christian views. Plaintiffs understand that the Christian "we" and "us" who are addressed in her sermons are imbuing USDA with a religious—rather than a secular—mission.[37] This "fusion of governmental and religious functions" stemming from government elevating a particular religion or sect is what the Founders fought to stamp out through the Establishment Clause. *See Schempp*, 374 U.S. at 222.

Further, the Secretary's use of "we," "us," and "our," along with her failure to recognize other religious holidays or acknowledge that other employees may have different beliefs, expresses to Plaintiffs that the agency expects that its employees share in the Secretary's beliefs and that those who do not hold the same beliefs "are outsiders, not full members of the political community." *Cath.*

---

[37] *See, e.g.*, Miller Decl. ¶ 11; Poopatanapong Decl. ¶ 11; Roberts Decl. ¶ 12; NFFE Decl. ¶¶ 12, 19.

*Charities*, 605 U.S. at 248 (quoting *Santa Fe*, 530 U.S. at 309).[38]

As the Secretary's proselytizing messages plainly express an official denominational preference, this Court must apply strict scrutiny. *Cath. Charities*, 605 U.S. at 248. Because Defendants cannot meet their burden in showing that the Secretary's proselytizing messages are "closely fitted to further a compelling governmental interest," *id.* (citation modified), this Court should enjoin Defendants' unconstitutional conduct.

### D.  There is no longstanding historical practice supporting the Secretary's conduct.

The Secretary's conduct cannot survive an Establishment Clause challenge under a historical-practice theory. In *Marsh*, 463 U.S. at 795, and *Town of Greece*, 572 U.S. at 591–92, the Supreme Court upheld opening prayers at legislative sessions and at public town board meetings, respectively. But the Court explained in *Town of Greece* that its holdings relied on the unique, unbroken history of such prayers: Because legislative prayer is "a practice that has long endured," "[i]t is presumed that the reasonable observer is acquainted with this tradition and understands that its purposes are to lend gravity to public proceedings and to acknowledge the place religion holds in the lives of many private citizens, not to afford government an opportunity to proselytize or force truant constituents into the pews." *Town of Greece,* 572 U.S. at 587 (plurality opinion).

Here, however, unlike opening prayers in legislative sessions, which have been an "unbroken practice for two centuries in the National Congress," *Marsh*, 463 U.S. at 795, there is no unbroken historical practice of top-level federal government officials sending proselytizing communications to their employees. Plaintiffs who have worked for the USDA for decades have attested that there has been no such practice.[39] While Plaintiffs have received emails acknowledging religious holidays,

---

[38] *See, e.g.*, Dietrich Decl. ¶¶ 5, 8, 9; MaGee Decl. ¶¶ 8, 11-12; Miller Decl. ¶¶ 7, 13; Poopatanapong Decl. ¶¶ 8, 10–12; Roberts Decl. ¶¶ 9, 11–13, 15; Wolfe Decl. ¶¶ 8, 11, 15; NFFE Decl. ¶ 10, 15–16, 18–20, 22.

[39] *See, e.g.*, Dietrich Decl. ¶ 6; MaGee Decl. ¶ 9;  Poopatanapong Decl. ¶ 9.

none have been evangelizing and exclusionary like the Secretary's.[40]

What is more, the Secretary has done precisely what the Supreme Court cautioned against in *Town of Greece*: She has taken advantage of her authority over and access to the agency's 100,000 employees and "exploited" them "to proselytize." 572 U.S. at 583. The Secretary made the proselytizing purpose of her Easter Sermon evident when she posted on X in response to the filing of this action, "It's just another opportunity to remind *everyone*: He is Risen."[41] Certainly, her declaration to *everyone* of Jesus's resurrection does not "unite" employees or "serve to solemnize the occasion." *Town of Greece*, 572 U.S. at 583. It "denigrate[s] nonbelievers or religious minorities, threaten[s] damnation, [and] preach[es] conversion." *Id.*

In fact, history indicates that the Founders considered conduct like Secretary Rollins'—religious messaging from government officials—to be especially problematic. Presidential prayer proclamations provide an example.[42] Of the first five presidents, Jefferson and Madison both considered presidential prayer proclamations—indeed, proclamations advancing religious views at all—to be unconstitutional. Ragosta Decl. ¶ 86. In line with this view, Jefferson and Monroe declined to issue any religious proclamations. *Id.* Madison issued non-denominational prayer proclamations (which he later regretted as unconstitutional). *Id.* ¶¶ 77–80. George Washington and John Adams, who issued prayer proclamations, also took pains to ensure that such proclamations were strictly generic, so as to acknowledge holidays without unduly influencing the public or expressing a denominational preference. *Id.* ¶¶ 81, 83.

Historical records reveal the Founders' reasoning. Consider Jefferson's response in declining to

---

[40] *See, e.g.*, Dietrich Decl. ¶ 6; MaGee Decl. ¶ 9;  Poopatanapong Decl. ¶ 9.

[41] Daiute Decl., Ex. B (emphasis added).

[42] To be sure, presidential prayer proclamations are not a perfect analogy to this case. Unlike the Secretary's emails, such proclamations were issued to the general public, and there is "no evidence that government employees were required to read or listen to such proclamations." Ragosta Decl. ¶ 68. But these differences emphasize the coercive nature of the Secretary's proselytizing emails, which USDA employees *are* required to read.

issue an official proclamation in 1808 calling upon citizens to pray for the welfare of the nation. *Id.* ¶ 70. Jefferson believed that even a recommendation of a day of fasting and prayer would "*indirectly* assume to the US[] an authority over religious exercises which the constitution has directly precluded [it] from," because it would imply the imposition of a "sanction[] by some penalty on those who disregard it," including even "some degree of proscription perhaps in public opinion." *Id.* Similarly, in Madison's Detached Memoranda, he wrote, "The members of a Govt. as such can in no sense, be regarded as possessing an advisory trust from their Constituents in their religious capacities. They can not form an Convocation, Council or Synod, and *as such* issue decrees or injunctions addressed to the faith or the Consciences of the people." *Id.* ¶ 75.

Given the Founders' aversion to official religious messaging, there is no historical-practice theory that could save the Secretary's conduct from an Establishment Clause violation. The opposite is true: The Founders would have characterized the Secretary's sermons as an abuse of her official authority prohibited by the Constitution.[43]

## II.    Plaintiffs are likely to succeed on the merits of their Administrative Procedure Act claims.

Plaintiffs are likely to prevail on their claims that Defendants' practice and policy of sending proselytizing religious messages to the entirety of the USDA workforce from the Office of the Secretary's official account is arbitrary and capricious and contrary to constitutional right in violation of the Administrative Procedure Act.

### A. Defendants' practice and policy of sending proselytizing religious messages is reviewable final agency action.

The APA provides for judicial review of a "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. The statutory definition of "agency action" is broad and

---

[43] Shortly after the Founding, Thomas Cooley, a noted constitutional scholar of the early nineteenth century, cautioned that public affirmations were susceptible to devolve into expressions of religious preference, which was prohibited. Ragosta Decl. ¶ 76.

"includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act," *id.* § 551(13), though courts have cautioned against rigid focus on these "imprecise" statutory categories, *see Indus. Safety Equip. Ass'n v. EPA*, 837 F.2d 1115, 1117 (D.C. Cir. 1988). Indeed, the Ninth Circuit has explained that an agency "rule" under § 704 "includes 'nearly every statement an agency may make.'" *Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Airforce*, 128 F.4th 1089, 1107 (9th Cir. 2025) (quoting *Batterton v. Marshall*, 648 F.2d 694, 700 (D.C. Cir. 1980)). Agency actions "cover comprehensively every manner in which an agency may exercise its power." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001).

An agency action is final if it (1) "mark[s] the consummation of the agency's decisionmaking process" and (2) is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citation modified). Courts take a "pragmatic and flexible" approach to finality, *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006) (citation modified); *see also U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016), focusing on "the concrete consequences an agency action has or does not have," *Ipsen Biopharmaceuticals, Inc. v. Azar*, 943 F.3d 953, 956 (D.C. Cir. 2019). The finality analysis hinges on the "'practical and legal effects of the agency action,' not on labels." *Ctr. for Biological Diversity v. Haaland*, 58 F.4th 412, 417 (9th Cir. 2023) (citation modified).

Plaintiffs challenge a discrete agency action and satisfy both prongs of the finality inquiry.

Under the expansive interpretation adopted by the Supreme Court in *Whitman* and reinforced in this Circuit and elsewhere, Defendants' practice and policy of sending proselytizing religious messages to the entirety of the USDA workforce from the Office of the Secretary is a discrete agency action. Plaintiffs challenge Defendants' dramatic departure from a practice and policy of, at most, acknowledging religious holidays in a nonsectarian and non-proselytizing manner that reflected the

religious diversity of the USDA's workforce.[44] The messages demonstrating this policy change came from a cabinet secretary who oversees more than 100,000 USDA employees and reports directly to the President; were sent to all USDA employees from the Office of the Secretary's internal email system; express the Secretary's religious views about "our shared mission at USDA"; and were intended to and did coerce USDA employees to conform their views to the Secretary's.

To be sure, not everything that an agency does amounts to "agency action." Plaintiffs cannot, for example, mount a "broad programmatic attack" or voice a generalized complaint about agency behavior. *See Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1010 (9th Cir. 2021). But Plaintiffs challenge a "circumscribed, discrete agency action[ ]" with an actual or immediately threatened effect, as described above. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004). Defendants' practice and policy is like other agency decisions that depart from the normal course and implicate the legal rights of agency employees, which courts have treated as reviewable agency action. *See, e.g.*, *AFGE v. OPM*, 777 F. Supp. 3d 253, 279–80 (S.D.N.Y. 2025) ("illegal, rushed, and dangerous" disclosure of employees' data); *cf. AFGE v. Trump*, 139 F.4th 1020, 1039 (9th Cir. 2025) (agency personnel decisions).

Moreover, the absence of a formal statement of policy in writing is of no moment. *See Her Majesty the Queen ex rel. Ont. v. EPA*, 912 F.2d 1525, 1531 (D.C. Cir. 1990). Courts may determine that an agency has changed its practices, as here, even where plaintiffs "failed to cite any statute, regulation, policy memoranda, or any other document memorializing the [change] they challenge." *R.I.L.–R v. Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015).

The Secretary's action is final. First, the Secretary's action marks the consummation of the agency's decision-making. It is not "merely tentative," *Bennett*, 520 U.S. at 178, or "advisory in

---

[44] Dietrich Decl. ¶ 6; MaGee Decl. ¶ 9; Miller Decl. ¶ 8; Poopatanapong Decl. ¶ 9; Roberts Decl. ¶ 10; Wolfe Decl. ¶ 9.

nature," *Hawkes*, 578 U.S. at 597 (quoting 33 C.F.R. § 331.2 (2000)). Defendants have decided to send proselytizing messages to the entire USDA workforce on and around major Christian and national holidays. And Secretary Rollins carries out that policy with official emails from the Office of the Secretary to all USDA employees. Defendants' action represents the consummation of whatever decision-making process Defendants undertook and results in the violation of Plaintiffs' rights without further action by the agency or any other actor.

Second, the Secretary's action determines legal rights or obligations and creates legal consequences. *See Bennett*, 520 U.S. at 178. At this step, "[t]he core question is . . . whether the result of [the agency's decision-making] process is one that will directly affect the parties." *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992). The policy has legal consequences for Plaintiffs because it violates their First Amendment rights. *See, e.g.*, *AFGE v. OPM*, 777 F. Supp. 3d at 280 (agency's improper disclosure of data had legal consequences because it violated federal law and was arbitrary and capricious); *M-J-M-A v. Hermosillo*, 822 F. Supp. 3d 1147, 1181 (D. Or. 2026) ("[I]ndividuals . . . have already experienced very real harm as a result of the violations of their individual rights," and thus finality requirement was satisfied.).

**B.  Defendants' policy is arbitrary and capricious.**

Defendants' policy should be set aside because it is arbitrary and capricious in violation of the APA, 5 U.S.C. § 706(2)(A). Under that standard, agency action must be both "reasonable and reasonably explained." *Biden v. Texas*, 597 U.S. 785, 806–07 (2022). The agency must "examine the relevant data" and provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation modified); *Ohio v. EPA*, 603 U.S. 279, 292 (2024).

Agency action is arbitrary and capricious if the agency has "entirely failed to consider an important aspect of the problem" or if the action "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," among other things. *State Farm*, 463 U.S. at 43. When an agency changes course, it must ordinarily "display awareness that it *is* changing position" and "show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). "[I]t must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (citation modified).

Defendants' policy is arbitrary and capricious for several independent reasons. First, it departs without any explanation whatsoever, much less a reasonable or satisfactory one, from the agency's previous policy under which USDA secretaries sent simple ecumenical greetings to federal employees. Second, it departs without explanation from USDA's own recent guidance regarding the expression of religious beliefs in the workplace.[45] USDA Secretary's Memorandum 1078-019, Guidance on Federally Protected Religious Expression and Accommodation Rights, provides that USDA officials "[c]annot use official authority to pressure subordinates" regarding their religious beliefs and that they "[m]ust stop if a colleague asks [them] to stop."[46] Yet that is exactly what the Secretary is doing. For example, when Plaintiff Dietrich requested to stop receiving the Secretary's religious messages, a USDA supervisor told her that was not an option.[47] Third, Defendants have failed to consider other legal requirements by which they must abide, including the Secretary's obligation not to violate the Establishment Clause rights of the USDA workforce. And finally, Defendants have failed to account for USDA employees' significant reliance interests on the former policy—namely, that employees who do not share the Secretary's religious views (and even those

---

[45] Daiute Decl., Ex. D.
[46] Daiute Decl., Ex. D, at 3.
[47] Dietrich Decl. ¶ 14.

who do) expect to be free from coercive religious proselytizing in the federal workforce. Indeed, as one of Plaintiff NFFE's members has explained, that expectation and the protections of the Establishment Clause are a reason that some choose employment with the federal government.[48]

### C.  Defendants' policy is contrary to constitutional right.

Agency action also violates the APA if it is "contrary to constitutional right," § 706(2)(B). Because, as described above, Plaintiffs are likely to show that Defendants' practice and policy of sending religious messages violates the Establishment Clause, Plaintiffs are likely to show that the policy is contrary to constitutional right and must be set aside under § 706(2)(B) as well.

### III.    The remaining preliminary injunction factors weigh heavily in Plaintiffs' favor.

Plaintiffs are highly likely to succeed on the merits of their First Amendment and APA claims for the reasons discussed above. As a general matter, "[i]f a plaintiff . . . shows he is likely to prevail on the merits" of a constitutional violation and injury, "that showing usually demonstrates he is suffering irreparable harm no matter how brief the violation," and it "tips the public interest sharply in his favor because it is always in the public interest to prevent the violation of a party's constitutional rights." *Baird*, 81 F.4th at 1040 (citation modified); *see also Fellowship of Christian Athletes*, 82 F.4th at 694–95 (where plaintiff raises serious First Amendment questions, generally the other preliminary injunction factors are met). This proves true here.

Plaintiffs are likely to suffer irreparable harm because "[i]t is axiomatic that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Fellowship of Christian Athletes*, 82 F.4th at 694 (second alteration in original) (quoting *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020)). As such, when a First Amendment right is implicated, "irreparable harm is relatively easy to establish . . . because the party seeking the injunction need only demonstrate the existence of a colorable First Amendment claim."

---

[48] NFFE Decl. ¶¶ 13–14.

*Id.* at 694–95 (citation modified). The Plaintiffs have more than satisfied that standard here.

Plaintiffs have been and, in the absence of preliminary relief, will continue to be subject to coercive and proselytizing messages from Secretary Rollins that display a clear preference for one religious viewpoint. The "serious harm" inflicted by such coercive and preferential government conduct, *see Cath. Charities*, 605 U.S. at 248, particularly when coming from an employer who wields direct power over the Plaintiffs' careers and livelihoods, cannot be remedied after litigation has run its course. Each proselytizing religious message from the Secretary places further pressure on the Plaintiffs to stifle their own beliefs and conform their behavior to the Secretary's preferred brand of Christianity or face the threat of professional repercussions, up to and including loss of their jobs. The balance of equities and public interest also weigh heavily in Plaintiffs' favor.[49] There will be no harm to the Defendants or to the public interest based upon a preliminary injunction that bars the Secretary from sending proselytizing messages to employees—conduct that is not relevant to fulfilling USDA's mission. Moreover, "the government 'cannot suffer harm from an injunction that merely ends an unlawful practice.'" *Thakur v. Trump*, 176 F.4th 1187, 1205 (9th Cir. 2026) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)). Instead, the public interest will be well-served by an injunction because "it is always in the public interest to prevent the violation of a party's constitutional rights." *Fellowship of Christian Athletes*, 82 F.4th at 695 (citation modified).

## CONCLUSION

For the foregoing reasons, this Court should issue a preliminary injunction and stay Defendants' policy under 5 U.S.C. § 705.

---

[49] As noted *supra* at 7*,* because the equities tip sharply in Plaintiffs' favor, Plaintiffs are required merely to raise "serious questions' as to the merits, and need not demonstrate likelihood of success. Under either standard, Plaintiffs win.

Dated: July 22, 2026

Respectfully submitted,

*/s/  Bryan Schwartz*

Bryan Schwartz (SBN 209903)
Sam Goity (SBN 359678)
BRYAN SCHWARTZ LAW, P.C.
180 Grand Avenue, Suite 1380
Oakland, CA 94612
Tel. (510) 444-9300
Fax (510) 444-9301
bryan@bryanschwartzlaw.com
sam@bryanschwartzlaw.com

Amy Tai*
Rebecca S. Markert*^
Jenny Samuels*
Elias Daiute*
AMERICANS UNITED FOR SEPARATION
OF CHURCH & STATE
1310 L Street NW, Suite 200
Washington, D.C. 20005
Tel. (202) 466-3234
tai@au.org
markert@au.org
samuels@au.org
daiute@au.org

Sarah Goetz*
Ayesha Khan*
Elena Goldstein*
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
Tel. (202) 448-9090
sgoetz@democracyforward.org
akhan@democracyforward.org
egoldstein@democracyforward.org

* Appearing *pro hac vice*.
^ Admitted to practice in Wisconsin; not a
member of the D.C. bar.

*Attorneys for Plaintiffs*