**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| NATIONAL FEDERATION OF FEDERAL EMPLOYEES, et al., | |
| Plaintiffs, | Case No. 3:26-cv-04406-LB |
| v. | **DECLARATION OF JOHN A. RAGOSTA, Ph.D AND EXPERT REPORT IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| UNITED STATES DEPARTMENT OF AGRICULTURE, and | |
| BROOKE L. ROLLINS, Secretary of Agriculture, in her official capacity, | |
| Defendants. | |

I, John A. Ragosta, pursuant to 28 U.S.C. § 1746, declare the following:

**I.    Qualifications of Expert**

1.      My name is John A. Ragosta. I am an independent historian with expertise in early American religious freedom, constitutional history, and the American Revolution and early republic. I received my PhD in early American history from the University of Virginia in 2008. I received my MA in legal and American history from George Washington University in 2004. A copy of my curriculum vitae ("CV") is attached as **Exhibit A.**

2.      I am the author of several peer-reviewed works concerning the history and development of religious freedom and the Establishment and Free Exercise Clauses of the First Amendment of the U.S. Constitution (together the "Religion Clauses"), including *Wellspring of Liberty: How Virginia's Religious Dissenters Helped Win the American Revolution & Secured Religious Liberty* (Oxford University Press, 2010); *Religious Freedom: Jefferson's Legacy, America's Creed* (University of Virginia Press, 2013); "The Virginia Statute for Establishing

Religious Freedom," in *A Companion to Thomas Jefferson*, ed. F.D. Cogliano (Wiley-Blackwell Publishing, 2011); "Fighting for Freedom: Virginia Dissenters' Struggle for Religious Liberty during the American Revolution," *Virginia Magazine of History and Biography,* 116:3 (Fall 2008); "A Religious Republican and a Republican Religion," in *Jeffersonians in Power: Ideas in Practice*, eds. J. Freeman & J. Neem (University of Virginia Press, 2019); "Jefferson, Madison, and Adams: Conversations on Religious Liberty," in *Rival Visions: How Jefferson and his Contemporaries Defined the Early American Republic*, eds. Dustin Gish & Andrew Bibby (University of Virginia Press, 2021), and "A Wall Between a Secular Government and a Religious People," *Roger Williams Law Review*, 26:2 (2021), 545-619. My most recent book, *For the People, For the Country: Patrick Henry's Final Political Battle* (University of Virginia, 2023), addresses, *inter alia*, constitutional federalism in the early republic.

3.      I have taught American history at Hamilton, Oberlin, and Randolph Colleges, including courses in religious history, religious freedom, and the formation of the Constitution; law and American history at the University of Virginia; and law at the George Washington University School of Law. From 2018 to 2024, I was a historian at Thomas Jefferson's Monticello, serving as the acting director of the International Center for Jefferson Studies for a period from 2022 to 2023. I interned with the First Federal Congress project at George Washington University in 2003 and have held fellowships from James Madison's Montpelier, the Jack Miller Center with Colonial Williamsburg, Virginia Humanities, and the International Center for Jefferson Studies.

4.      I have participated in or authored a number of talks, interviews, op-eds, and panels on historic topics, including the development of religious freedom in early America. These are summarized in my CV.

5.      Given my experience, I have extensive familiarity with the debates surrounding adoption of religious freedom in Virginia and the early republic, including adoption of the First Amendment. My familiarity includes religious petitions, correspondence of leading Founders, especially Thomas Jefferson and James Madison, early American newspapers and journal treatment of the issues, state constitutional developments, and the secondary literature.

6.      I have not previously testified as an expert at trial or by deposition.

## II.    <u>Assignment</u>

7.      At the request of Plaintiffs, I was asked to give my expert opinions on, and prepare a report on: (1) The original understanding and historical context of the Establishment Clause of the First Amendment, including as it relates to religious coercion, promotion of religion by government, and religious preferences by government; and (2) Historical practice with respect to religious statements by federal government officials, especially as to observing and acknowledging holidays.

8.      This expert report is based on my knowledge, research, and study in this area, spanning the past twenty years.

9.      I am receiving a total of $5,000 as compensation to be paid for this report and testimony in this case.

## III.    <u>Methodology</u>

10.     In preparing this report, I employed standard historical research methods. In particular, I identified and reviewed primary sources, including key documents that speak to Thomas Jefferson's and James Madison's commitment to religious freedom (e.g., the Virginia Statute for Establishing Religious Freedom, the "Memorial and Remonstrance Against Religious Assessments," the "Detached Memoranda," and the Dansbury Baptist letter), all presidential

3

proclamations through James Monroe's presidency, and other sources. I also considered the context in which these documents were drafted and propagated. I reviewed the secondary literature, especially focusing on the issue of coercion. I also reviewed my own publications that look extensively at the extent to which Jefferson, Madison, and other Founders were relied upon in early American debates over the meaning of religious freedom.

IV.    **Summary of Conclusions**

11.    In response to Plaintiffs' assignment, I reach the following four conclusions:

12.    ***Conclusion 1: The Founders intended the Religion Clauses of the First Amendment to serve four key purposes.*** Given their familiarity with a history of religious conflict; discrimination, persecution, civil incapacitation, and incarceration of religious dissenters; and the threat that religious conflict posed to the new nation, the Founders intended the Religion Clauses of the First Amendment to serve multiple, inter-related purposes, including: (1) avoiding religious conflict among a deeply heterogenous population; (2) protecting the equality of all citizens, especially minorities who, based on history and electoral logic, were prone to be discriminated against and disadvantaged in their civil rights; (3) discouraging government imposed restraints on belief that interfered with the independent thinking essential for effective citizenship; and (4) protecting the integrity of rights of conscience.

13.    ***Conclusion 2: Broad protections for religious freedom, including a strict separation of church and state, are incorporated in the First Amendment.*** Enlightenment statesmen joined by evangelical religionists insisted upon broad religious freedom, including a strict separation of church and state. During and after the Revolutionary War, these views were adopted in Virginia, the largest new state by population, land size, and economy. Based upon the

political reality of the times, proponents of religious freedom and separation of church and state were successful in having their views incorporated in the First Amendment.

14.     ***Conclusion 3: The Founders rejected both direct and indirect government religious coercion of religious belief or promoting a particular denomination or religion***. The Founders were well-aware of the problem and complexity of government coercion related to religion or a religious preference. They rejected direct religious coercion, either financial or physical penalties or benefits. They were also aware of indirect or psychological coercion, both historically and in their own time, and sought to prevent such government influence over religious beliefs as such government involvement would undermine each of the purposes of the Religion Clauses of the First Amendment. Jefferson, for example, was clear that even indirect or psychological government pressure on religion was unconstitutional. Madison believed the same.

15.     ***Conclusion 4: Jefferson and Madison were clear that government officials should not use their positions to advance their own religious (or political) views or seek to coerce religious support from citizens, as reflected in their view about early presidential prayer proclamations.*** All of the first five presidents either refused to issue any such proclamations or, when doing so, used generic, non-sectarian language and were clear that they were simply recommending a day of prayer. When presidents in the early republic issued prayer proclamations, government employees had no obligation to read those proclamations, and government officials' statements that concerned religion were generic (i.e. not expressly denominational or even Christian) and clear that any religious response was voluntary.

## V.   Original Understanding and Historic Context of the Establishment Clause

16.    The Religion Clauses of the First Amendment are intimately tied to the history of religious freedom and the Founders' experience with religious freedom and persecution before, during, and after the American Revolution

A.   History of American Religious Freedom before the American Revolution

17.    America's Founders were deeply conscious of the violent damage from "Old World" alliances between church and state, including the seventeenth century English Civil War and the Thirty Years War that devastated Britain and large parts of the continent because of religious disagreements fed by governments' use of religion to support political regimes. The Founding generation was also familiar with the serious persecution of French Huguenots by Catholic authorities that resulted in 160,000 people fleeing France in the late seventeenth century, many to America; some leading patriots were descendants of these Huguenot refugees.[1]

18.    Thomas Jefferson recalled that "oceans of human blood have been spilt, & whole regions of the earth have been desolated by wars & persecutions" in the name of religion. "Millions of innocent men, women, and children, since the introduction of Christianity, have been burnt, tortured, fined, imprisoned; yet we have not advanced one inch toward uniformity." James Madison explained that "[t]orrents of blood have been spilt in the old world" from laws intermeddling with religion. John Leland, a leading Baptist minister in Virginia at the Founding,

---

1. See, e.g., Paul E. McGreal, "Ten Commandments Cases: Learning from Reformation Coercion," *Michigan Law Review Online* 124 (2026): 74, 81-82 ("principled historical approach to the Establishment Clause must examine the European religious conflicts that the Founders' ancestors fled"). See also generally Erwin Chemerinsky, "No, It's Not a Christian Nation, and It Never Has Been and Should Not Be One," *Roger Williams University Law Review* 26, no. 2 (Spring 2021): 404-29.

expressed similar concerns about "the horrid evils that have been so pestiferous in Asia and Europe, faction, ambition, war, perfidy, fraud, and persecution for conscience sake."[2]

19.     But the dangers and the damage were not limited to Europe. Religious dominance, persecution, and violence, supported by government, had been too common in seventeenth century New England. In the eighteenth century, most of the colonies had established churches (including government tax support); all had at least some requirements making officials or voters or anyone testifying in court subject to religious tests.

20.     In Virginia, the most populous and largest British colony in North America (economically and geographically),[3] the Church of England was the established church, and, by law, Anglicans dominated not only religion but politics. The governor's council, the House of Burgesses, and the highest court were all controlled by Anglicans. Anglican vestries collected a church tax from all citizens (often the largest tax paid) and administered a host of civil laws, including poor relief, care of orphans, marriage, and laws requiring attendance at the Anglican church or a licensed meeting house (of which there were few)—violation of which was the most prosecuted crime in colonial Virginia. These laws were often enforced in a discriminatory manner against religious dissenters (primarily Presbyterians and Baptists). For example, William Fristoe, a Baptist minister, explained that "[l]ittle notice was taken of the omission [in church

---

2. Jefferson to James Fishback (Draft), 27 September 1809, https://founders.archives.gov/documents/Jefferson/03-01-02-0437-0002. Unless otherwise indicated, all letters are from the National Archives' *Founders Online* database. Thomas Jefferson, *Notes on the State of Virginia* (Boston: 1832), Query XVII, available at https://tile.loc.gov/storage-services/service/gdc/lhbcb/04902/04902.pdf. James Madison, "Memorial and Remonstrance Against Religious Assessments, [ca. 20 June] 1785," https://founders.archives.gov/documents/Madison/01-08-02-0163. John Leland, *Virginia Chronicle: With Judicious and Critical Remarks, Under XXIV Heads* (Fredericksburg, 1790), 47.

3. Virginia's population, including enslaved African Americans, was almost twice that of the next largest colonies (Massachusetts and Pennsylvania).

attendance], if members of the established church; but so soon as the new-lights [evangelical Baptists and Presbyterians] were absent they were presented by the grand jury, and fined according to law."[4] Similarly, if a Presbyterian's (or Baptist's or Lutheran's or Quaker's) children were orphaned, an Anglican vestry would often place the children in an Anglican home, infuriating dissenters. Marriages could only be performed by an Anglican priest or with his approval. Mandatory prayers were offered in church for the King and Queen.[5]

21.    As religious dissent grew rapidly after the First Great Awakening in the middle of the eighteenth century, Anglican leaders in Virginia turned from legal discrimination to active persecution. Starting in the 1760s, open-air meetings of religious dissenters were often interrupted by men on horseback whipping attendees (especially any African Americans in attendance) and dissenting ministers were often physically assaulted. In one case, attackers broke into a religious service and beat congregants so that the floor of the meeting house was sprinkled with blood (in spite of complaint, no legal recourse was provided). A hornets' nest was thrown into a dissenting prayer meeting, a snake into another. People who permitted dissenting ministers to preach on their land could be fined; those in attendance could as well if they failed to disperse when a magistrate declared a minister unlicensed and a meeting improper.

22.    Starting in 1768, dissenting ministers were often arrested for disturbing the peace or preaching without a license. By the time of the American Revolution in 1775, over half of the Baptist ministers in Virginia had suffered jail time on these trumped-up charges.[6] In the late

---

4. William Fristoe, *A Concise History of the Ketocton Baptist Association* (Staunton, 1808; repr., Sprinkle Publications, 2002)*, 64.

5. See generally Ragosta, *Wellspring of Liberty*, on religious persecution and the development of religious freedom in Virginia before, during, and after the Revolution.

6. Leland points out that dissenting laity were sometimes also imprisoned. Leland, *Virginia Chronicle*, 24.

colonial period, Virginia, the largest colony, was also the colony with the most serious religious discrimination and persecution.

23.     This pattern of discrimination, persecution, and incarceration was obviously of deep concern to religious dissenters, but it was also deeply disturbing to Enlightenment statesmen. In 1774, observing the persecution and incarceration of religious dissenters in Virginia, a young Madison wrote to one friend that the "diabolical Hell conceived principles of persecution rages among some and to their eternal Infamy the [Anglican] Clergy can furnish their Quota of Imps for such business. This vexes me the most of anything whatever." Jefferson and others similarly expressed great concern with attacks on dissenters and religious freedom.[7]

B.   Religious Freedom and the American Revolution

24.     When the Revolution began in 1775, however, Virginia's persecution of religious dissenters effectively stopped. By that time, religious dissenters accounted for from 1/5 to 1/3 or more of Virginia's population, and the political establishment—led by many of the same men who had incarcerated dissenters before the War, for example Edmund Pendleton (first speaker of Virginia's House of Delegates) and Archibald Cary (first speaker of Virginia's Senate)—realized quickly that they needed the assistance of religious dissenters if they were to be successful in a war against the dominant British empire. Significantly, there was a tendency of religious dissenters to be loyalists in other former colonies (e.g. in North Carolina, Maryland, South Carolina), and it was essential for Virginia to avoid that pattern.[8]

---

[7]. James Madison to William Bradford, 24 January 1774, https://founders.archives.gov/documents/Madison/01-01-02-0029. See "A Religious Freedom, 18 June 1779," https://founders.archives.gov/documents/Jefferson/01-02-02-0132-0004-0082.

[8]. Ragosta, *Religious Freedom*, 59.

25.    Leveraging the political establishment's need for their support, dissenters abandoned previous pleas for improved toleration and demanded religious freedom. Petitions sought to end the church tax, Anglican controls on marriage, poor relief, and orphans, and to allow dissenters equal privileges. What followed was an extended negotiation in which dissenters, supported by Enlightenment statesmen like Jefferson and Madison, demanded religious freedom in return for their support of the desperate war effort as the state incrementally liberalized the establishment.[9]

26.    By the end of the War in 1783, the church tax had been eliminated, but some restrictions on marriages performed by dissenting ministers and Anglican control of poor relief in most of the state were still in place, and the Anglican Church was still nominally the official state church.

C.  Virginia's Statute for Establishing Religious Freedom

27.    After the War, some Anglicans, noting that the support of dissenters for the war effort was no longer necessary, began to contemplate renewed or expanded restrictions and tax support of religion.[10] In 1784, representatives in the Virginia House of Delegates reintroduced a

---

9. See generally Ragosta, *Wellspring of Liberty,* 43-70. Returning to Virginia in late 1776 from the Continental Congress (after drafting the Declaration of Independence), Jefferson joined the new Virginia House of Delegates and helped to lead the battles to dismantle the establishment. This is where he first encountered and worked with James Madison. Late in life, he would refer to these legislative battles as the "severest contests in which I have ever been engaged," an extraordinary statement from someone with as full a history of political battles as Jefferson. Thomas Jefferson, "Notes on Early Career (the so-called 'Autobiography'), [6 January-29 July 1821]," https://founders.archives.gov/documents/Jefferson/03-17-02-0324-0002. Jefferson alluded to the negotiation of reforms during the war in *Notes on the State of Virginia*, Query XVII: "From the conclusion of this war we shall be going down hill. It will not then be necessary to resort every moment to the people for support."

10. For example, after the War, a leading Anglican minister, David Griffith, urged his colleagues to act to gain government support for religion, concluding that during the War it would have been unwise to "interrupt that union which was so necessary for our mutual security and preservation." David Griffith to John Buchanan, Fall 1783, in Bishop William Meade, *Old*

proposal to adopt a "General Assessment" to provide tax support to all Christian sects, a proposal that had been tabled by the Virginia legislature in 1779.[11]

28.      A flood of opposition from across the state doomed the effort. In 1785, Madison drafted his "Memorial and Remonstrance Against Religious Assessments," directly opposing the proposed assessment and providing a detailed rationale for a broad denunciation of government interference in matters of religion and a defense of separation of church and state in fifteen numbered paragraphs. The "Memorial" is often quoted by the Supreme Court and is worth quoting at length:

> 1 . . . . The Religion then of every man must be left to the conviction and conscience of every man; . . . We maintain therefore that in matters of Religion, no mans right is abridged by the institution of Civil Society and that Religion is wholly exempt from its cognizance . . . .
> 3 . . . . Who does not see that the same authority which can establish Christianity, in exclusion of all other Religions, may establish with the same ease any particular sect of Christians, in exclusion of all other Sects? . . .
> 5 . . . . the Bill implies either that the Civil Magistrate is a competent Judge of Religious Truth; or that he may employ Religion as an engine of Civil policy. The first is an arrogant pretension falsified by the contradictory opinions of Rulers in all ages, and throughout the world: the second an unhallowed perversion of the means of salvation . . . .
> 7. Because experience witnesseth that ecclesiastical establishments, instead of maintaining the purity and efficacy of Religion, have had a contrary operation . . . .
> 8 . . . . In some instances [ecclesiastical establishments] have been seen to erect a spiritual tyranny on the ruins of the Civil authority; in many instances they have

---

*Churches, Ministers and Families of Virginia* (Philadelphia, 1857; repr. Genealogical Publishing, 1978), 2:264-65.

11. It is often argued that George Washington supported the General Assessment. In fact, Washington expressed general support for the idea that those who choose to profess Christianity should pay to support the church, but he mistakenly thought the proposed bill would exclude any non-Christians. (In fact, it allowed people to specify that their tax go to a school rather than a church, but such private schools were also generally run by Christian ministers. See Ragosta, *Religious Freedom*, 93-95.) More to the point, Washington hoped that the proposal "could die an easy death" because it threatened to "rankle, & perhaps convulse the State" by encouraging religious conflict. George Washington to George Mason, 3 October 1785, https://founders.archives.gov/documents/Washington/04-03-02-0260.

been seen upholding the thrones of political tyranny . . . . Rulers who wished to subvert the public liberty, may have found an established Clergy convenient auxiliaries . . . .  A just Government . . . will be best supported by protecting every Citizen in the enjoyment of his Religion with the same equal hand which protects his person and his property; by neither invading the equal rights of any Sect, nor suffering any Sect to invade those of another.

9 . . . . It degrades from the equal rank of Citizens all those whose opinions in Religion do not bend to those of the Legislative authority. Distant as it may be in its present form from the Inquisition, it differs from it only in degree . . . .

11. Because it will destroy that moderation and harmony which the forbearance of our laws to intermeddle with Religion has produced among its several sects. Torrents of blood have been spilt in the old world, by vain attempts of the secular arm, to extinguish Religious discord, by proscribing all difference in Religious opinion . . . .

29.    Madison's "Memorial and Remonstrance" has for over two centuries been seen as a hearty and ground-breaking defense of religious freedom and separation of church and state. But at the same time, evangelical Presbyterian and Baptist petitions submitted in opposition to the General Assessment also demanded that government stay out of religion completely. Given evangelicals' personal experience with the mixing of church and state, they insisted upon a strict separation while warning that mixing the two corrupted both.

30.    Presbyterians explained that the proposed General Assessment was "a Departure from the proper line of Legislation." They emphasized "It unjustly subjects men who may be good Citizens, but who have not embraced our Common Faith, to the hardship of supporting a system, they have not, as yet, believed the Truth of; . . . It establishes a precedent for further Encroachment, by making the Legislature a judge of religious Truth."[12]

---

12. Petition, Ministers of Presbyterian Church in Convention (November 2, 1785). This and other cited petitions, unless a different citation is provided, are available from a collection maintained by the Library of Virginia. See Legislative Petitions Digital Collection, *Library of Va.*, http://www.virginiamemory.com/collections/petitions.

A November 1784 Presbyterian petition, drafted by a minister on behalf of the Hanover Presbytery, took a considerably narrower view, arguing primarily for equal treatment among the sects but accepting a government assessment to support religion, apparently seeing it as a *fait accompli*. Outraged, both Presbyterian clergy and laity demanded a more fulsome understanding

31.     Baptists, with the most numerous signatories on their petitions, were even more pointed: Borrowing language from Jefferson's proposed Statute for Establishing Religious Freedom, they declared the proposed assessment "sinful and tyrannical," explaining "[c]ompulsion in matters of Religion would be so far from engaging men to be what it proposes [i.e. supporting religion], that it would rather prejudice them against it." Chesterfield County dissenters were equally clear: "let Jews, Mehometans [sic], and Christians of every Denomination injoy [sic] religious liberty . . . religion is of god to man[,] the Civil law is of you to your people . . . . and let the Church of Christ and religion alone."[13]

32.     With the 1785 defeat of the General Assessment under the flood of public opinion, Madison reintroduced to the Virginia legislature the Statute for Establishing Religious Freedom initially drafted by Jefferson in 1777. Championed in the legislature by Madison (while Jefferson served as the U.S. minister to France), the Statute was adopted in January 1786. The Statute, adopted with overwhelming support and later incorporated in Virginia's constitution, provides for religious freedom and separation of church and state. It later became a foundation for the Religion Clauses of the First Amendment. It is worth quoting at length:

> [A]ll attempts to influence [the human mind] by temporal punishments, or burthens, or by civil incapacitations, tend only to beget habits of hypocrisy and meanness . . . ; the impious presumption of legislators and rulers, civil as well as ecclesiastical, who . . . have assumed dominion over the faith of others, setting up

of religious freedom, rejecting the earlier petition, and numerous Presbyterian congregations sent the quoted (Bethel) petition to Virginia's General Assembly. See Ragosta, *Religious Freedom*, 86-87. Michael McConnell and other commentators have relied upon the earlier petition to attempt to narrow understanding of religious freedom and forbidden establishments in the early republic and to justify government support of religion. See, e.g., Michael W. McConnell, "Establishment at the Founding," in *No Establishment of Religion*, eds. T. Jeremy Gunn & John Witte, Jr. (Oxford University Press, 2012), 59. But even the earlier petition was premised on the equal treatment of denominations, and that petition was heartily rejected by both Presbyterian clergy and laity.

13. Petition, Several Baptist Associations Assembled in Powhatan County (November 3, 1785). Petition, Chesterfield County (November 14, 1785).

their own opinions and modes of thinking as the only true and infallible, and as such endeavoring to impose them on others, hath established and maintained false religions over the greatest part of the world . . . ; our civil rights have no dependence on our religious opinions . . . ; proscribing any citizen as unworthy the public confidence by laying upon him an incapacity of being called to offices of trust and emolument, unless he profess or renounce this or that religious opinion, is depriving him injuriously of those privileges and advantages to which, in common with his fellow citizens, he has a natural right; that it tends only to corrupt the principles of that religion it is meant to encourage, by bribing, with a monopoly of worldly honours and emoluments, those who will externally profess and conform to it . . . ; that to suffer the civil magistrate to intrude his powers into the field of opinion and to restrain the profession or propagation of principles on supposition of their ill tendency is a dangerous fallacy, which at once destroys all religious liberty . . . ; finally, that truth is great and will prevail if left to herself . . . . Be it enacted by the General Assembly that no man shall be compelled to frequent or support any religious worship, place, or ministry whatsoever, nor shall be enforced, restrained, molested, or burthened in his body or goods, nor shall otherwise suffer, on account of his religious opinions or belief; but that all men shall be free to profess, and by argument to maintain, their opinions in matters of religion, and that the same shall in no wise diminish, enlarge, or affect their civil capacities.[14]

D.     First Amendment

33.     This history is critical to understanding adoption of the Religion Clauses of the First Amendment and their purposes. **Given this history, the Founders sought to address multiple concerns with the Religion Clauses, thereby providing broad protections for religious freedom, including a strict separation of church and state.**

34.     As a preliminary matter, given legislative realities, the Religion Clauses in the proposed Bill of Rights had to address serious, multiple, and overlapping concerns. Since adoption of the First Amendment required a two-thirds vote in Congress and adoption by three-quarters of the states, the Founders needed to appeal to a coalition of various interests. Thus, in addition to seeking to prevent religious conflict in the new nation, particularly by protecting the

---

14. This is the language of the Statute as adopted. Minor changes had been made to Jefferson's draft. See "Bill for Establishing Religious Freedom," https://founders.archives.gov/documents/Jefferson/01-02-02-0132-0004-0082.

equality of all citizens regardless of religion, they were equally committed to encouraging effective citizenship (preventing church-state alliances that undermined republican values) and ensuring the rights of conscience of all. Congress, under the guidance of Madison, reached a consensus across a wide coalition on a provision protecting broad religious freedom and a separation of church and state.[15]

36. This coalition included Enlightenment statesmen, religious dissenters (including, for example, evangelical Baptists and Presbyterians), Antifederalists who willingly joined to support an amendment that made clear that the federal government had no authority to engage the topic of religion (the "respecting" language understood to sweep very broadly), and states with expansive religious freedom that wanted strong substantive protections against federal government interference. Enlightenment and evangelical interests accepted nothing less than strict, substantive restrictions on federal engagement with religion. Others endorsed the result.[16]

36. Thus, the Establishment Clause imposed strict restrictions on areas under federal control, including territories, the District of Columbia, federal bureaucracy and the military, and other areas of federal power. This was intentional. Since these areas were not under state control, expansive protections against federal intermeddling with religion were needed and willingly accepted by all involved.[17] Responding to the argument that the unamended Constitution gave

---

15. See Ragosta, *Religious Freedom*, 101-31.

16. Ragosta, *Religious Freedom*, 111-12. Michael I. Meyerson, *Endowed by Our Creator: The Birth of Religious Freedom in America* (Yale University Press, 2012), 153-54, 173 (states with strong religious freedom protections led the call for a religious freedom provision).

Critically, Madison's election both to the Virginia ratification convention for the U.S. Constitution and to the first federal Congress depended upon support from evangelical Baptists demanding religious freedom and a separation of church and state and Madison's promise to protect the robust freedom they expected.

17. The Enlightenment statemen and religionists who supported the First Amendment's Religion Clauses understood them to protect a personal freedom from government encroachment in areas

15

federal officials no express authority over religion and therefore a substantive restriction was unneeded, Jefferson called on Madison to seek a Bill of Rights with a fulsome provision on religious freedom: "It should . . . guard us against [federal officials'] abuses of power within the field submitted to them." Similarly, Henry Marchant, a Rhode Island Federalist, defended the First Amendment against complaints that it did not interfere with state establishments by noting it was "enough for us to keep [religion] out of the General Government."[18]

37.  **As a result, the purposes of the First Amendment's Religion Clauses are four-fold:**

38.  **First purpose, discouraging religious conflict**. First, it was essential that the First Amendment discourage religious conflict among the heterogenous American people by keeping government neutral on all matters of religion.

39.  The Founders were deeply conscious of the fact that republics were fragile, and historically nations with much more homogenous ethnic, cultural, and religious communities had still been split apart, spilling "oceans of human blood," to use Jefferson's phrase, over religious conflicts encouraged by government interference in religion. In *Federalist* #19, for example, Madison and Alexander Hamilton recounted how "controversies on the subject of religion" in the

---

of federal authority; the Clauses were not purely jurisdictional. While the provisions of the Bill of Rights originally did not apply to the states, and many of its various requirements would likely not have been adopted at the time if they had been immediately applicable to the states, they became so after the Civil War amendments. See generally Ragosta, *Religious Freedom*, 172-75 (on incorporation); Meyerson, *Endowed*, 172-76.

18. Thomas Jefferson to James Madison, 15 March 1789, https://founders.archives.gov/documents/Madison/01-12-02-0015. "Convention Debates, 4 March 1790," in *Documentary History of the Ratification of the Constitution*, eds. John P. Kaminski, *et al.* (University of Virginia Press), XXVI Rhode Island 939.

Swiss confederacy "have kindled violent and bloody contests, [and] may be said, in fact, to have severed the [Swiss] league."[19]

40.    During the War, General Washington warned John Hancock against trying to regulate military chaplains (who were generally appointed by individual units) because it could "introduce religious disputes into the Army, which above all things should be avoided" to prevent "the smallest uneasiness & jealousy among the Troops." As the American expedition intended for the conquest of Canada prepared to depart, Washington instructed that care be taken not to insult the religion of the country, again seeking to avoid religious conflict. Shortly after the adoption of the First Amendment, Washington wrote to one correspondent, "[o]f all the animosities which have existed among mankind, those which are caused by difference of sentiments in religion appear to be the most inveterate and distressing, and ought most to be deprecated"; doing so was needed to protect the "peace of society."[20]

41.    Avoiding denominational preferences and the resulting sectarian conflict had been at the heart of the religious freedom battles in Virginia. Madison's "Memorial and Remonstrance," ¶ 11, for example, spoke of the "moderation and harmony which the forbearance of our laws to intermeddle with Religion has produced among its several sects." Dissenters'

---

19. James Madison & Alexander Hamilton, *Federalist #19*.

20. George Washington to John Hancock, 8 June 1777, https://founders.archives.gov/documents/Washington/03-09-02-0639. George Washington to Benedict Arnold, 14 September 1775, https://founders.archives.gov/documents/Washington/03-01-02-0355. George Washington to Edward Newenham, 20 October 1792, https://founders.archives.gov/documents/Washington/05-11-02-0132. (Compare Washington's concern that a general assessment would "rankle" the people, *supra* note 11.)

In debates over the Constitution's prohibition on test oaths, one South Carolina delegate bemoaned that any religious preference "naturally excites jealousies, envy and discontent among citizens, tending to distraction and public disturbances." "Convention Speech of Francis Cummins, 20 May 1788," in *Documentary History*, XXVII South Carolina 359.

petitions to the government hoped (and warned) that providing all people "equal liberty" in matters of religion, which meant government not taking sides in religious disputes, would avoid "plagues of jarring interests" that might undermine the war effort. In his Detached Memoranda, written later in life, Madison warned that one of the great dangers of mixing church and state is the risk of religion's "subserviency to political views; to the scandal of religion, as well as the increase of party animosities. Candid *or incautious* politicians will not *always* disown such views."[21]

42.     Given that religious conflict in Virginia, not to mention loyalism among religious dissenters in other colonies, had threatened the Revolution itself, the Religion Clauses were intended to avoid conflict among the American people who practiced a broad mix of religions. Given the experience of conflict before and during the Revolution, and how religious dissenters had to be promised religious freedom and full rights of political participation to garner their support for the Revolution, this was essential. (See, e.g., "Memorial and Remonstrance," ¶ 11: "Torrents of blood have been spilt in the old world, by vain attempts of the secular arm, to extinguish Religious discord, by proscribing all difference in Religious opinion," i.e., by government choosing and seeking to enforce one religious belief.).

43.     **Second purpose: protecting the rights of minorities**. Second, as a related matter, history demonstrated the particular necessity of protecting the rights of minorities who had faced discrimination, persecution, and disenfranchisement. Religions had to enjoy equality before government, and government had to abjure any religious preferences, indirect coercion being particularly effective and harmful vis-à-vis minorities. In Virginia, the minority demanded

---

21. Madison, "Memorial and Remonstrance" (emphasis added). Petition, Augusta County (October 18, 1776). James Madison, "Detached Memoranda, ca. 31 January 1820," https://founders.archives.gov/documents/Madison/04-01-02-0549 (emphasis in original).

this as their price for supporting the war effort. As Jefferson and the evangelicals had noted repeatedly, religious freedom had to apply equally to all Christian sects, non-Christians, and non-believers. (See, e.g., "Memorial and Remonstrance," ¶ 4: "the Bill violates that equality which ought to be the basis of every law . . . . Above all are [all men] to be considered as retaining an '*equal* title to the free exercise of Religion according to the dictates of Conscience.'").

44.     While equality applied to all, minorities were a particular concern as the majority controlled power in a democracy. As Madison explained, "the invasion of private rights is chiefly to be apprehended, not from acts of Government contrary to the sense of its constituents, but from acts in which the Government is the mere instrument of the major number of the constituents." In the "Memorial and Remonstrance," Madison explained that "the majority may trespass on the rights of the minority . . . . Whilst we assert for ourselves a freedom to embrace . . . the Religion which we believe to be of divine origin, we cannot deny an equal freedom to those whose minds have not yet yielded to the evidence that has convinced us."[22]

45.     This recognition of the need to protect minority interests, as well as the necessity of preventing religious conflict among a heterogenous population discussed above, was why Jefferson spoke of American religious freedom being for the "Jew and the Gentile, the Christian and the Mahometan, the Hindoo and the infidel of every denomination." This particular comment in Jefferson's "Autobiography" explained the significance of Virginia's decision to reject an amendment to his Statute for Establishing Religious Freedom that would have suggested a sectarian preference. After the General Assessment was defeated and Madison reintroduced Jefferson's Statute, there was a proposal to insert the phrase "Jesus Christ" into the Statute's

---

22. James Madison to Thomas Jefferson, 17 October 1788, https://founders.archives.gov/documents/Madison/01-11-02-0218. Madison, "Memorial and Remonstrance," ¶¶ 1, 4.

preamble. While some historians have dismissed the effort as insignificant since it was only the preamble that was to be amended, Jefferson and Madison understood that the proposed amendment would feed (and for some justify) the argument that America was purportedly a Christian nation and that only Christians should enjoy full religious freedom. Madison later wrote that "the object of which [the proposed amendment], would *was* [*sic*] have been, to imply a restriction of the liberty defined in the Bill, to those professing his religion *only*." This was an anathema to both Jefferson and Madison. Madison made the point generally in *Federalist* #51: "It is of great importance in a republic not only to guard the society against the oppression of its rulers, but to guard one part of the society against the injustice of the other part."[23]

46.      Dissenters agreed. John Leland, for example, warned that "the *many* generally oppress the *few*" and rejected the idea "that some have a pre-eminence above the rest to grant indulgence, whereas all should be equally free, Jews, Turks, Pagans and Christians." Government "rightly formed . . . embraces Pagans, Jews, Mahometans and Christians, within its fostering arms—prescribes no creed of faith for either of them—proscribes none of them for being heretics, promotes the man of talent and integrity, without inquiring after his religion—impartially protects all of them." As dissenters had argued in denouncing the proposed General Assessment, "let Jews, Mehometans [sic], and Christians of every Denomination injoy [sic] religious liberty."[24]

---

23. Jefferson, *Autobiography*. Madison, "Detached Memoranda." James Madison, *Federalist* #51.

24. Leland, *Virginia Chronicle*, 44, 40. John Leland, "The Government of Christ: A Christocracy," in L.F. Greene, ed., *Writings of the Late Elder John Leland* (New York, 1845), 476, quoted in Meyerson, *Endowed*, 155. Petition, Chesterfield County (November 14, 1785).

U.S. Constitution Article VI, prohibiting religious tests for office, had a similar purpose. Benjamin Rush, commenting on Article VI after a Jewish rabbi was included in the parade celebrating ratification of the Constitution: "There could not have been a more happy emblem contrived, of that section of the new constitution, which would open all its power and offices

47.      The Virginia Statute itself was crafted to protect this equal liberty—"all men shall be free to profess, and by argument to maintain, their opinion in matters of religion, and that the same shall in no wise diminish enlarge, or affect their civil capacities." Madison's "Memorial and Remonstrance" was to the same effect—"If 'all men are by nature equally free and independent,' all men are to be considered as entering into Society on equal conditions . . . . Above all are they to be considered as retaining an '*equal* title to the free exercise of Religion according to the dictates of Conscience.'" Madison understood such equal treatment to be an essential element of "A just Government" in a republic. "Such a Government will be best supported by protecting every Citizen in the enjoyment of his Religion with the same equal hand which protects his person and his property; by neither invading the equal rights of any Sect, nor suffering any Sect to invade those of another."[25]

48.      Famously, when President Washington was approached by the Jewish congregation of Newport Rhode Island explaining they had been

> [d]eprived . . . of the invaluable rights of free Citizens; we now (with a deep sense of gratitude to the Almighty disposer of all events) behold a Government, erected by the Majesty of the People—a Government, which to bigotry gives no sanction, to persecution no assistance—but generously affording *to All* liberty of conscience, and immunities of Citizenship; deeming every one, of whatever Nation, tongue, or language, *equal* parts of the great governmental Machine,

Washington responded in kind:

> *All possess alike* liberty of conscience and immunities of citizenship. It is now no more that toleration is spoken of, as if it was by the indulgence of one class of people, that another enjoyed the exercise of their inherent natural rights. For happily the Government of the United States, which gives to bigotry no sanction, to persecution no assistance

---

alike, not only to every sect of Christians, but to worthy men of every religion." Benjamin Rush, "Observations on the Fourth of July Procession in Philadelphia," *Pennsylvania Mercury*, July 15, 1788.

25. "Bill for Establishing Religious Freedom." Madison, "Memorial and Remonstrance," ¶ 4.

requires only that they who live under its protection should demean themselves as good citizens.[26]

49.    Early in Jefferson's presidency, the letters from and to the Danbury Baptists also demonstrated an understanding that application of the First Amendment would prohibit government action that embraced a denominational preference and discriminated against Baptists (a minority in Connecticut). Another Baptist petition from Connecticut in 1802 noted "all subordination of one religious sect to another, has a tendency to suppress the investigation of religious opinions and promote contention among the different denominations of Christians, thereby throwing an odium on Christianity itself, rendering the divinity of its precepts problematical, and the peace-making spirit of its doctrine suspicious."[27]

50.    **Third purpose: preserving the independent thinking essential for effective citizenship.** Third, religious freedom and separation of church and state were essential to prevent government, in cooperation with organized religion, from undermining or inappropriately influencing the independent thinking of citizens that was essential in a functioning republic. Thus, a functioning republic demanded separation of church and state. It was in this context, the danger of government involvement with religion, that Jefferson declared, "I have sworn upon the altar of god eternal hostility against every form of tyranny over the mind of man." Jefferson later wrote to his dear friend, John Adams, that the Virginia Statute "put down the *aristocracy* of the clergy, and restored to the citizen the freedom of the mind." Jefferson bemoaned the threat an alliance of "kings, nobles and priests" posed for the body politic. "[I]n every country and in every age, the priest has been hostile to liberty. [H]e is always in alliance with the Despot."

---

26. George Washington to the Hebrew Congregation in Newport, Rhode Island, 18 August 1790, https://founders.archives.gov/documents/Washington/05-06-02-0135 (emphasis added).

27. Petition, *Aurora* (June 16, 1802).

Governments in Europe, owing "their organistion [to] kings, hereditary nobles, and priests," worked to "constrain the brute force of the people" and "to lessen the dependance of the general functionaries on their constituents, to subject to them those of the states." Eliminating government control and influence on religion would prevent this danger. Free thought was essential to an enlightened republic, but one could not have the requisite freedom of the mind in the face of church and state entanglement.[28]

51.    Madison, too, warned that government use of religion had "been seen to erect a spiritual tyranny on the ruins of Civil authority; in many instances [religious establishments] have been seen upholding the thrones of political tyranny; in no instance have they been seen the guardians of the liberties of the people. Rulers who wished to subvert the public liberty, may have found an established Clergy convenient auxiliaries." Reflecting upon the persecution of religious dissenters, Madison had explained in 1774 that the "liberal catholic and equitable way of thinking as to the rights of Conscience . . . is one of the Characteristics of a free people."[29]

52.    Oliver Ellsworth, a member of the Philadelphia Constitutional Convention and of the first federal Congress, made the same general point about the relationship of religious

---

28. Thomas Jefferson to Benjamin Rush, 23 September 1800, https://founders.archives.gov/documents/Jefferson/01-32-02-0102. Thomas Jefferson to John Adams, 28 October 1813, https://founders.archives.gov/documents/Jefferson/03-06-02-0446. Thomas Jefferson to George Wythe, 13 August 1786, https://founders.archives.gov/documents/Jefferson/01-10-02-0162. Thomas Jefferson to Horatio G. Stafford, 17 March 1814, https://founders.archives.gov/documents/Jefferson/03-07-02-0167. Thomas Jefferson to William Johnson, 12 June 1823, https://founders.archives.gov/documents/Jefferson/03-19-02-0518. See generally Ragosta, *Wellspring of Liberty*. See also Thomas E. Buckley, *Church and State in Revolutionary Virginia: 1776 to 1787* (University of Virginia Press, 1977). For a fuller discussion of the political, philosophical, and theological motivations for religious freedom and separation of church and state, see Ragosta, "Wall Between."

29. Madison, "Memorial and Remonstrance," ¶ 8. James Madison to William Bradford, 1 April 1774, https://founders.archives.gov/documents/Madison/01-01-02-0031.

23

freedom and the civil polity in his "Landowner" essays supporting ratification: when religious tests for office excluded some American citizens from eligibility, they "degrade them from the rank of freemen." Government authority dictating what leaders thought were religious truths served only "[t]o make one half the world fools, and the other half hypocrites," Jefferson concluded. (See also John Leland: "The very tendency of religious establishments by human law, is to make some hypocrites, and the rest fools.")[30]

53.      **Fourth purpose: protecting rights of conscience**. Fourth, the Religion Clauses were understood to protect religion and the rights of conscience of citizens, especially minorities who might otherwise face majority-imposed restrictions; the Clauses allowed them to practice their religion without government interference, even government encouragement. Jefferson's Statute explains that government support of religion "tends also to corrupt the principles of that very religion it is meant to encourage, by bribing, with a monopoly of worldly honours and emoluments, those who will externally profess and conform to it." As Madison explained the point, "[t]he Religion then of every man must be left to the conviction and conscience of every man; and it is the right of every man to exercise it as these may dictate . . . [one] cannot follow the dictates of other men." He went on to cite history for evidence of the necessity of separating church and state: "ecclesiastical establishments, instead of maintaining the purity and efficacy of Religion, have had a contrary operation. During almost fifteen centuries has the legal establishment of Christianity been on trial. What have been its fruits? More or less in all places, pride and indolence in the Clergy, ignorance and servility in the laity, in both, superstition,

---

30. Ellsworth quoted in Meyerson, *Endowed*, 147. Jefferson, *Notes on the State of Virginia*, Query XVII. Leland, *Virginia Chronicle*, 39.

bigotry and persecution."[31] The Founders and eighteenth-century evangelicals understood that the right to believe (also protected by the Free Exercise Clause) was meaningless without an equal right not to believe. Thus, for the Founders, the prohibition on Establishment and a strict separation of church and state were not inconsistent with free exercise; they were essential to it. (See, e.g., "Memorial and Remonstrance," ¶ 5: political use of religion is an "unhallowed perversion of the means of salvation.")

54.    This was theologically very important to eighteenth-century evangelicals who saw the religious necessity of a personal relationship with God, a free will offering, one not mediated by popes, bishops, or governments. John Leland understood the problem thus: "The fondness of magistrates to foster Christianity, has done it more harm than all the persecutions ever did…. state establishment of religion, like a bear, hugs the saints, but corrupts Christianity, and reduces it to a level with state policy." "Every man must give an account of himself to God, and therefore every man ought to be at liberty to serve God in a way that he can best reconcile to his conscience. If government can answer for individuals at the day of judgment, let men be controlled by it in religious matters; otherwise, let men be free." Baptists from Buckingham County Virginia opposed even legislative incorporation of churches, insisting that government needed simply to leave religion alone as "the only way to convince the gazing world, that Disciples do not follow Christ for Loaves, and that Preachers do not preach for Benefices."[32]

---

31. "Bill for Establishing Religious Freedom." Madison, "Memorial and Remonstrance," ¶¶ 1, 7. See also Madison Proclamation: "If the public homage of a people can ever be worthy the favorable regard of the Holy and Omniscient Being to whom it is addressed, it must be that, in which those who join in it are guided only by their free choice, by the impulse of their hearts and the dictates of their consciences." James Madison, "Presidential Proclamation, [23 July] 1813," https://founders.archives.gov/documents/Madison/03-06-02-0434.

32. Leland, "Government of Christ,", 297, quoted in Meyerson, *Endowed*, 157. Greene, *Late Elder John Leland*, 181. H.J. Eckenrode, *Separation of Church and State in Virginia* (Richmond, 1910), 119, quoting Petition from Inhabitants of Buckingham County (November 1, 1786).

55.    Evangelicals reasoned that since all that God wanted from humans was a personal commitment, that commitment had to be entirely voluntary; a commitment resulting from government intervention was of no interest or value to God. Presbyterian clergy in Virginia explained that "[r]eligion is altogether personal . . . . [I]t is not, cannot, and ought not to be, resigned to the will of the society at large; & much less to the Legislature." These Presbyterians added that religion and morality "can be promoted only by the internal Conviction of the Mind, & its voluntary choice which such Establishments cannot affect." "For the discharge of the duties of Religion every man is to account for himself as an individual in a future state . . . not to be under the direction or *Influence* of any Human being." "It is the duty of every man for himself to take care of his immortal interests in a future state, where we are to account for our conduct as individuals; and it is by no means the business of a Legislature to attend to this."[33]

56.    Baptists fighting the proposed general assessment insisted that the legislature "leave them entirely free in matters of [r]eligion." During the hotly-contested election of 1800, one minister, Stanley Griswold, wrote that "Religion is a concern between the soul of a man and his maker;" as such, Griswold explained, "[w]herever religion has been leagued with temporal policy, there it has uniformly been corrupted." He went on to write, "[c]ompulsion in matters of Religion would be so far from engaging men to be what it proposes, that it would rather prejudice them against it." The point was also made by Isaac Backus, a Massachusetts Baptist minister and later delegate to Massachusetts' convention to ratify the U.S. Constitution, in

---

33. Petition, Ministers of the Presbyterian Church (November 2, 1785). Petition, Rockbridge County (November 2, 1785) (emphasis added). Petition, Presbyterian Clergy (November 12, 1784). See also Petition, Hanover Presbytery (October 24, 1776).

See also Reverend William Tennent, SC: "All religious establishments are an infringement of religious liberty" because they "interfere with the rights of private judgment and conscience." Quoted in Meyerson, *Endowed*, 178 (ftnt. omitted).

26

discussing a draft bill of rights for Massachusetts in 1779: "As . . . nothing can be true religion but a voluntary obedience unto his [God's] revealed will . . . , every person has an unalienable right to act in religious affairs according to the full persuasion of his own mind, where others are not injured thereby."[34]

57.    Jefferson made important statements concerning religion that echo these theological concerns. Jefferson often would respond to inquiries concerning his own religion that "religion is a matter which lies solely between Man & his God;" religion is "a matter between every man and his maker, in which no other, & far less the public, had a right to intermeddle." This was not a mere matter of convenience or political expediency, but a matter of theological principle. With respect to religion, Jefferson wrote, "I cannot give up my guidance to the magistrate; because he knows no more of the way to heaven than I do & is less concerned to direct me right than I am to go right . . . . [co]mpulsion in religion is distinguished peculiarly from compulsion in every other thing. I may grow rich by art I am compelled to follow, I may recover health by medicines I am compelled to take ag[ains]t. my own judgm[en]t., but I cannot be saved by a *worship* I disbelieve & abhor."[35] Madison made a similar profession in his "Memorial and Remonstrance": "It is the duty of every man to render to the Creator such

34. Petition, Amelia County (November 18, 1785) ("leave them") (a version of the "Spirit of the Gospel" petition copied by numerous Baptist congregations). Stanley Griswold, *Truth Its Own Test and God Its Only Judge* (Bridgeport, 1800), 5, 17-18. Petition, Powhatan County (November 3, 1785) ("Compulsion"). Backus quoted in Marci A. Hamilton & Rachel Steamer, "Religious Origins of Disestablishment Principles," *Notre Dame Law Review* 81, no. 5 (2006): 1775. See also Reverend Backus: "religion is ever a matter between God and individuals." "Convention Debates, 4 February," in *Documentary History*, VI Massachusetts 1421.

35. Thomas Jefferson to the Danbury Baptist Association, 1 January 1802, https://founders.archives.gov/documents/Jefferson/01-36-02-0152-0006. Thomas Jefferson to Richard Rush, 31 May1813, https://founders.archives.gov/documents/Jefferson/03-06-02-0155. Thomas Jefferson, "Notes on Locke and Shaftesbury, 11 October-9 December, 1776," https://founders.archives.gov/documents/Jefferson/01-01-02-0222-0007.

27

homage and *such only* as he believes to be acceptable to him."[36] For Jefferson and Madison, historian Jack Rakove explains, "[t]he attack on establishment flowed logically, perhaps even necessarily, from the commitment to freedom of conscience."[37]

E.  Jefferson and Madison are Central to the Understanding of the First Amendment

58.    At the time of its adoption, Virginia's Statute for Establishing Religious Freedom—drafted by Jefferson and championed by Madison, see supra section V.C.—provided the broadest protection of religious freedom, and Madison played a central role in the crafting and adoption of the First Amendment. Of course, there were many Founders, and they had a host of different perspectives on religion and religious freedom, albeit with a broad consensus to strengthen religious freedom after the Revolution and limit government involvement. But there are compelling reasons for giving Jefferson, Madison, the Virginia experience, and a robust Jeffersonian conception of separation of church and state precedence in trying to understand what was intended by the First Amendment.

59.    In 1879, the Supreme Court first addressed the Religion Clauses of the First Amendment in *Reynolds v. United States* and unanimously declared that Jefferson's Statute for Establishing Religious Freedom "defined" the religious freedom protected by the First Amendment.[38] But even before that decision, there were compelling reasons to see Jefferson's and Madison's views as seminal.

---

36. Madison, "Memorial and Remonstrance" (emphasis added).

37. Jack Rakove, "Beyond Locke, Beyond Belief: The Nexus of Free Exercise and Separation of Church and State," in *Religion, State, and Society: Jefferson's Wall of Separation in Comparative Perspective*, eds. Robert Fatton, Jr. & R.K. Ramazani (Palgrave Macmillan, 2009), 47.

38. *Reynolds v. United States*, 98 U.S. 145, 163 (1879). In reaching its conclusion, the Court relied upon, *inter alia*, the Virginia Statute, Madison's "Memorial and Remonstrance," and Jefferson's letter to the Danbury Baptists. *Ibid.*

60.     First, while twelve of the thirteen states provided less protection for religious freedom than the Virginia Statute at the time the First Amendment was adopted, the Statute became emblematic, a model and a principle for others to adopt. In his Detached Memoranda, for example, Madison again embraced the Virginia Statute and called on states that had not fully eliminated government interference with religion and implemented a complete separation of church and state to do so. By the time of the Supreme Court's unanimous *Reynolds* decision in 1879, each of these states had modified their constitutional provisions to move in a distinctly Jeffersonian/Madisonian direction—removing denominational preferences, increasing separation of church and state—and often relying expressly on Jefferson and Madison and/or using the language from the Virginia Statute.[39]

61.     Second, across the country and throughout the period from 1789 to 1879 (when *Reynolds* was decided), as Americans discussed religious freedom and debated what religious freedom entailed, what was appropriate or inappropriate government action, how to resolve conflicts, and how to adjust laws and state constitutions on religious freedom, they returned over

---

Madison similarly explained that the Virginia Statute for Establishing Religious Freedom "unfolded and defined" religious freedom, and that "As long as it is respected *& no longer*, these [religious liberty and rights of conscience] will be safe. Every provision for them—short of this principle, will be found to leave crevices at least, thro' which bigotry may introduce persecution; a monster, that feeding & thriving on its own venom, gradually swells to a size & strength overwhelming all laws divine & human." Madison, "Detached Memoranda" (ftnt. omitted).

See also *Board of Education of the City of Cincinnati v. Minor* (Cincinnati Bible Case), 23 Ohio St. 211, 253 (1872) (relying on Madison to conclude "Religion is not within the purview of human government" and a "connection between them is injurious to both."); *Perry v. Commonwealth*, 44 Va. 632, 642 (1846) (citing the Virginia Statute in concluding "the Christian and Mahometan, the Jew and the Gentile, the Epicurean and Platonists, (if any such there be amongst us,) … so long as they keep within its [the law's] pale, all are equally objects of its protection").

39. Madison, "Detached Memoranda." Ragosta, *Religious Freedom*, 132-68. See also Meyerson, *Endowed*, 244 *et seq.*

29

and over again to Jefferson and Madison and the Virginia Statute, the "Memorial and Remonstrance," and the Danbury Baptist letter. Scores of examples are available. Appendix. At mid-century, the *Southern Literary Messenger* saw Jefferson's Statute as "embodying principles which lie at the very foundation of our dearest rights and which are essential to the true prosperity both of Church and State." In 1835, a letter from a Virginian was reprinted broadly declaring "Who but *Jefferson* could have so clearly defined the inalienable rights of man; and the legitimate objects of Government . . . ? What other statesman could have broken down, at once, the connexion between Church and State, and all the barricades of nobility?" As one mid-century religious author explained, "it is thought by some that what this skeptic [Jefferson] meant [by religious freedom] was not intended by the Christian men who cooperated with him. The history tells another story." No other source, no other Founder, and no other principle, comes even close to being quoted, embraced, and relied upon across the nation and across the period.[40]

62.     The Danbury Baptist letter explaining that the First Amendment created a "wall of separation between Church & State" is sometimes referred to by opponents of separation as an insignificant private letter, but Jefferson, as he explained expressly to his attorney general, saw it as an "occasion . . . of sowing useful truths & principles among the people, which might germinate and become rooted among their political tenets." Significantly, and contra the critics, within months the letter was published in dozens of newspapers across the country, beginning on

---

40. *Southern Literary Messenger* 14, no. 6 (June 1848); *Washington Globe* (May 16, 1835); *Vermont Patriot & State Gazette* (June 22, 1835) (reprinted from *Hartford Patriot* and *Baltimore Republican*). Reverend John W. Kramer, "The Free Church in the Free American State: Part II," *American Church Review* 29 (July 1877): 321.

January 18, 1802, in New York (and again in the years before the *Reynolds* decision).[41] See Appendix.

63.     Even many of those who initially rejected and fought the Jeffersonian/Madisonian understanding of religious freedom came to accept its centrality and embrace the result of separation. The resulting free market of religion, separated from government influence, dramatically expanded American religiosity. Lyman Beecher, a leading evangelical in the first half of the nineteenth century, was initially a determined opponent of Jefferson's disestablishment of religion and separation of church and state, but Beecher eventually admitted that forcing Congregational clergy to rely on the voluntary commitment of their congregants, rather than government coerced support, was "the best thing that ever happened to the State of Connecticut. It cut the churches loose from dependence on state support. It threw them wholly on their own resources and on God." In a Jeffersonian voice, Beecher conceded the danger that a church-state alliance posed to Christianity, noting that with the explosion of religion under the voluntary principle, Christianity "has survived the deadly embrace of establishments nominally Christian." Alexis de Tocqueville saw the broad influence of religion in America as the direct result of church-state separation, what he referred to as the mixing of "the spirit of religion and the spirit of liberty" as he condemned the "intimate union of politics and religion" in Europe. As one devout republican newspaper editor explained the Jeffersonian "voluntary principle," "God is taking care of his own cause, for never since the settlement of this country has there been such glorious revivals of religion as since President Jefferson presided."[42]

---

41. Jefferson to Danbury Baptists. Thomas Jefferson to Levi Lincoln, 1 January 1802, https://founders.archives.gov/documents/Jefferson/01-36-02-0152-0004.

42. Edwin S. Gaustad, *Faith of the Founders: Religion and the New Nation: 1776-1826* (Baylor University Press, 2004), 120, quoting Barbara M. Cross, ed., *The Autobiography of Lyman Beecher* (Cambridge, 1961), 1:251-53. Lyman Beecher, *The Memory of Our Fathers: A Sermon*

64.     On occasion, Justice Joseph Story is cited as an example of a narrower view of religious freedom and separation, but he was not a Founder (being nine years old when the Constitution was ratified). Moreover, his view that the Massachusetts church establishment—allowing each community democratically to choose one sect/minister to receive government support—was the appropriate standard for church-state relations was emphatically rejected by the people of Massachusetts (almost 10-1) shortly after he published his argument. His narrow view (which would have also restricted aid to Christian ministers) was also rejected elsewhere. Even before the decision in *Reynolds*, the Reverend John Kramer observed that "the learned Justice [Story] here was in opposition to the men who controlled formation of the Union and the changes of State Constitutions . . . . The statesmen whom Jefferson represented were directly at variance with the ideas of Justice Story, as was also that party of the Church which favored separation."[43]

65.     Third, nineteenth century historians made clear that Jefferson and Madison were the authors of American religious freedom. The leading history of the period, George Bancroft's *History of the United States of America*, explains that Jefferson's Statute "expressed the ideas of America," "the forming convictions of the people of the United States." It is significant that Bancroft spoke of the "forming convictions," recognizing that the principles of Jefferson reflected in the Virginia Statute and the U.S. Constitution's First Amendment were being adopted around the country as the century proceeded. Richard Hildreth's *History of the United States of America*, noting the critical role of religious dissenters in support of a separation of church and

---

*Delivered at Plymouth* (Boston, 1828), 11. Tocqueville quoted first in James T. Schleifer, "Tocqueville, Religion, and *Democracy in America*: Some Essential Questions," *Am. Pol. Thought* 3, no. 2 (Fall 2014): 254, 257, 259, and then in Forrest Church, *So Help Me God: The Founding Fathers and the First Great Battle over Church and State* (Harcourt, 2007), 272.

43. Ragosta, *Religious Freedom*, 151-53. Kramer, "The Free Church," 321.

state, refers to the Virginia Statute and Madison's essential role in its adoption. Robert Howison's *History of Virginia* cites the Statute and Madison's "Memorial and Remonstrance" for the meaning of religious freedom. Burk, Jones, and Girardin's *History of Virginia* concludes that the Statute was part of the plan to "crush forever the eternal antagonism of artificial aristocracy against the rights and happiness of the people."[44]

66.     In the early republic, Jefferson and Madison were broadly relied upon to explain American religious freedom and the First Amendment. Again, there is no one else comparable.

## VI.    Historical Practice with respect to Religious Statements by Government Officials

67.     The Founders envisioned the Establishment Clause as forbidding government funding of a particular religion or denomination or imposing financial or physical punishments for failing to support a particular religion or sect, or any religion. But they understood a prohibited establishment to go well beyond those instances. **For the Founders, the Establishment Clause also forbade government directly or indirectly coercing religious belief or promoting a particular denomination or religion.** Such actions threatened each of the four purposes of the First Amendment Religion Clauses discussed above.[45]

---

44. George Bancroft, *History of the United States of America from the Discovery of the Continent* (Boston, 1875), 10:224-25. Richard Hildreth, *History of the United States of America* (New York, 1856), 3:384. Robert R. Howison, *History of Virginia from Its Discovery and Settlement by Europeans to Present Times* (Richmond, 1848), 2:298-302, 333, 297. John Burk, Skelton Jones, and Louis Hue Girardin*, The History of Virginia* (Petersburg, 1816), 348. See Ragosta, *Religious Freedom*, 147, 152.

45. While the proposed General Assessment in Virginia was to benefit Christian sects, and there was some objection at its exclusion of non-Christians, most of the protests treated it effectively as an aid for all religion (which, as a practical matter in 1784 Virginia, it was). Most of the objections to its adoption, including most of the fifteen reasons for rejecting the General Assessment in Madison's "Memorial and Remonstrance," apply to a government aid to all religion. Ragosta, *Religious Freedom*, 93-95.

68.    The Founders and the early Republic obviously did not have email or broadcast media. At the same time, the federal government was a fraction of its current size, and even cabinet heads had relatively few employees. Thus, there was nothing directly equivalent to an email blast from a government employer, much less one sent by a cabinet secretary to over 100,000 employees who were required to read it. While politicians in the early republic could seek to have their religious views reported in newspapers, those were not official government publications and government employees were not required to read them; rarely were such views expressed in an official's governmental capacity.[46] The closest analogy touching upon religious preferences would seem to be presidential prayer proclamations. This is, though, an imperfect analogy as proclamations were issued to the general public, and there is no evidence that government employees were required to read or listen to such proclamations.

69.    While each of our earliest presidents took a slightly different approach, early presidential proclamations reflect the Founders' view that government should not express support for particular religions or coerce such support from the citizenry.

70.    Jefferson rejected all such prayer proclamations or express government engagement of religion as violations of the First Amendment. For example, in 1808, in a period of national difficulty (that would lead to the War of 1812), Jefferson was asked to issue an official proclamation calling upon citizens to pray for the welfare of the nation. His response is worth quoting at length:

---

46. During ratification debates, a Pennsylvania petition demanding a religious freedom amendment to the Constitution described the "rights of conscience" to include "no man should be molested for his religion, and … none should be compelled contrary to their principles and inclination *to hear* or support the clergy of any one religion." "Petition Against Confirmation of the Ratification of the Constitution, January 1788," in *Documentary History*, II Pennsylvania 711 (emphasis added).

I consider the government of the US. as interdicted by the constitution from intermedling with religious institutions, their doctrines, discipline, or exercises. this results not only from the provision that no law shall be made respecting the establishment, or free exercise, of religion, but from that also which reserves to the states the powers not delegated to the US . . . . but it is only proposed that I should *recommend*, not prescribe a day of fasting & prayer. that is that I should *indirectly* assume to the US. an authority over religious exercises which the constitution has directly precluded them from. it must be meant too that this recommendation is to carry some authority, and to be sanctioned by some penalty on those who disregard it: not indeed of fine & imprisonment but of some degree of proscription perhaps in public opinion. and does the change in the nature of the penalty make the recommendation the less a *law* of conduct for those to whom it is directed? I do not believe it is for the interest of religion to invite the civil magistrate to direct it's exercises, its discipline or its doctrines . . . . every religious society has a right to determine for itself the times for these exercises & the objects proper for them according to their own particular tenets. and this right can never be safer than in their own hands, where the constitution has deposited it.[47]

71.    Indirect coercion from government embracing a religion constituted a forbidden establishment by creating a psychological burden on those who did not join in the preferred belief. "Patriotic" Americans would be identified as those that joined in the government-endorsed religious practice. The pressure to conform triggered by that government action, what Jefferson termed "some degree of proscription perhaps in public opinion," was enough to require prohibition of the practice.[48]

---

47. Thomas Jefferson to Samuel Miller, 23 January 1808, https://founders.archives.gov/documents/Jefferson/99-01-02-7257.

48. Founders were also familiar with the history of psychological coercion on Protestant dissenters in Catholic countries when officials publicly embraced Catholicism, e.g. through public processionals where believers were expected to show respect to the Catholic Eucharist. See McGreal, "Ten Commandments," 77 ("Public religious displays inherently coerce when imposed on captive audiences of different faiths."). See also "Truth," *Massachusetts Centinel* (November 24, 1787) ("hamperings of the conscience"). See, e.g., Chemerinsky, "No, It's Not a Christian Nation," 414: "World history, to say nothing of the history of this country, shows us that inherently, when the government becomes aligned with religion, people feel coerced to participate."

72.     The letter from the Danbury Baptists to Jefferson adopted a similar fulsome understanding of how government could interfere with religious freedom, explaining that "[r]eligion is at all times and places a matter between God and individuals—That no man ought to suffer in *name*, person, or effects on account of his religious opinions." Of course, psychological or indirect coercion might often include the fear of future direct coercion (through loss of employment, financial or physical burdens) or the threat of social ostracism.[49]

73.     **Given this threat of indirect coercion, Jefferson and Madison agreed that government officials should not use their position to advance their religious views.**

74.     Jefferson's Statute expressed the point broadly: "to suffer the civil magistrate to intrude his powers into the field of opinion, and to restrain the profession or propagation of principles on supposition of their ill tendency will make his opinions the rule of judgment, and approve or condemn the sentiments of others only as they shall square with or differ from his own…" No person should "be enforced, restrained, or burthened in his body or goods, *nor shall otherwise suffer* on account of his religious opinions or belief" by government actions, "but that all men shall be free to profess, and by argument to maintain, their opinion in matters of religion, and that the same shall in no wise diminish enlarge, or affect their civil capacities." (Emphasis added).

75.     Madison made a similar point about religious statements emanating from government officials: "The members of a Govt. as such can in no sense, be regarded as possessing an advisory trust from their Constituents in their religious capacities. They can not

---

49. Danbury Baptist Association to Thomas Jefferson, [After 7 October 1801], https://founders.archives.gov/documents/Jefferson/01-35-02-0331, (emphasis added). Such identification and ostracism of dissenters had also been common in the treatment of French Huguenots. See, e.g., McGreal, "Ten Commandments."

form an Convocation, Council or Synod, and *as such* issue *decrees or injunctions addressed to the faith or the Consciences of the people*." Madison was making the point that officials could not, as officials ("as such"), make any religious decree. He understood that officials would likely be personally religious. "In their individual capacities, as distinct from their official station, they might unite in recommendations of any sort whatever; in the same manner as any other individuals might do." Still, it was critical that they not use their government position or government resources to promote those personal views. "But then their recommendations ought to express the true character from which they emanate."[50] In other words, Madison explained that while nothing prevents officials from privately practicing their religion, even in public, they cannot seek to advance a religious position using their official positions. Use of a mandatory means of communication to proselytize would have been an anathema to Madison.

76.     Others in the period recognized the limitations on appropriate governmental decrees in this regard. Willing to accept a mere generic government declaration, what Madison referred to as a voluntary "designation," Thomas Cooley, a noted constitutional scholar of the early nineteenth century, expressed concern that even proclamations without material penalties could evidence an unacceptable government "preference" for religion. "Cooley … stated that this understanding of disestablishment did not prohibit the government from engaging in the 'solemn recognition of a superintending Providence in public transactions,' such as days of thanksgiving [today ceremonial deism], but he cautioned that public affirmations were susceptible to devolve into expressions of religious preference, which was prohibited."[51]

---

50. Madison, "Detached Memoranda" (second emphasis added).

51. Steven K. Green, "The 'Second Disestablishment': The Evolution of Nineteenth-Century Understandings of Separation of Church and State," in Gunn & Witte, *No Establishment*, 292.

37

77.    Madison as president did issue several proclamations of prayer and thanksgiving during the War of 1812 at Congress' behest. But later in life, removed from congressional political pressure, he concluded that all such proclamations violated the Establishment Clause by creating implicit coercion of religious beliefs. Even when recommendations only, proclamations "naturally terminate[] in conformity to the creed of the majority and to a single sect, if amounting to a majority," he concluded. The "Father of the Constitution" explained the issue thus:

> Altho[ugh] recommendations only, they imply a religious agency, making no part of the trust delegated to political rulers. The objections to them are . . . . that Gov[ernmen]ts ought not to interpose in relation to those subject to their authority but in cases where they can do it with effect. An **advisory** Gov[ernmen]t is a contradiction in terms  . . . . The members of a Gov[ernmen]t as such can in no sense, be regarded as possessing an advisory trust from their Constituents in their religious capacities . . . . They see[m] [to] imply and certainly nourish the erronious idea of a **national** religion.[52]

78.    Madison understood that use of religious proclamations by government always had underlying political purposes, a "Scandal of religion, as well as the increase of party animosities" (i.e. encouraging conflict and impairing religion, both impinging on the purposes of the First Amendment).[53]

79.    Madison was also quick to point out that even when he issued proclamations, he was careful not to promote specifically a particular religion or actively to encourage participation, telling one correspondent he was "always careful to make the Proclamations absolutely indiscriminate [non-sectarian], and merely recommendatory; or rather mere *designations* of a day, on which all who thought proper might unite in consecrating it to religious purposes, according to their own faith & forms." He emphasized that his proclamations were

---

52. Madison, "Detached Memoranda."

53. *Ibid*.

very clear in calling for voluntary action and denounced any "that lost sight of the equality of *all*

Religious Sects in the eye of the Constitution," and thus in government official actions.[54]

80.    When he did issue a proclamation, Madison always noted that Congress requested

the proclamation, that religious actions of citizens should be entirely voluntary, and used only

general references to a deity or religion, abjuring any denominational or sectarian preference.

Examples of proclamations that Madison issued show both the neutrality and the voluntariness

that he insisted upon:

- Recommending a Day of Prayer (July 9, 1812): "Whereas the Congress . . .  have signified a request . . . [I] recommend . . . a convenient day . . . rendering the Sovereign of the Universe and the Benefactor of Mankind the public homage due to His holy attributes."
- Recommending a Day of Prayer (July 23, 1813): In response to Congress' resolution, "recommending to all who shall be piously disposed" [to] "the Great Parent and Sovereign of the Universe". Thankful for "a political Constitution . . . guaranteeing to each individual . . . those sacred rights of conscience so essential to his present happiness and so dear to his future hopes." "If the public homage of a people can ever be worthy the favorable regards of the Holy and Omniscient Being to whom it is addressed, it must be that in which those who join in it are guided only by their free choice, the by impulse of their hearts and the dictates of their consciences . . . ; freed from all coercive edicts, from that unhallowed connection with the powers of this world which corrupts religion into an instrument or an usurper of the policy of the state."
- Recommending a Day of Public Humiliation, Fasting, and Prayer (November 16, 1814): In response to Congress' resolution, recommends "a day on which all may have an opportunity of voluntarily offering at the same time in their respective religious assemblies their humble adoration to the Great Sovereign of the Universe."
- Recommending a Day of Public Thanksgiving for Peace (March 4, 1815): In response to Congress' resolutions, recommends "a day of thanksgiving and of devout acknowledgments to Almighty God . . . on which the people of every religious denomination may in their solemn assemblies" unite.

---

54. James Madison to Edward Livingston, 10 July 1822,
https://founders.archives.gov/documents/Madison/04-02-02-0471 (emphasis original).

Even with these limitations, Madison ultimately concluded that such official proclamations were unconstitutional. [55]

81.     President Washington also offered similar prayer proclamations but, like Madison, always in the most general and nonsectarian terms. For example:

- Day Thanksgiving (October 3, 1789): In response to Congress' request, Washington recommends a day "to the service of that great and glorious Being . . . ."[56]
- Day Thanksgiving (January 1, 1795): Day to "mark our situation with indications of the Divine beneficence . . . acknowledge our many and great obligations to Almighty God." Washington "recommend[s] to all religious societies and denominations, and to all persons whomsoever . . . to the Great Ruler of Nations."[57]

82.     In a closely parallel situation, Jefferson evidenced particular sensitivity to government officials using their positions to influence other citizens' political views. Fearing that some government officials had used the authority of their positions to sway voters in past elections, Jefferson's Secretary of Treasury, Albert Gallatin, proposed a circular letter to Customs officers (the most numerous public officials at the time) clarifying that

> whilst freedom of opinion, & freedom of suffrage at public elections are considered by the President, as imprescriptible [sic] rights, which, possessing as citizens, you cannot have lost by becoming public officers; he will regard *any*

---

55. James Madison, "Presidential Proclamation, [9 July] 1812," https://founders.archives.gov/documents/Madison/03-04-02-0625. James Madison, "Presidential Proclamation, [23 July] 1813," https://founders.archives.gov/documents/Madison/03-06-02-0434. James Madison, "Presidential Proclamation, 16 November 1814," https://founders.archives.gov/documents/Madison/03-08-02-0324. James Madison, "Presidential Proclamation, 4 March 1815," https://founders.archives.gov/documents/Madison/03-09-02-0066.

56. This, the first proclamation under the new Constitution, was dated in "the year of our Lord 1789". George Washington, "Thanksgiving Proclamation, 3 October 1789," https://founders.archives.gov/documents/Washington/05-04-02-0091. Subsequent proclamations dropped this formulation referring to the year of our sovereignty or independence. Compare "Proclamation—Publishing a Treaty of Peace and Friendship Between the United States and the Creek Nation of Indians" (August 14, 1790), https://www.presidency.ucsb.edu/node/200923, referring to "the fifteenth year of the Sovereignty and Independence of the United States."

57. George Washington, "Proclamation, 1 January 1795," https://founders.archives.gov/documents/Washington/05-17-02-0239.

*exercise of official influence to restrain or controul* the same rights in others as injurious to that part of the public administration which is confided to your care, and practically destructive of the fundamental principles of a republican Constitution.

Jefferson agreed: "I approve . . . entirely of the two paragraphs on the participation of office, & electioneering activity."[58]

83.     Of the founding presidents, John Adams' proclamations were the most overtly religious, but two things are worthy of note: First, Adams still generally avoided sectarian preferences. For example:

- Recommending a National Day of Humiliation, Fasting, and Prayer (March 23, 1798): "depend on the protection and blessing of Almighty God . . . , " "it has appeared to me that the duty of imploring the mercy and benediction of Heaven  . . . recommend . . . a day of solemn humiliation, fasting, and prayer . . . agreeable to those forms or methods which they [citizens] have severally adopted."
- Recommending a National Day of Humiliation, Fasting, and Prayer (March 6, 1799): "a due acknowledgment of the governing providence of a Supreme Being." "I have thought proper to recommend . . . a day of solemn humiliation, fasting, and prayer . . . ; implore His pardoning mercy, through the Great Mediator and Redeemer . . . , Author of All Good." [59]

84.     Second, Adams later recounted his belief that his proclamations, being too overtly religious for a president's proclamation under the new Constitution, "turned me out of Office" in the election of 1800 as the American people rejected even a general religious intervention by the

---

58. "Enclosure: Circular to Customs Collectors," Albert Gallatin to Jefferson, 25 July 1801 (emphasis added), https://founders.archives.gov/documents/Jefferson/01-34-02-0486-0002, (emphasis added). Thomas Jefferson to Albert Gallatin, 26 July 1801, https://founders.archives.gov/documents/Jefferson/01-34-02-0495.

59. John Adams, "Proclamation Proclaiming a Fast-Day, 23 March 1798," https://founders.archives.gov/documents/Adams/99-02-02-2386. John Adams, "Proclamation—Recommending a National Day of Humiliation, Fasting, and Prayer" (March 6, 1799), https://www.presidency.ucsb.edu/documents/proclamation-recommending-national-day-humiliation-fasting-and-prayer.

government. Adams explained "This Principle is at the Bottom of the Unpopularity of national Fasts and Thanksgivings, Nothing is more dreaded than the National Government meddling with Religion."[60]

85.    Importantly, the evangelicals who supported Jeffersonian/Madisonian religious freedom and church-state separation and who were critical to the adoption of Jefferson's Statute and the First Amendment also rejected indirect government coercion on theological grounds. A petition from Rockbridge County opposing the proposed General Assessment explained that "[f]or the discharge of the duties of Religion every man is to account for himself as an individual … not to be under the direction or *Influence* of any Human being." These eighteenth-century religionists understood that even government promotion of a religion was unfairly coercive of the personal free will belief in God that God desired. John Leland, the great Baptist preacher, explained that receiving government "indulgence, preferment or even protection" was a form of "idolatry, by acknowledging a power" not of the church. Using language not unlike Jefferson's, Leland made clear that government lacked the authority to put pressure on a person based on religious belief. "Nor do the legitimate powers of civil government extend so far as to disable, incapacitate, proscribe, or *any way distress* in person, property, liberty or life any man who cannot believe and practice in the common road." Baptists from Buckingham County opposed even legislative incorporation of churches, insisting that government needed simply to leave

---

60. John Adams to Benjamin Rush, 12 June 1812, https://founders.archives.gov/documents/Adams/99-02-02-5807. In that letter Adams also warned of the danger of giving churches civil authority: "We Shall have the civil Government overawed and become a Tool."

42

religion alone as "the only way to convince the gazing world, that Disciples do not follow Christ for Loaves, and that Preachers do not preach for Benefices."[61]

86.    In sum, presidential prayer proclamations under the first five presidents did not promote or favor a particular religion. Jefferson and Monroe declined to issue any. Jefferson and Madison concluded that any official religious statement violated the Constitution. All of the first presidents either refused to issue any such proclamations or, when doing so, used generic, non-sectarian language and were clear that they were simply recommending a day of prayer. I am aware of no evidence of government employees being addressed expressly in this regard, and certainly not officially.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief. Executed on July 21, 2026.

John A. Ragosta, Ph.D.

---

61. Petition, Rockbridge County (November 2, 1785) (emphasis added). Leland, *Virginia Chronicle*, 22n+, 26 (emphasis added). Baptist Petition, *Journal of the House of Delegates of Virginia*, November 1, 1786, 15.

## Appendix

## Newspapers Quoting/Reprinting Jefferson's Statute, Madison's *Memorial & Remonstrance*, and the Danbury Baptist Letter through *United States v. Reynolds* (1879)

For newspapers that reprinted and/or commented favorably on Jefferson's Statute in the years before 1879, see, for example, *Independent Gazetteer* (Philadelphia), February 4, 1786; *Pennsylvania Evening Herald*, February 4, 1786; *Massachusetts Gazette*, February 13, 1786; *Connecticut Journal*, February 15, 1786; *New Haven Gazette*, February 16, 1786; *American Recorder and Charleston Advertiser* (MA), February 17, 1786; *New Hampshire Gazette*, February 18, 1786; *Virginia Gazette and American Advertiser*, February 22, 1786; *Providence (RI) Gazette*, February 25, 1786; *Middlesex (CN) Gazette*, February 27, 1786; *Connecticut Gazette*, March 17, 1786; *Vermont Journal*, March 28, 1786; *State Gazette of South Carolina*, August 10, 1786; *Massachusetts Centinel*, November 18, 1786 (well received abroad); *Cumberland Gazette* (Portland, ME), December 1, 1786 (well received abroad); *New York Journal*, January 9, 1788 (reporting its printing in *American Museum* of November 1787); *New Hampshire Spy*, December 17, 1791; *Herald of Liberty*, April 1, 1799, 2:60 (from *Aurora*) (quoting Statute in opposition to Sedition Act); *Maryland Gazette*, August 28, 1800 (politics "converted the elegant reasoning of Jefferson against *religious establishments*, into a blasphemous argument against religion itself," reprints, from *Federal Gazette*); *City Gazette and Daily Advertiser* (Carolina), August 18, 1800 (consistent with Christian principles); *Kline's Carlisle Weekly Gazette* (Carlisle, PA), September 10, 1800; *Carolina Gazette*, October 2, 1800 (favorable comment in election piece); *Salem Gazette* (*Salem Register*), March 3, 1803; *New-Hampshire Gazette*, September 27, 1803; *Bennington (VT) World*, July 11, 1804; *Worcester National Aegis*, 4:100, December 19, 1804; *Aurora General Advertiser*, March 5, 1806 (favorable comment); *Portland (ME) Eastern Argus*, November 10, 1808 (reprinting address of Baltimore Baptist Association to Jefferson, same *National Intelligencer and Washington Advertiser*, November 19, 1808); *Pittsfield (MA) Sun*, November 7, 1810 ("celebrated 'Act for Establishing Religious Freedom' drawn up by the luminous and immortal pen of Thomas Jefferson" in article about *Memorial & Remonstrance*); *Bridgeport (CN) Republican Farmer*, November 21, 1810 (same as *Sun*, November 7); *Rhode-Island Republican*, November 21, 1810 (Baptist role in defeat of assessment and passage of Statute) (from *Richmond Enquirer*); *Portsmouth (NH) People's Advocate*, November 30, 1816 (reprints under title "Seek Not to Lay a

44

Restraint on the Mind . . ."); *Boston Daily Advertiser*, 35:70, September 25, 1822 (eulogy to Judge Roane, who referred to statute as "that sublime act") (from *Richmond Enquirer*); *Haverhill Gazette* (as *Salem Gazette*), October 1, 1822 (same); *Philadelphia Reformer,* 6:71, November 1, 1825 ("nothing more important in a state than the free enjoyment of religious opinions, without the interruption of legislative authorities") (from *Gospel Luminary*); *Aurora & Franklin Gazette* (Philadelphia), 2462, March 4, 1826; *United States' Telegraph* (Washington, DC), June 27, 1826; *Richmond Enquirer,* July 4, 1826 (preamble); *Vermont Patriot & State Gazette,* 25, July 4, 1826 ("justly procured for him the applause of the world") (from the *Enquirer*); *Columbia Telescope, and South Carolina State Journal,* 27, July 4, 1826) (same); *Charleston (SC) City Gazette,* July 13, 1826 (quoting Jefferson on key accomplishments) (from *Richmond Enquirer*, July 7, 1826); *Richmond Enquirer,* July 14, 1826 (reporting on eulogy)(numerous same omitted); *Augusta Chronicle*, 84, July 22, 1826 (same *Vermont Patriot,* July 4); *Pittsfield Sun*, August 3, 1826; *Boston Gospel Advocate and Impartial Investigator* 3:44, (November 11, 1826) (same as *Reformer*, November 1); *Columbia Telescope and South Carolina State Journal*, November 21, 1826; *Richmond Enquirer,* February 12, 1829 (reporting on publication of *Writings of Thomas Jefferson*: statute "always held by Mr. Jefferson to be one of his best efforts in the cause of liberty . . . and it is certainly the strongest <u>legal</u> barrier that could be erected against a connection between Church and State"); *Portland (ME) Eastern Argus*, V:460, February 27, 1829 (same); *Illinois Gazette*, March 21, 1829 (same); *Ohio State Journal,* 18, no. 42 (April 30, 1829) (reporting on publication of *Writings*); *Raleigh Register, and North-Carolina Gazette,* April 29, 1830; *Pensacola Gazette and Florida Advertiser,* May 15, 1830; *The American Almanac and Repository of Useful Knowledge,* 1836 (reprints operative paragraph); *Vermont Gazette,* 14:1:1, January 3, 1843; *Southern Literary Magazine*, June 1848; *Louisville Christian Observer,* 31:18, May, 1, 1852 (reprinting portions); *Mississippian and State Gazette,* 7, February 14, 1855 (response to anti-Catholic, anti-immigrant, quotes operative paragraph); *Washington Sentinel*, April 15, 1855; *Texas State Gazette* (Austin), July 7, 1855 (reprints); *Liberator,* December 28, 1855; *Christian Review,* April 1 (1858), 199 ("unanswerable arguments"); *New York Herald,* August 15, 1859 (Jefferson and Madison two great law-givers of the Revolution); *Middletown (NY) Banner of Liberty,* August 17, 1859; *Boston Investigator,* 33:236, December 4, 1861 (requests to reprint), 34:243, December 11, 1861 (reprints); *Columbus (OH) Crisis,* 1:48, December 26, 1861; *Daily Arkansas Gazette,* June 7, 1871. Scores of additional passing

references appear in reported July Fourth and Jefferson birthday toasts, obituaries, and references to the inscription on Jefferson's tomb.

For newspapers that reprinted or commented favorably on Madison's *Memorial & Remonstrance*, see, for example, *Virginia Journal* (Alexandria), November 17, 1785; *Boston Independent Chronicle,* May 11-14, 1801; *Richmond Enquirer*, October 16, 1810; *National Intelligencer and Washington Advertiser,* 1566, October 24, 1810 (reprints, led to Statute from the "luminous and immortal pen of Thomas Jefferson"); *Pittsfield (MA) Sun,* November 7, 1810 (same as *National Intelligencer* October 24); *New Hampshire Patriot*, November 6, 1810; *Bridgeport (CN) Republican Farmer,* 1:31:1, November 21, 1810 (same); *Rhode-Island Republican,* November 21, 1810 (same); *Essex Register,* December 8, 1810 (same); *Hartford (CN) American Mercury,* June 17, 1817; *Brattleboro (VT) American Yeoman,* July 1, 1817; *Baltimore Niles Weekly Register*, July 5, 1817; *Norfolk (VA) American Beacon and Commercial Diary,* July 12, 1817; *The Times* (Hartford, CN), July 22, 1817; *Bridgeport (CN) Republican Farmer,* November 21, 1820; *Baltimore Patriot,* November 7, 1826 (quoted in antislavery piece); *Columbia Telescope and South Carolina State Journal,* November 21, 1826 (reprints, "under the influence of the public sentiment thus manifested, the celebrated bill 'establishing religious freedom' enacted into a permanent barrier against future attempts on the rights of conscience") (from *Richmond Enquirer*); *Vermont Chronicle,* 5:18, January 30, 1829 (quotes and notes pamphlet available); *Vermont Gazette,* January 27, 1829 (reprints), February 24, 1829 (comments, noting reprinted in *Vermont Telegraph*); *Buffalo (NY) Gospel Advocate and Impartial Investigator,* 7:4, February 21, 1829 (from *Hartford Times*); *New York Correspondent,* 5:11, April 4, 1829 (reprints); *New York Free Enquirer,* 1:26, April 22, 1829 (Senator Johnson's report on Sunday mail relied on M&R, reprints); *Boston Christian Watchman,* 13:3, January 20, 1832 (reprints); *Boston Recorder,* 17:4, January 25, 1832; *Boston Christian Review,* 2:5, March 1, 1837 (eulogy of Madison by John Quincy Adams, citing to Benedict's *A General History of the Baptist Denomination in America,* 2 vols. 1813 for text of M&R); *Boston Investigator,* 48, 49, April 7, 1847, April 14, 1847 (reprints); *Southern Literary Magazine,* 14:6, June 1848 ("A memorial, celebrated for its dignity of tone, and strength of argument"); *Christian Review,* April 1, 1858, 199 ("unanswerable arguments"); *Washington, DC, Daily National Intelligencer,* 16817, July 16, 1866 (M&R reprinted in Rives, "diffused extensively throughout the State, and caused the ultimate defeat of the" general assessment).

46

For newspapers that reprinted or commented favorably on Jefferson's Letter to the Danbury Baptists, see, for example, *New York American Citizen and General Advertiser,* January 18, 1802; *Republican Watch-Tower* (New York), January 20, 1802; *Boston Independent Chronicle,* 2-3, January 25, 1802; *Salem Register,* January 25, 1802 ("Religion is a matter which lies solely between man and his God"); *New Jersey Journal,* January 26, 1802; *Boston Constitutional Telegraph,* January 27, 1802; *Hartford (CT) American Mercury,* January 28, 1802; *Boston Independent Chronicle,* January 28, 1802 (summary); *Salem Gazette,* January 28, 1802; *Salem Register,* January 28, 1802; *Rhode Island Republican,* January 30, 1802; *Charleston City Gazette,* January 30, 1802; *Aurora* (Philadelphia), February 1, 1802; *Spooner's Vermont Journal*, February 2, 1802; *Farmer's Weekly Museum* (Walpole, NH), February 2, 1802 (quoting but without "wall of separation"); *New London (CN) Bee,* February 3, 1802; *Carolina Gazette,* February 4, 1802; *Stonington-Port (CT) Patriot, or Scourge of Aristocracy,* February 5, 1802; *Sun* (Dover, NH), February 6, 1802; *The Temple of Reason* (Philadelphia), February 6, 1802; *New Hampshire Gazette,* February 9, 1802; *Sun* (Pittsfield, MA), February 15, 1802; *Newark Centinel of Freedom,* February 16, 23, 1802; *Rhode-Island Republican,* February 27, 1802; *True American* (Trenton), March 2, 1802; *Waterford Gazette* (NY), March 9, 1802; *Daily South Carolinian* (Columbia), May 4, 1855; *Delaware State Reporter,* May 8, 1855; *Boston Investigator,* May 30, 1855, January 9, 1869 (from *Richmond Whig*), June 9, 1869 (from *Richmond Whig*, reprints with Jefferson letter to Levi Lincoln).

# Exhibit A

## JOHN A. RAGOSTA

922 Bolling Ave., Charlottesville, VA  22902
540-718-2073    —    ragostas@comcast.net

### EDUCATION

**University of Virginia**, PhD, Early American/US Legal History; advisor: Peter Onuf; 2008. 3.9 GPA

*Fighting for Freedom: How Virginia's Religious Dissenters Helped Win the American Revolution and Religious Liberty*: Committee: Peter Onuf, Charles McCurdy, Joe Kett, Heather Warren
Outside field: seventeenth and eighteenth century Britain

**George Washington University**, MA, Early American/U.S. Legal History. 4.0 GPA

Intern: First Federal Congress Project

**University of Virginia School of Law**, J.D. 3.6 GPA

Honors: National Moot Court team; winning team Sutherland Moot Court Competition
(Virginia, Yale, Cornell, and Catholic Univ.)

**Case Western Reserve University School of Law**, transferred. 3.9 GPA

Honors: Case Western Law Review (invited); Shelley Halpern Award (1st/1st year)

**Grove City College**, B.S. Physics-Chemistry, *magna cum laude*; Honors Physics-Chemistry, Highest Honors Philosophy. 3.6 GPA

Honors: Omicron Delta Kappa; Mortar Board; Who's Who; Theta Alpha Phi (theater);
Sigma Pi Sigma (physics); Kemikos (chemistry); Freshman Math Award
Activities: Stage Manager Pew Fine Arts Center

### PREVIOUS POSITION

**Historian, Robert H. Smith International Center for Jefferson Studies, Monticello**: 2018-2024
**Acting Director**: October 2022-July 2023

Researching/writing for Thomas Jefferson Foundation website and guides, especially nation formation and religious freedom; assisting in organization of conferences; communication.

### TEACHING POSITIONS

**Visiting Assistant Professor, Randolph College**: 2016-17; **Instructor:** 2009-10

Religious Freedom, Era of the American Revolution, North American History from the Ice Age to the Present, Native American History, North American History to 1800, Religious History

**Visiting Assistant Professor, Oberlin College**: 2014-15

Making the Constitution, American History to 1877, Rebellion in the Late Seventeenth Century, Native American History to 1877, Era of the American Revolution

## TEACHING POSITIONS (continued)

**Visiting Assistant Professor, Hamilton College**: nominated Wertimer Teaching Award: student award for mentor and active participant in academic community; 2012-13

Making the Constitution, Era of the American Revolution, Native American History to 1865, History of the United States to 1861, Rebellion in the Late Seventeenth Century

**Lecturer, Department of History, University of Virginia**

Native Americans and the American Revolution, Spring 2009; Religion and the American Revolution, Fall 2007; Era of the American Revolution, Summer 2006

**Lecturer, School of Law, University of Virginia**

American Law for LLMs, Fall 2019; International Trade, Fall 2011, 2009; International Dispute Resolution, Spring 2006, 2005

**Adjunct Professor, School of Law, George Washington University**: 1997-2003

## LEGAL EXPERIENCE

**Dewey Ballantine**: Managed some of the largest international trade legal and policy disputes, including lumber, CMT, steel; legislative policy; antitrust, constitutional, other litigation

## SELECTED HONORS

Inaugural James Madison Fellow, Montpelier (2026)

Faculty Director, University of Virginia Summer Jefferson Symposium (biennial 2012-present)

Red Hill, Patrick Henry Memorial Foundation, Advisory Committee (2020-present)

Virginia Humanities, fellow (2015-present), Robert C. Vaughan Fellow (2013-14), and Edna and Norman Freehling Fellow in South Atlantic Studies (2011-2012)

William M.W. Rachal Award (best article), 2025, Coleman McGehee Award (best graduate article), 2008, *Virginia Magazine of History and Biography*

Jack Miller Center—Colonial Williamsburg Foundation Fellowship (Oct.-Nov. 2017)

Instructor, *Patrick Henry: Forgotten Founder*: MOOC, Top Twenty MOOC in 2017 at "Class Central;" https://www.coursera.org/learn/henry

American Law Institute (2001-2015)

Gilder Lehrman Junior Research Fellow, Robert H. Smith International Center for Jefferson Studies, Monticello (2010-11) (short-term fellowships April, Oct. 2008)

Designated by the U.S. Government as a candidate to serve on North American Free Trade Agreement bi-national dispute settlement panels (1997-2005, 1993-94)

Ragosta: 2 of 8

## SELECTED PUBLICATIONS

### Books

*For the People, For the Country: Patrick Henry's Final Political Battle* (Univ. of Virginia Press, 2023)

*Patrick Henry: Proclaiming a Revolution* (Routledge Press, 2017)

*Religious Freedom: Jefferson's Legacy, America's Creed* (Univ. of Virginia Press, 2013; paperback 2014), History Book Club featured alternate June 2013

*Wellspring of Liberty: How Virginia's Religious Dissenters Helped Win the American Revolution & Secured Religious Liberty* (Oxford Univ. Press, 2010)

### Edited Volumes

w/ Andrew J. O'Shaughnessy and Marie-Jeanne Rosignol, *European Friends of the American Revolution* (Univ. of Virginia Press, 2023)

w/ Jon Meacham and Annette Gordon-Reed, *In the Hands of the People* (Random House, 2020)

w/ Peter S. Onuf and Andrew J. O'Shaughnessy, *The Founding of Thomas Jefferson's University* (Univ. of Virginia Press, 2019)

### Selected Articles/Chapters

"Thomas Jefferson v. Patrick Henry: A Personal and Political Battle," *Virginia Magazine of History and Biography*, 132:2 (Fall 2024)

"A Wall Between a Secular Government and a Religious People," *Roger Williams University L. Rev.* 26:2 (Spring 2021): 545-619

"Jefferson, Madison, and Adams: Conversations on Religious Liberty," in *Rival Visions of the Early American Republic*, eds. A. Bibby & D. Gish (Univ. of Virginia Press, 2021)

"Thomas Jefferson: Icon," in *Thomas Jefferson: Critical Insights*, ed. R. Evans (Salem Press, 2020)

"A Religious Republican and a Republican Religion," in *Jeffersonians in Power: Ideas in Practice*, eds. J. Freeman & J. Neem (Univ. of Virginia Press, 2019)

"'Caesar had his Brutus:' What Did Patrick Henry Really Say?" *Virginia Magazine of History and Biography*, 126:3 (Fall 2018): 282-97

"The Virginia Statute for Establishing Religious Freedom," in *A Companion to Thomas Jefferson*, ed. F.D. Cogliano (Wiley-Blackwell Publishing, 2011): 75-90

"FIGHTING FOR FREEDOM: Virginia Dissenters' Struggle for Religious Liberty during the American Revolution," *Virginia Magazine of History and Biography,* 116:3 (Fall 2008): 226-61

**Selected Articles/Chapters** (continued)

"Trade and Agriculture, and Lumber," *Kansas J.L. & Public Pol*. XIV (2005): 413-47

w/ Joneja and Zeldovich, "WTO Dispute Settlement" *Int'l Lawyer* 37 (2003): 697-752

"Can the WTO DSB Live Up to the Moniker 'World Trade Court'?," *Law & Pol'y Int'l Bus.* 31 (2000): 739-68

"Twelve Rules for Successful Associates," *Student Lawyer* 27 (1999): 32-35

"The Information Revolution – Culture and Sovereignty – a U.S. Perspective," *Canada-U.S. L.J.* 24 (1998): 155-63, presented Canada-U.S. Law Institute, April 1998

w/ Magnus, "Antidumping and Antitrust Reform in the NAFTA," in *Finding Middle Ground: Reforming the Antidumping Laws in North America,* ed. by Michael Hart (Ontario: Centre for Trade Policy and Law, 1997): 86-141

"The Cultural Industries Exemption from the NAFTA – Its Parameters:  A U.S. Perspective," *Canada-U.S. L.J.* 23 (1997): 165-76

**Selected Other (Essays, Encyclopedia, Reviews, Op-eds)**

"What are We Celebrating," *Gerald R. Ford Leadership Forum*, May 21, 2026

"Trump Blurring Lines between Church, State," *Richmond Times-Dispatch*, Jan. 16, 2026

"When Religion was Forced on Americans," *Time Magazine*, July 7, 2025

"Separation of Church and State Dodges a Bullet – for Now," *The Hill*, June 17, 2025

"It's a Mistake to Turn International Students Away," *Baltimore Sun*, May 4, 2025

"'What's in it for Me' has Gone Too Far, & Trump-Musk Make it Worse," *The Hill*, March 19, 2025

"Trump's 'Beautiful' Tariffs will Weaken Trade and Worsen Inequality," *The Hill*, March 5, 2025

"A Bullying Trade Policy Comes with Costs," *Baltimore Sun*, Feb. 20, 2025

"A Day to Celebrate a President, Not a King," *Real Clear History*, Feb. 17, 2025

"Trump's Tax Cuts have Worsened Already-Disastrous Wealth Gap," *Baltimore Sun*, Feb. 1, 2025

"Trump's TikTok Argument Puts his Ego Above the Law," *The Hill*, Jan. 17, 2025

"The Presidency of Thomas Jefferson," *Virginia Encyclopedia*, 2024

"What Happens when Churches and Community Both Decline?" *Pittsburgh Post-Gazette*, Dec. 24, 2024

**Selected Other (Essays, Encyclopedia, Reviews, Op-eds)** (continued)

"The True Meaning of Give me Liberty," *Time Magazine*, July 1, 2024

"What the Declaration of Independence Means," *Monticello Magazine*, Spring-Summer 2024

"Rethinking Patrick Henry on a Historic Anniversary," *Virginia-Pilot*, March 21, 2024

"Texas's Secessionist Compact with the Devil Aims to 'Nullify' Federal Law," *The Hill*, Feb. 20, 2024

"Religious Freedom is a Principle Worth Celebrating," *Virginia-Pilot*, Jan. 15, 2024

"Architect of American Democracy: What Jefferson's Tombstone Teaches Us," *Monticello Magazine*, Fall-Winter 2023

"The Rules of Democracy, and how the Founders Struggled with Them," UVA *Thoughts from the Lawn*, August, 2023; [UVA Engagement (virginia.edu)](#)

"Reading the Declaration," *Monticello Magazine*, Fall-Winter 2022

"Patrick Henry and the Defense of Democracy," *History News Network*, Jan. 25, 2022

"Nod to Religious Freedom and American Diversity," *Richmond Times Dispatch*, Jan. 15, 2022

"The Case Testing the Supreme Court's Boundaries on Church & State," *The Hill*, Dec. 22, 2021

"What Would Patrick Henry Say?" *Richmond Times Dispatch*, Jan. 18, 2021

"Jefferson Still Teaches Us Lessons about Religious Freedom," *Orlando Sentinel*, Jan. 16, 2021

"A Revolution at the Ballot Box," *Monticello Magazine*, Fall-Winter 2020

Review, "Daniel L. Dreisbach and Mark David Hall, eds., Great Christian Jurists in American History," *Journal of Church and State* 62:3 (Summer 2020)

"Declaring Independence: A Cloer Look at America's Defining Document," *Monticello Magazine*, Spring-Summer 2020

"We can Celebrate Religious Freedom," *Dallas Morning News*, Jan. 16, 2020

"Election of 1800," in *Encyclopedia of Virginia*, ed. Brendan Wolfe, Virginia Humanities, [https://www.encyclopediavirginia.org/U_S_Presidential_Election_of_1800](https://www.encyclopediavirginia.org/U_S_Presidential_Election_of_1800) (2019)

"What We're Missing in All the Fuss," *Richmond Times-Dispatch*, Sept. 15, 2019

"The Limits on Religious Toleration," *Richmond Times-Dispatch*, Jan. 16, 2019

"Religious Freedom and the American Experiment," *Richmond Times-Dispatch*, Jan. 16, 2018

**Selected Other (Essays, Encyclopedia, Reviews, Op-eds)** (continued)

Review, "Steven D. Smith, The Rise and Decline of American Religious Freedom," *Journal of Southern Religion* 17 (June 2015)

"The Enduring Legacy of Religious Freedom," in *A Commemoration of America's First Freedom* (First Freedom Center, Jan. 16, 2015)

"Exceptional Blessing of Religious Freedom," *Richmond Times Dispatch,* Jan. 11, 2015

"Christian or Satanist displays? Keep them off gov't land," *Detroit Free Press*, Dec. 18, 2014

w/ Finkelman and Green, "Town Prayers: What does the Supreme Court mean by coercion?" *Washington Post* (RNS), May 7, 2014

"Can There be a Rational Compromise on the Pledge?" *Washington Post* (RNS), April 23, 2014

Review, "David O. Stewart, American Emperor: Aaron Burr's Challenge to Jefferson's America," *The Historian* 76:1 (Spring 2014): 142-44

Review Essay, "Dennis J. Goldford, The Constitution of Religious Freedom: God, Politics, and the First Amendment," *Politics and Religion* 6:4 (Dec. 2013): 870-73

## SELECTED PRESENTATIONS

"Hornets, Snakes, Baptists & Presbyterians," Florida Council for History Education, July 26, 2025

"For the People, For the Country," Concord Museum, May 21, 2025

"Hamilton v. Jefferson: The Fight that Shaped the Nation," UVA Lifetime Learning, May 20, 2025

"Thomas Jefferson and the Nuances of Leadership," Smithsonian Associates, July 31, 2024

"Patrick Henry's Final Political Battle," Colonial Williamsburg, July 6, 2024

"[For the People, For the Country](#)," w/ Jack Rakove, National Archives, September 2023

"[Building a New Nation: The Role of Four Virginia Presidents](#)," UVA Lifetime Learning, March 2023

"Jefferson and Religious Freedom," OLLI, UC San Diego, November 14, 2022

"Thomas Jefferson: A Model for Leadership?", Roads Scholars, September, October 2022, May, September 2023, May, October 2024, May 2025, May 2026

"Jefferson and the Founding of the University of Virginia," UVA Board of Visitors Spouses, September 15, 2022

## SELECTED PRESENTATIONS (continued)

"Principles, Hypocrisy, and Enlightenment," Thomas Jefferson and Democracy, Young African Leaders Initiative, June 24, 2022

"Patrick Henry and the Crisis of Union that Died in 1799," OLLI, UC San Diego, Jan. 10, 2022

"Hornets, Snakes, Baptists & Presbyterians: Winning the Contest for Religious Freedom," Historic Christ's Church, November 7, 2021

"Patrick Henry and the Crisis of Union that Died in 1799," Virginia Sons of the American Revolution, September 11, 2021

"Patrick Henry and the Crisis of Union that Died in 1799," SHEAR Conference, July 15, 2021

"Thomas Jefferson: American Icon and Slaveowner," U.S. Institute on American Politics and Political Thought, State Department/UMass Amherst, July 26, 2019

"Jefferson and the Meaning of Religious Freedom," Smithsonian Associates, June 17, 2019

"Patrick Henry, Richard Henry Lee, and Lighthorse Harry Lee: A Complicated Dance," Stratford Hall, June 1, 2019

"Thomas Jefferson's Contributions and Contradictions," University of Virginia Founder's Day (invited by the office of the president), April 12, 2019

"Hamilton v. Jefferson: On History, Freedom, and American Government," Alexander Hamilton Institute and Robert H. Smith International Center for Jefferson Studies, November 15-17, 2018

"Thomas Jefferson's Legacy and Religious Freedom," Monticello/Miller Center, October 11, 2017

Moderator, "Fake News: Today and in Jefferson's Time," Poplar Forest, March 30, 2017

"Witches, Patriots, and Partisans," Virginia Festival of the Book, March 24, 2017

"The University of Virginia and Thomas Jefferson's Battle for Religious Freedom," *More than the Score*, UVA Office of Lifetime Learning and Alumni Association, November 12, 2016; podcast

Moderator, "Religious Freedom Now and Jefferson's Time," Poplar Forest, September 22, 2016

"Thomas Jefferson, Our Times, and the Challenge of Leadership," National Executive Institute, Charlottesville, September 23, 2015

"Who Defines Religious Freedom?" Richard Reynolds Foundation Lecture, Polegreen Foundation, Richmond, June 11, 2015

"Religious Freedom: Is the American Revolutionary Experience Relevant to Africa?" Young African Leaders Initiative, Monticello, July 2, 2014

## SELECTED PRESENTATIONS (continued)

"Jefferson, Madison, and Adams: Conversations on Religious Liberty," Christopher Newport University, Oct. 10-11, VFH, October 8, 2013; vimeo

"Hornets, Snakes, Presbyterians & Baptists," Colonial Williamsburg Foundation, April 2013

"Is James Madison Still Speaking to Us about Religious Freedom?" Montpelier, March 16, 2012 (invited for Madison's birthday)

"America as 'Christian Nation,'" People for the American Way, November 2011

## SELECTED SERVICE

Referee history: Oxford University Press, University of Virginia Press, *Journal of the Early Republic*, *Virginia Magazine of History and Biography*, *Journal of Religious History*

Referee political science: *American Political Thought*

Reviewer, James Madison's Montpelier, "Creation of the Constitution" course

Reviewer, Jamestown-Yorktown Foundation, exhibits

Co-leader, historians' amicus *Town of Greece* (U.S. Supreme Court)

1776 Little Fork Preservation Foundation, board (National Historic Register building), 2005-16

American Bar Foundation