BRETT A. SHUMATE
Assistant Attorney General
Civil Division
NOAH T. KATZEN
Assistant Branch Director
Federal Programs Branch
ELISABETH J. NEYLAN
Trial Attorney
Civil Division, Federal Programs Branch
*Attorneys for the United States*

**UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| NATIONAL FEDERATION OF FEDERAL EMPLOYEES, ADAM DIAMOND, LANETTE DIETRICH, THOMAS MAGEE, ASHLEY MILLER, ANNE POOPATANAPONG, ETHAN ROBERTS, and JENNIFER WOLFE,<br><br>*Plaintiffs*,<br>v.<br><br>UNITED STATES DEPARTMENT OF AGRICULTURE, and<br><br>BROOKE L. ROLLINS, Secretary of Agriculture, in her official capacity,<br><br>*Defendants*. | No. 3:26-cv-04406<br><br>**DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' PRELIMINARY INJUNCTION MOTION; NOTICE OF CROSS-MOTION; AND CROSS-MOTION TO DISMISS PLAINTIFFS' COMPLAINT**<br><br>Date: October 27, 2026<br>Time: 2:00 p.m.<br>Location: San Francisco, Courtroom 9, 19th Floor<br><br>HONORABLE TRINA L. THOMPSON<br>UNITED STATES DISTRICT JUDGE |

## TABLE OF CONTENTS

NOTICE OF CROSS-MOTION ....... 1

RELIEF SOUGHT ....... 1

MEMORANDUM OF POINTS AND AUTHORITIES ....... 1

INTRODUCTION ....... 1

ISSUES TO BE DECIDED ....... 3

BACKGROUND ....... 3

LEGAL STANDARDS ....... 5

ARGUMENT ....... 7

I. Plaintiffs are Unlikely to Succeed on the Merits ....... 7

A. Plaintiffs Lack Standing ....... 7

B. The APA Claims Must be Dismissed for Lack of Jurisdiction and Failure to State a Claim ....... 10

C. The Complaint Fails to State a Claim Under the Establishment Clause ....... 14

1. The Secretary's Emails Comport with History and Tradition ....... 15

2. The Secretary's Emails Are Not Coercive ....... 22

3. The Secretary's Emails Do Not Establish a Denominational Preference ....... 28

II. The Remaining Preliminary Injunction Factors Weigh in Favor of the Government ....... 29

III. Any Relief Must Be Narrowly Tailored ....... 31

CONCLUSION ....... 32

## TABLE OF AUTHORITIES

**CASES**

*Am. Legion v. Am. Humanist Ass'n*,
588 U.S. 29 (2019) ... *passim*

*Anderson v. Laird*,
466 F.2d 283 (D.C. Cir. 1972) ... 27

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ... 6

*Batterton v. Marshall*,
648 F.2d 694 (D.C. Cir. 1980) ... 11

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ... 6

*Bennett v. Spear*,
520 U.S. 154 (1997) ... 13

*Boardman v. Pac. Seafood Grp.*,
822 F.3d 1011 (9th Cir. 2016) ... 29

*Caldwell v. Caldwell*,
545 F.3d 1126 (9th Cir. 2008) ... 8, 9

*Caribbean Marine Servs. Co., Inc. v. Baldrige*,
844 F.2d 668 (9th Cir. 1988) ... 30

*Cath. Charities Bureau, Inc. v. Wisconsin Lab. & Indus. Rev. Comm'n*,
605 U.S. 238 (2025) ... 28, 29

*Chaudhuri v. Tennessee*,
130 F.3d 232 (6th Cir. 1997) ... 26

*Citizens for Quality Educ. San Diego v. Barrera*,
333 F. Supp. 3d 1003 (S.D. Cal. 2018) ... 30

*Cobell v. Kempthorne*,
455 F.3d 301 (D.C. Cir. 2006) ... 13

*Cole v. Oroville Union High Sch. Dist.*,
228 F.3d 1092 (9th Cir. 2000) ... 10, 25

*County of Allegheny v. Am. C.L. Union Greater Pittsburgh Chapter*,
492 U.S. 573 (1989) ........ 14, 27

*Ctr. for Competitive Pol. v. Harris*,
784 F.3d 1307 (9th Cir. 2015), *abrogated by Americans for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021) ........ 5

*Diamond v. Charles*,
476 U.S. 54 (1986) ........ 8, 9

*Doremus v. Bd. of Educ. of Borough of Hawthorne*,
342 U.S. 429 (1952) ........ 10

*Elk Grove Unified Sch. Dist. v. Newdow*,
542 U.S. 1 (2004) ........ 1, 4, 28

*Engel v. Vitale*,
370 U.S. 421 (1962) ........ 25

*Epperson v. Arkansas*,
393 U.S. 97 (1968) ........ 29

*Firewalker-Fields v. Lee*,
58 F.4th 104 (4th Cir. 2023) ........ 14

*Foothills Christian Ministries v. Johnson*,
148 F.4th 1040 (9th Cir. 2025), *cert. denied sub nom. Foothills Ministries v. Johnson*,
No. 25-802, 2026 WL 1377110 (U.S. May 18, 2026) ........ 8

*Freedom From Religion Found., Inc. v. Chino Valley Unified Sch. Dist. Bd. of Educ.*,
896 F.3d 1132 (9th Cir. 2018) ........ 25

*Groff v. DeJoy*,
600 U.S. 447 (2023) ........ 28

*Hilsenrath v. Sch. Dist. of Chathams*,
136 F.4th 484 (3d Cir. 2025), *cert denied sub nom. Hilsenrath v. Chathams Sch. Dist. Bd. of Educ.*, 146 S. Ct. 885 (2025) ........ 14

*Hunt v. Washington State Apple Advert. Comm'n*,
432 U.S. 333 (1977) ........ 9

*Indus. Safety Equip. Ass'n, Inc. v. E.P.A.*,
837 F.2d 1115 (D.C. Cir. 1988) ........ 12

*Juliana v. United States*,
947 F.3d 1159 (9th Cir. 2020) .......... 9, 10

*Kennedy v. Bremerton Sch. Dist.*,
597 U.S. 507 (2022) .......... *passim*

*Klein v. City of San Clemente*,
584 F.3d 1196 (9th Cir. 2009) .......... 30

*Kumar v. Koester*,
131 F.4th 746 (9th Cir. 2025) .......... 8

*Larson v. Valente*,
456 U.S. 228 (1982) .......... 29

*Lee v. Weisman*,
505 U.S. 577 (1992) .......... 15, 25, 26, 30

*Leite v. Crane Co.*,
749 F.3d 1117 (9th Cir. 2014) .......... 6

*Lemon v. Kurtzman*,
403 U.S. 602 (1971) .......... 14, 27, 28

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) .......... 12

*Lynch v. Donnelly*,
465 U.S. 668 (1984) .......... 4, 15, 19, 20

*Marrero-Mendez v. Calixto-Rodriguez*,
830 F.3d 38 (1st Cir. 2016) .......... 27

*Marsh v. Chambers*,
463 U.S. 783 (1983) .......... 4, 15

*Mazurek v. Armstrong*,
520 U.S. 968 (1997) .......... 5

*Mellen v. Bunting*,
327 F.3d 355 (4th Cir. 2003) .......... 27

*Miller ex rel. NLRB v. California Pac. Med. Ctr.*,
991 F.2d 536 (9th Cir. 1993), *on reh'g*, 19 F.3d 449 (9th Cir. 1994) .......... 30

*Milwaukee Deputy Sheriffs Ass'n v. Clarke*,
513 F. Supp. 2d 1014 (E.D. Wis. 2007), *aff'd sub nom. Milwaukee Deputy Sheriffs' Ass'n v. Clarke*, 588 F.3d 523 (7th Cir. 2009) ........ 26

*Moss v. U.S. Secret Serv.*,
572 F.3d 962 (9th Cir. 2009) ........ 6

*Nat. Res. Def. Council, Inc. v. Winter*,
508 F.3d 885 (9th Cir. 2007) ........ 31

*Nathan v. Alamo Heights Indep. Sch. Dist.*,
173 F.4th 576 (5th Cir. 2026) ........ 28, 29

*Nat'l TPS All. v. Noem*,
150 F.4th 1000 (9th Cir. 2025) ........ 6

*Newdow v. Lefevre*,
598 F.3d 638 (9th Cir. 2010) ........ 9

*Nken v. Holder*,
556 U.S. 418 (2009) ........ 5

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) ........ 11, 12

*Papasan v. Allain*,
478 U.S. 265 (1986) ........ 6

*Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Airforce*,
128 F.4th 1089 (9th Cir. 2025) ........ 11

*Rattlesnake Coal. v. U.S. EPA*,
509 F.3d 1095 (9th Cir. 2007) ........ 11

*Reach Cmty. Dev. v. U.S. Dep't of Homeland Sec.*,
174 F.4th 1143 (9th Cir. 2026) ........ 31

*S. California Edison Co. v. FERC*,
770 F.2d 779 (9th Cir. 1985) ........ 11

*Santa Fe Indep. Sch. Dist. v. Doe*,
530 U.S. 290 (2000) ........ 25

*Sch. Dist. of Abington Twp. v. Schempp*,
374 U.S. 203 (1963) ........ 4

*Shurtleff v. City of Boston*,
596 U.S. 243 (2022) ... 15

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ... 7

*Tanford v. Brand*,
104 F.3d 982 (7th Cir. 1997) ... 26

*Torcaso v. Watkins*,
367 U.S. 488 (1961) ... 27

*Town of Greece v. Galloway*,
572 U.S. 565 (2014) ... *passim*

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ... 7

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ... 31

*Valley Forge Christian Coll. v. Americans United for the Separation of Church & State*,
454 U.S. 464 (1982) ... 8

*Van Orden v. Perry*,
545 U.S. 677 (2005) ... *passim*

*Vasquez v. Los Angeles County*,
487 F.3d 1246 (9th Cir. 2007) ... 9

*Venters v. City of Delphi*,
123 F.3d 956 (7th Cir. 1997) ... 26

*Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*,
714 F.3d 186 (4th Cir. 2013) ... 13

*Villegas Lopez v. Brewer*,
680 F.3d 1068 (9th Cir. 2012) ... 5, 6

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ... 5, 6

*Zorach v. Clauson*,
343 U.S. 306 (1952) ... 3, 4, 23

**CONSTITUTIONS**

U.S. Const. amend. I ........ 3

**STATUTES**

5 U.S.C. § 551 ........ 2, 11, 12

5 U.S.C. § 704 ........ 11

5 U.S.C. § 705 ........ 1, 6

5 U.S.C. § 706(2)(A) ........ 10

5 U.S.C. § 6103 ........ 4

36 U.S.C. § 302 ........ 19

Va. Code § 57-1 (1786) ........ 17

World War II Memorial Prayer Act of 2013,
Pub. L. No. 113-123, 128 Stat. 1377 (2014) ........ 18

**ADMINISTRATIVE AND EXECUTIVE MATERIALS**

Fed. R. of Civ. P. 12(b) ........ 1, 6

Proclamation No. 3560,
28 Fed. Reg. 11,871 (Nov. 7, 1963) ........ 19

Proclamation No. 3752,
31 Fed. Reg. 13,635 (Oct. 22, 1966) ........ 19

Proclamation No. 4093,
36 Fed. Reg. 21,401 (Nov. 9, 1971) ........ 19

Proclamation No. 4803,
45 Fed. Reg. 75,633 (Nov. 13, 1980) ........ 19

Proclamation No. 5098,
48 Fed. Reg. 42,801 (Sept. 15, 1983) ........ 19

**OTHER AUTHORITIES**


Abraham Lincoln, *Proclamation Appointing a National Fast Day* (Mar. 30, 1863), *available at* Abraham Lincoln Online, https://www.abrahamlincolnonline.org/lincoln/speeches/fast.htm ..... 17

Abraham Lincoln, *Second Inaugural Address* (Mar. 4, 1865), *available at* The Avalon Project, https://avalon.law.yale.edu/19th_century/lincoln2.asp ..... 18

*Chaplains Hill Monuments*, Arlington National Cemetery, https://www.arlingtoncemetery.mil/Explore/Monuments-and-Memorials/Chaplains-Hill (last visited Aug. 21, 2026) ..... 19

Coalition Letter to the Senate Committee on Energy and Natural Resources urging opposition to the World War II Memorial Prayer Act (S.1044), ACLU (Nov. 21, 2013), https://www.aclu.org/documents/coalition-letter-senate-committee-energy-and-natural-resources-urging-opposition-world-war-ii ..... 18

Franklin D. Roosevelt, *Prayer on D-Day* (June 6, 1944), *available at* The American Presidency Project, https://www.presidency.ucsb.edu/documents/prayer-d-day ..... 18

Franklin D. Roosevelt, *Proclamation 2629—Thanksgiving Day, 1944* (Nov. 1, 1944), *available at* The American Presidency Project, https://www.presidency.ucsb.edu/documents/proclamation-2629-thanksgiving-day-1944 ..... 19

Frederick B. Jonassen, *Kiss the Book . . . You're President . . . : "So Help Me God" And Kissing the Book in The Presidential Oath of Office*, 20 William and Mary Bill of Rts. J. 853 (2012) ..... 19

General Dwight D. Eisenhower, *Order of the Day* (June 6, 1944), *available at* Nat'l Archives, https://www.archives.gov/milestone-documents/general-eisenhowers-order-of-the-day ..... 18, 20

George Washington, *First Inaugural Address* (Apr. 30, 1789), *available at* The Avalon Project, https://avalon.law.yale.edu/18th_century/wash1.asp ..... 16

George Washington, *Thanksgiving Proclamation* (Oct. 3, 1789), *available at* The Avalon Project, https://avalon.law.yale.edu/18th_century/gwproc01.asp ..... 20

George Washington, *Thanksgiving Proclamation of 1789* (Oct. 3, 1789), *available at* Founders Online, https://founders.archives.gov/documents/Washington/05-04-02-0091 ..... 16

Harry S Truman, *Remarks in Kansas City at a Luncheon for the Press* (Dec. 22, 1950), *available at* The American Presidency Project, https://www.presidency.ucsb.edu/documents/remarks-kansas-city-luncheon-for-the-press ..... 19

*History & Culture*, National Park Service, https://www.nps.gov/wamo/learn/historyculture/index.htm ............ 16

House and Senate Chaplains: An Overview (2026), https://www.congress.gov/crs-product/R41807 (last visited Aug. 21, 2026) ............ 19

James Madison, *First Inaugural Address* (Mar. 4, 1809), *available at* The Avalon Project, https://avalon.law.yale.edu/19th_century/madison1.asp ............ 17

James Madison, *Memorial and Remonstrance* (1785), *available at* Bill of Rts. Inst., https://billofrightsinstitute.org/primary-sources/memorial-and-remonstrance/ ............ 29

John Adams, *Proclamation of Day of Fasting, Humiliation and Prayer* (Mar. 23, 1798), *available at* Univ. of Va. Miller Ctr., https://millercenter.org/the-presidency/presidential-speeches/march-23-1798-proclamation-day-fasting-humiliation-and-prayer ............ 16, 20

Michael W. McConnell, *Establishment and Disestablishment at the Founding*, 44 Wm. & Mary L. Rev. 2105 (2003) ............ 15

*Proselytize*, Merriam-Webster, https://www.merriam-webster.com/dictionary/proselytize ............ 10

*Quotations on the Jefferson Memorial*, Thomas Jefferson Encyclopedia, https://www.monticello.org/encyclopedia/quotations-jefferson-memorial (last visited Aug. 21, 2026) ............ 17

Thomas Jefferson, *Draft of Instructions to the Virginia Delegates in the Continental Congress* (July 1774), *available at* Founders Online, https://founders.archives.gov/documents/Jefferson/01-01-02-0090 ............ 17, 21

Thomas Jefferson, *Second Inaugural Address* (Mar. 4, 1805), *available at* The Avalon Project, https://avalon.law.yale.edu/19th_century/jefinau2.asp ............ 17

## NOTICE OF CROSS-MOTION

PLEASE TAKE NOTICE that on October 27, 2026, at 2:00 p.m., or as soon thereafter as the matter may be heard, Defendants will and hereby do move this Court for an order dismissing Plaintiffs' Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of jurisdiction, and pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. Defendants' cross-motion is based on this notice; the accompanying memorandum of points and authorities; all pleadings and papers on file in this matter; any other matters of which the Court takes judicial notice; and any such oral argument the Court may hear.

## RELIEF SOUGHT

Defendants seek an order from the Court dismissing all claims asserted in Plaintiffs' Complaint and denying Plaintiffs' request for a preliminary injunction and/or a stay under 5 U.S.C. § 705.

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

The Constitution does not mandate secularism in government affairs. On the contrary, "[e]xamples of patriotic invocations of God and official acknowledgments of religion's role in our Nation's history abound." *Elk Grove Unified School Dist. v. Newdow*, 542 U.S. 1, 26 (2004) (Rehnquist, C.J., concurring in the judgment). In keeping with this history and tradition, the Secretary of the U.S. Department of Agriculture (USDA), Brooke Rollins, sent emails wishing employees well on major holidays including the Fourth of July, Thanksgiving, Christmas, Easter, and Memorial Day. Because those emails contained religious references, Plaintiffs—a national labor union representing thousands of USDA employees and six individual USDA employees—claim that they violate the Establishment Clause of the First Amendment to the U.S. Constitution and the Administrative Procedure Act (APA). Plaintiffs are wrong on both counts, yet they demand emergency relief from this Court to prevent the Secretary from sending similar messages on future holidays. That request is legally groundless and must be firmly rejected.

At the outset, this Court should deny Plaintiffs' motion because Plaintiffs' claims are not only unlikely to succeed on the merits, they are subject to dismissal for lack of jurisdiction and failure to state a claim. As to jurisdiction, Plaintiffs lack standing because their only claimed injury—offense from having seen religious messages with which they disagree—is not a cognizable injury for purposes of Article III. Even if it were, that purported injury would not be redressable by Plaintiffs' requested relief, which asks this Court to undertake the impossible task of policing the religiosity of the Secretary's speech. This Court lacks jurisdiction over Plaintiffs' APA claims for the additional reason that the emails are not "agency action" as that term is defined in the APA. *See* 5 U.S.C. § 551.

On the merits, Plaintiffs ignore the Supreme Court's instruction to interpret the Establishment Clause by reference to historical practices and understandings. *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 536 (2022). The Secretary's emails do not violate any historically sensitive understanding of the Establishment Clause. They fit well within this Nation's deeply rooted history and tradition of religious invocations in official discourse, including on holidays. The emails also fail to exhibit the foremost hallmark of religious establishments that the First Amendment was designed to prevent: coercion of religious orthodoxy. They do not request, much less coerce, anyone to do anything. Nor do they establish a denominational preference. So they do not violate the Establishment Clause. Because the emails are therefore not contrary to constitutional right, Plaintiffs' APA claim asserting as much fails too. Plaintiffs' APA claims also fail because the emails are neither arbitrary and capricious nor in conflict with agency guidance regarding religious expression in the workplace.

Beyond the futility of their claims on the merits, Plaintiffs also fail to demonstrate irreparable harm, instead relying entirely on their assumption that they are likely to succeed on the merits. That is insufficient to justify the extraordinary remedy of a preliminary injunction. And the balance of equities and public interest firmly favor the Government's interest in not stifling religion expression in public life.

Accordingly, this Court should deny Plaintiffs' motion for a preliminary injunction and grant the Government's motion to dismiss.

**ISSUES TO BE DECIDED**

1. Whether Plaintiffs' request for a preliminary injunction should be denied, and their claims dismissed:

   a. for lack of jurisdiction because Plaintiffs lack standing;

   b. for lack of jurisdiction over the APA claims and failure to state a claim under the APA; and

   c. for failure to state an Establishment Clause claim; and

2. Whether Plaintiffs' request for a preliminary injunction should be denied for the additional reasons that Plaintiffs have not established irreparable harm, and the balance of equities and public interest weigh in favor of the Government.

**BACKGROUND**

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend. I. These two clauses serve complementary purposes: the Establishment Clause prevents the Government from establishing one religion because doing so would inhibit the free exercise of all other religions. *See Kennedy*, 597 U.S. at 533.

Under the Establishment Clause, the Government cannot force citizens to attend church or punish people for dissenting religious exercise. *See Zorach v. Clauson*, 343 U.S. 306, 313 (1952). But the Establishment Clause does not require "'the government to purge from the public sphere' anything an objective observer could reasonably infer endorses or 'partakes of the religious.'" *Kennedy*, 597 U.S. at 535 (citing *Van Orden v. Perry*, 545 U.S. 677, 699 (2005) (Breyer, J., concurring in the judgment)). On the contrary, as the Supreme Court has observed, "[w]e are a religious people whose institutions presuppose a Supreme Being." *Zorach*, 343 U.S. at 313. Our history is replete with invocations of God by public officials in all three branches and at all levels of our government. *See Elk Grove Unified School Dist.*, 542 U.S. at 26 (Rehnquist, C.J., concurring in the judgment); *see also Am. Legion v. Am. Humanist*

*Ass'n*, 588 U.S. 29, 49 (2019) (observing that the Establishment Clause tolerates "the prayers that open legislative meetings, . . . certain references to, and invocations of, the Deity in the public words of public officials; the public references to God on coins, decrees, and buildings; [and] the attention paid to the religious objectives of certain holidays, including Thanksgiving" (citation omitted)); *Zorach*, 343 U.S. at 312–14 (noting that "references to the Almighty that run through our laws, our public rituals, our ceremonies" are consistent with the First Amendment); *Lynch v. Donnelly*, 465 U.S. 668, 675 (1984); *Marsh v. Chambers*, 463 U.S. 783, 792 (1983); *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 213 (1963).

In keeping with that tradition, the Secretary of the USDA, Brooke Rollins, sent USDA employees emails in celebration of several major holidays, most of which are federally recognized legal public holidays. *See* 5 U.S.C. § 6103. For example, on July 4, 2025, she wrote: "May God continue to protect the United States of America and may His favor shine over all her land." Compl. ¶ 30 (July 4, 2025 email). Then, on Thanksgiving, the Secretary described the first Thanksgiving in 1621 and credited "gratitude towards a loving God" in bringing together two peoples despite their differences. *Id.* ¶ 31 (Thanksgiving email). A month later, the Secretary sent employees a Merry Christmas video message "from Secretary Rollins[,]" in which she shared her view of "the reason for the season"—the spirit of generosity that "flows from the very first Christmas when God gave us the greatest gift possible, the gift of his Son and our Savior Jesus Christ . . . ." *Id.* ¶ 33 (Christmas message). And on Easter Sunday, the Secretary shared: "Today we celebrate the greatest story ever told, the foundation of our faith, and the abiding hope of all mankind." *Id.* ¶ 34 (Easter email). She closed the email by expressing gratitude for the hard work of agency employees and wishing them a happy holiday: "Please know how amazed and grateful I am for the hard work each of you do to support our shared mission here at USDA. I hope you and your loved ones have a truly blessed and happy Easter. May God continue to bless you, your families, and our exceptional country[.]" *Id.*

Plaintiffs, the National Federation of Federal Employees (NFFE) and individual USDA employees, initiated this lawsuit on May 13, 2026, alleging that the Secretary's emails violate the Establishment Clause of the U.S. Constitution. *See* Compl. Count I. Plaintiffs also bring two claims under the APA, alleging that the emails constitute a "policy of communicating proselytizing Christian messages to USDA subordinates." Compl. ¶ 122. According to Plaintiffs, this purported policy is contrary to constitutional right and arbitrary and capricious. *See* Compl. Counts II & III. In the Complaint, they sought declaratory and injunctive relief to prevent "Defendants from continuing to send or otherwise communicate proselytizing Christian messages to USDA employees[,]" as well as attorneys' fees and litigation costs. *See* Compl. Request for Relief ¶ 2.

Then, after receiving additional emails from the Secretary in celebration of Memorial Day and the Fourth of July of this year, Plaintiffs filed their motion for a preliminary injunction on July 22, 2026, citing their fear of receiving another email on Christmas in support of their need for emergency relief. *See* Pls.' Notice of Mot. & Mot. for Prelim. Inj. at 2, ECF No. 26 (Pls.' Br.).

**LEGAL STANDARDS**

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (per curiam)). A "plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. The third and fourth factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The plaintiff bears the "heavy burden" of demonstrating those requirements. *Ctr. for Competitive Pol. v. Harris*, 784 F.3d 1307, 1312 (9th Cir. 2015), *abrogated by Americans for Prosperity Found. v. Bonta*, 594 U.S. 595 (2021); *see also Villegas Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (preliminary injunction "should not be granted unless the movant, by a clear showing, carries the burden of persuasion" (emphasis and citation omitted)).

And a preliminary injunction cannot issue on the basis of speculative or possible injury. Rather, the moving party must establish that irreparable harm is "*likely* in the absence of an injunction." *Winter*, 555 U.S. at 22.[1]

Under Federal Rule of Civil Procedure 12(b)(1), a movant may make a "facial" challenge to the plaintiffs' allegations concerning subject matter jurisdiction. *See Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014). In ruling on such a motion, the court determines whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction, after accepting the plaintiffs' allegations as true and drawing all reasonable inferences in the plaintiffs' favor. *See id.*

To withstand a 12(b)(6) motion to dismiss for failure to state a claim, the Complaint must contain facts sufficient to "raise a right to relief above the speculative level" and to satisfy the court that the claim is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007); *see also* Fed. R. Civ. P. 12(b)(6). A claim is plausible only "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556–57). Although well-pleaded allegations are presumed to be true and viewed in the light most favorable to the plaintiff, a court need not accept as true a plaintiff's conclusory allegations, unwarranted factual inferences, or legal conclusions. *See Moss v. U.S. Secret Serv.*, 572 F.3d 962, 970 (9th Cir. 2009). In the same vein, a court need not credit "a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). And "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

[1] The preliminary injunction standard also applies to Plaintiffs' request that the Court postpone agency action under the APA, 5 U.S.C. § 705. *See Nat'l TPS All. v. Noem*, 150 F.4th 1000, 1015 (9th Cir. 2025). Plaintiffs are not entitled to relief under § 705 for the same reasons they are not entitled to a preliminary injunction.

## ARGUMENT

Plaintiffs' motion for a preliminary injunction should be denied, and their claims dismissed, for lack of jurisdiction and failure to state a claim. This Court lacks jurisdiction over Plaintiffs' claims because Plaintiffs lack standing. Plaintiffs have not alleged a cognizable injury in fact, and their purported injury would not be redressed by their requested relief. This Court also lacks jurisdiction over Plaintiffs' APA claims for the additional reason that Plaintiffs have not challenged a discrete, final agency action.

On the merits, Plaintiffs have failed to state an APA claim because the emails are neither contrary to constitutional right nor arbitrary and capricious. Plaintiffs have also failed to state an Establishment Clause claim because the Secretary's emails comport with history and tradition, are not coercive, and do not establish a denominational preference. Finally, Plaintiffs have failed to establish irreparable harm, and the balance of equities and public interest favor the Government. Thus, this Court should deny Plaintiffs' request for a preliminary injunction and dismiss Plaintiffs' claims.

### I. Plaintiffs are Unlikely to Succeed on the Merits

#### A. Plaintiffs Lack Standing

Plaintiffs' motion for a preliminary injunction should be denied, and their claims dismissed, for lack of standing. The doctrine of Article III standing, which stems from the Constitution's case-or-controversy limitation on judicial power, requires the party invoking federal jurisdiction to plausibly allege (i) an injury-in-fact (ii) that is fairly traceable to the conduct of the party sued and (iii) judicially redressable. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Plaintiffs bear the burden of demonstrating that they meet those requirements "for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). Plaintiffs fail to satisfy the injury and redressability prongs of the standing test.

The Supreme Court has "rejected the notion that offense alone qualifies as a 'concrete and particularized' injury sufficient to confer standing." *Am. Legion*, 588 U.S. at 80 (Gorsuch, J., concurring); *id.* ("The presence of a disagreement, however sharp and acrimonious it may be, is insufficient by itself

to meet Art. III's requirements." (citing *Diamond v. Charles*, 476 U.S. 54, 62 (1986))). And it has done so in the Establishment Clause context itself. *See Valley Forge Christian Coll. v. Americans United for the Separation of Church & State*, 454 U.S. 464, 465 (1982). In *Valley Forge*, the Court held that "the psychological consequence presumably produced by observation of conduct with which one disagrees" "is not injury sufficient to confer standing under Art. III." *Id.* Applying *Valley Forge*, the Ninth Circuit held that a plaintiff who was offended by the discussion of religious views on a state university's "Understanding Evolution" website lacked standing to pursue an Establishment Clause claim. *Caldwell v. Caldwell*, 545 F.3d 1126, 1133 (9th Cir. 2008). Judge Fletcher concurred to emphasize that the plaintiff had no reason to visit the offending web page more than once, accessing and leaving a website is quick and easy, and the alleged offense from the content of one page that one need not "read or tarry over is fleeting at best." *Id.* at 1134 (Fletcher, J., concurring). In Judge Fletcher's view, the injury was "too de minimis" to confer standing. *Id.*

Thus, offense will not confer standing in the absence of government action that stigmatizes or expresses hostility for one's religion. *Compare Kumar v. Koester*, 131 F.4th 746, 756 (9th Cir. 2025) (holding that there was no injury where the challenged policy did not stigmatize the challengers' religion, even though the challengers were offended by the policy), *with Foothills Christian Ministries v. Johnson*, 148 F.4th 1040, 1053 (9th Cir. 2025) ("Government action that expresses hostility towards a plaintiff's religion, coupled with a sufficient connection between the plaintiff and that action, inflicts an injury that can satisfy Article III[.]"), *cert. denied sub nom. Foothills Ministries v. Johnson*, No. 25-802, 2026 WL 1377110 (U.S. May 18, 2026).

Here, Plaintiffs' only "injury" is the offense they allege they felt from reading the Secretary's emails. That is insufficient to confer standing under Article III. The emails expressed a religious viewpoint with which Plaintiffs disagree, but the messages did not acknowledge, much less stigmatize or express hostility towards, other viewpoints. Even though Plaintiffs' disagreement with that viewpoint is "sharp

and acrimonious[,]" *Diamond*, 476 U.S. at 62, it is not a cognizable injury for purposes of standing.[2] Plaintiffs' failure to allege that they had any reason to view the offending emails more than once or that they could not easily delete them confirms this result. *See Caldwell*, 545 F.3d at 1134 (Fletcher, J., concurring). And because individual employees, including members of the NFFE, lack standing, the union Plaintiff lacks standing too. *See Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 342–43 (1977) (explaining that an association may have standing as the representative of its members if the members themselves would have standing and the individual participation of each injured party is not necessary for proper resolution of the case).

Even if Plaintiffs had a cognizable injury, it would not be redressable by this Court. "To establish Article III redressability, the plaintiffs must show that the relief they seek is both (1) substantially likely to redress their injuries; and (2) within the district court's power to award." *Juliana v. United States*, 947 F.3d 1159, 1170 (9th Cir. 2020). Plaintiffs' requested relief fails both prongs of this test. Plaintiffs seek declaratory and injunctive relief preventing the Secretary "from continuing to send or otherwise communicate proselytizing Christian messages to USDA employees[.]" Compl. Request for Relief ¶ 2. To the extent Plaintiffs' request to not receive "proselytizing *Christian* messages" betrays an issue with the alleged sectarian nature of some of the messages, *id.*; *see* Compl. ¶ 99 (noting that NFFE members took issue with the Easter email in particular), Plaintiffs' requested relief would put this Court in the impossible position of policing the religiosity of the Secretary's speech. *See Town of Greece v. Galloway*, 572 U.S. 565, 582 (2014) (noting "[t]he difficulty, indeed the futility, of sifting sectarian from nonsectarian speech").[3] Where it is not possible for the Court to award the requested relief, redressability is lacking.

[2] *Newdow v. Lefevre*, 598 F.3d 638 (9th Cir. 2010) and *Vasquez v. Los Angeles County*, 487 F.3d 1246 (9th Cir. 2007) are not to the contrary. Those cases found injury where the plaintiff had "frequent regular contact with an allegedly offensive religious symbol[,]" *Vasquez*, 487 F.3d at 1250; *see also Newdow*, 598 F.3d at 642 (finding an injury where the plaintiff was forced "*repeatedly* to encounter" the motto "In God We Trust" on the Nation's money given the ubiquity of coins and currency in everyday life (emphasis added)). Here, there is no such frequent or regular contact, because Plaintiffs received each challenged email only once, and the emails were spread out over the course of several months.

[3] Even if the Court agrees with Plaintiffs' position that none of the six emails identified as offensive could have been "private speech," Pls.' Br. at 13 & n. 33, the requested relief would put this Court in the

*See Juliana*, 947 F.3d at 1171 (holding that redressability was not met where plaintiffs had not established "that the specific relief they seek is within the power of an Article III court").

Moreover, the messages challenged in the Complaint and Plaintiffs' motion do not "proselytize"—they do not on their face request that recipients adopt the beliefs expressed therein or live their lives in accordance with those beliefs.[4] *Compare, e.g.*, July 4, 2025 email ("May God continue to protect the United States of America and may His favor shine over all her land") and Easter email (relaying the beliefs of those who celebrate) *with Cole v. Oroville Union High Sch. Dist.*, 228 F.3d 1092, 1097 (9th Cir. 2000) (finding a student's graduation speech proselytizing where it called upon the audience to "accept God's love and grace" and "yield to God our lives"). Because an injunction barring the Secretary from "proselytizing" would not prevent her from sending the messages challenged in the Complaint, Plaintiffs' requested relief would not redress their injury.

Since Plaintiffs have failed to establish injury and redressability, they lack standing.[5]

### B. The APA Claims Must be Dismissed for Lack of Jurisdiction and Failure to State a Claim

Plaintiffs' APA Claims fail because Plaintiffs have not challenged agency action, let alone final agency action. Under the APA, aggrieved parties may challenge "agency action" that is arbitrary, capricious, or otherwise not in accordance with law. *See* 5 U.S.C. § 706(2). The APA defines agency action as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act . . ." Each category is further defined.[6] As their definitions make clear, "[a]ll of

---

impossible position that *Town of Greece* rejected. *See Town of Greece*, 572 U.S. at 582.

[4] *Proselytize*, Merriam-Webster, https://www.merriam-webster.com/dictionary/proselytize ("proselytize" means "to induce someone to convert to one's faith; to recruit someone to join one's party, institution, or cause").

[5] Plaintiff Dietrich has retired from USDA since this lawsuit was filed. *See* Decl. of Lanette Dietrich ¶ 2, ECF No. 26-6 (Dietrich Decl.). Her claims and requests for relief are therefore moot. *Cf. Doremus v. Bd. of Educ. of Borough of Hawthorne*, 342 U.S. 429, 432–33 (1952) (holding that parents lost standing to challenge bible reading in the classroom when their children graduated: "Obviously no decision we could render now would protect any rights she may once have had, and this Court does not sit to decide arguments after events have put them to rest").

[6] "[R]ule" means the whole or a part of an agency statement of general or particular applicability and

those categories involve circumscribed, discrete agency actions[.]" *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004) (*SUWA*). And any agency action must be "final" to be subject to judicial review. *See* 5 U.S.C. § 704. In this Circuit, these requirements are jurisdictional: the Court's jurisdiction extends only to agency action that is final. *See Rattlesnake Coal. v. U.S. EPA*, 509 F.3d 1095, 1104 (9th Cir. 2007) ("Absent final agency action, there was no jurisdiction in the district court.").

Here, the Secretary's unsolicited emails wishing recipients a happy holiday do not fall into any category of agency action. They are not a "rule" because they do not create law or explain existing law. *See S. California Edison Co. v. FERC*, 770 F.2d 779, 783 (9th Cir. 1985) (explaining that substantive rules create law by imposing "extrastatutory obligations pursuant to authority properly delegated by Congress" and interpretive rules clarify existing law or regulations). According to the Plaintiffs, the "Ninth Circuit has explained that an agency 'rule' under § 704 'includes 'nearly every statement an agency may make.''" Pls.' Br. at 20 (citing *Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Airforce*, 128 F.4th 1089, 1107 (9th Cir. 2025) (quoting *Batterton v. Marshall*, 648 F.2d 694, 700 (D.C. Cir. 1980))). Not exactly. In *Prutehi Litekyan,* the Ninth Circuit first quotes the statutory definition of a "rule," which does not cover literally

---

future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency. 5 U.S.C. § 551(4).

"[O]rder" means the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing. *Id.* § 551(6).

"[L]icense" includes the whole or a part of an agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission. *Id.* § 551(8).

"[S]anction" includes the whole or a part of an agency—(A) prohibition, requirement, limitation, or other condition affecting the freedom of a person; (B) withholding of relief; (C) imposition of penalty or fine; (D) destruction, taking, seizure, or withholding of property; (E) assessment of damages . . . ; (F) requirement, revocation, or suspension of a license; or (G) taking other compulsory or restrictive action. *Id.* § 551(10).

"[R]elief" includes the whole or a part of an agency—(A) grant of money, assistance, license, authority, exemption, exception, privilege, or remedy; (B) recognition of a claim, right, immunity, privilege, exemption, or exception; or (C) taking of other action on the application or petition of, and beneficial to, a person. 5 U.S.C. § 551(11).

any statement, but rather covers statements of "general or particular applicability and future effect[.]" 5 U.S.C. § 551(4), *see supra* n.6. Plaintiffs never quote the definition, cite the definition, or explain how the emails meet this definition of a "rule." And the emails do not plausibly fall within that definition.

The emails are also not an "order" because they do not finally dispose of agency matters. They are not licenses permitting someone to do something. Nor are they sanctions affecting the freedom or property of any person or relief beneficial to and taken on the petition of a person. Because the emails do not fall into any category of "agency action," Plaintiffs' APA challenge cannot proceed. *See SUWA*, 542 U.S. at 62.

Plaintiffs tacitly concede that the emails do not fall into any cognizable category of agency action, instead citing the D.C. Circuit for proposition that these categories are "imprecise." Pls.' Br. at 20 (citing *Indus. Safety Equip. Ass'n, Inc. v. E.P.A.*, 837 F.2d 1115, 1117 (D.C. Cir. 1988)). This is also not helpful to their case, as the "imprecise" action challenged there—an agency guide regarding protection against asbestos exposure—did not fall into any of those categories of agency action and was therefore unreviewable under the APA. *Id.*

Still, Plaintiffs claim that the emails constitute a "policy of communicating proselytizing Christian messages to USDA subordinates." Compl. ¶ 122. Plaintiffs' framing does not get around the APA's fundamental limitation that they must challenge discrete agency action. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990) (rejecting broad challenge to agency program where challengers had not directed their attack against "some particular 'agency action' that causes [them] harm," but rather sought review of the agency's ongoing operations); *see also SUWA*, 542 U.S. at 66 (rejecting an APA claim to compel agency action that was neither discrete nor legally required).

These limitations are meant to "protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *SUWA*, 542 U.S. at 66. Other courts have applied these principles to conclude that, because "'an on-going program or policy is not, in itself, a final agency action under the

APA,' [a court's] jurisdiction does not extend to reviewing generalized complaints about agency behavior." *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) (citation omitted); *accord Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*, 714 F.3d 186, 195 (4th Cir. 2013) (finding that "implementation" of a policy "is neither agency action nor final agency action subject to judicial review under the APA.").

Because the emails are not "agency action," Plaintiffs may not challenge them under the APA. But even if such emails could qualify as agency action, they would not be *final* agency action because they neither mark the "consummation" of the agency's decision-making process nor constitute actions by which "rights or obligations have been determined," or from which "legal consequences will flow[.]" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citation omitted). The emails did not determine any rights or obligations, and no legal consequences flowed from them. Plaintiffs' arguments to the contrary presuppose their incorrect view of the merits of their Establishment Clause claim. *See* Pls.' Br. at 21–22.

Even if this Court had jurisdiction under the APA to review the emails, they are not contrary to constitutional right because, for the reasons explained below, they do not violate the Establishment Clause. *See infra* pp. 14–29. Nor are they arbitrary or capricious or inconsistent with USDA Guidance—issued by the Secretary herself—on federally protected religious expression and accommodation rights. *See* USDA Guidance on Federally Protected Religious Expression and Accommodation Rights, Secretary's Memorandum 1078-019 (Nov. 20, 2025) (USDA Guidance) (citing OPM Memorandum, Protecting Religious Expression in the Federal Workplace (July 28, 2025)). The Guidance provides that all USDA employees enjoy "broad constitutional and statutory rights to engage in religious expression in the workplace." *See id.* at 1. Employees may, for example, wear religious jewelry and clothing at work, perform religious exercises during breaks, and engage in religious conversations with interested colleagues. *See id.* at 2. With respect to religious conversations, the Guidance states that employees must stop if a colleague asks them to stop and cannot create a hostile work environment through persistent unwelcome advances or use official authority to pressure subordinates. *See id.* at 3. The Secretary's emails

do not violate that policy. Plaintiffs do not allege that they asked the Secretary to stop before marching straight to federal court to initiate this lawsuit. In any event, the emails neither pressure subordinates into adopting any belief or engaging in any religious exercise, nor create a hostile work environment through "persistent advances." As alleged in the Complaint and Plaintiffs' motion, Plaintiffs received a total of six emails over the course of a year. Those emails express the Secretary's own beliefs regarding certain holidays in a way that fits well within a broad historical tradition of religious invocations by public officials. *See infra* pp. 15–22. They are therefore entirely consistent with the sentiment in the Guidance. And it is irrelevant that other Secretaries have chosen to express their holiday greetings differently. *See* Pls.' Br. at 23.

Thus, Plaintiffs' APA claims must be dismissed.

**C. The Complaint Fails to State a Claim Under the Establishment Clause**

Plaintiffs have also failed to state a claim under the Establishment Clause. The Establishment Clause must be interpreted by reference to historical practices and understandings. *See Kennedy*, 597 U.S. at 535; *see also Am. Legion*, 588 U.S. at 60. In *Kennedy*, the Supreme Court abandoned its prior Establishment Clause test under *Lemon v. Kurtzman*, 403 U.S. 602 (1971), which focused on a law's purposes, effects, and potential for entanglement with religion, as well as *Lemon*'s "endorsement test" offshoot. *Kennedy*, 597 U.S. at 534. The latter test asked whether a "reasonable observer" would consider the government's challenged action an "endorsement" of religion. *See County of Allegheny v. Am. C.L. Union Greater Pittsburgh Chapter*, 492 U.S. 573, 592 (1989), *abrogated by Town of Greece*, 572 U.S. 565 (2014). But those approaches ignored the Supreme Court's repeated instruction that an analysis focused on original meaning and history is the rule, not the exception. *See Kennedy*, 597 U.S. at 536. Under *Kennedy*, the Plaintiff bears "the burden of proving a set of facts that would have historically been understood as an establishment of religion." *Firewalker-Fields v. Lee*, 58 F.4th 104, 122 n.7 (4th Cir. 2023); *accord Hilsenrath v. Sch. Dist. of Chathams*, 136 F.4th 484, 491 n.54 (3d Cir. 2025), *cert denied sub nom. Hilsenrath v. Chathams Sch. Dist. Bd. of Educ.*, 146 S. Ct. 885 (2025).

Plaintiffs have made no such showing here. "Beyond a formal declaration that a religious denomination was in fact the established church, . . . founding-era religious establishments often bore certain telling traits," most of which involved "forms of 'coercion' regarding 'religion or its exercise." *Shurtleff v. City of Boston*, 596 U.S. 243, 286 (2022) (Gorsuch, J., concurring) (citing *Lee v. Weisman*, 505 U.S. 577, 587 (1992)). For example, government-mandated church attendance, punishment for dissenting religious exercise, restricted political participation for dissenters, and government financial support for the established church were all hallmarks of founding-era establishments. *See id.* at 286 (citing Michael W. McConnell, *Establishment and Disestablishment at the Founding*, 44 Wm. & Mary L. Rev. 2105, 2110–2112, 2131 (2003)). On the other hand, "where history shows that the specific [challenged] practice is permitted[,]" *Town of Greece*, 572 U.S. at 577, "it is not necessary to define the precise boundary of the Establishment Clause[.]" *Id.*; *see also, e.g.*, *Marsh*, 463 U.S. at 787–792, 795; *Van Orden*, 545 U.S. at 686–690 (plurality opinion).

Here, the Secretary's emails fit within an unbroken tradition of religious invocations by public figures dating back to the founding. And even assuming the facts alleged in the Complaint are true, they do not share the historical characteristics of an established religion. In particular, Plaintiffs have failed to plausibly allege that the emails coerced anyone with respect to religion or its exercise. Plaintiffs have also failed to show that the emails establish a denominational preference, so Plaintiffs' Establishment Clause claim must be dismissed.

**1. The Secretary's Emails Comport with History and Tradition**

The Secretary's emails fit within an unbroken tradition of religious invocations by public officials in all three branches of government, including those in the Executive Branch. *See Van Orden*, 545 U.S. at 686 ("There is an unbroken history of official acknowledgment by all three branches of government of the role of religion in American life from at least 1789." (quoting *Lynch*, 465 U.S. at 674)). Because "history shows that the specific practice [challenged here] is permitted[,]" *Town of Greece*, 572 U.S. at 577, there is no Establishment Clause violation. *See id.*; *see also, e.g.*, *Marsh*, 463 U.S. at 787–792, 795

(upholding the Nebraska legislature's practice of opening each session with a prayer by a chaplain paid with public funds because the practice dates back to the Continental Congress); *Van Orden*, 545 U.S. at 686–690 (plurality opinion) (upholding Ten Commandments display after finding it was consistent with tradition of official acknowledgements of religion's role in American life).

To begin, President George Washington opened his presidency with a prayer.[7] In his first inaugural address, he resorted "in humble supplication" "to the benign Parent of the Human Race" for the security of the Union.[8] Washington went on to request that "His divine blessing may be equally conspicuous in the enlarged views, the temperate consultations, and the wise measures on which the success of this Government must depend."[9] Later in his presidency, at the request of the very Congress that passed the Bill of Rights, Washington proclaimed a day of "public thanksgiving and prayer to be observed by acknowledging with grateful hearts the many and signal favors of Almighty God[.]"[10] To this day, the capstone of the Washington monument bears the inscription, Laus Deo, "Praise be to God."[11]

The next three Presidents—John Adams, Thomas Jefferson, and James Madison—followed suit. Adams proclaimed a fast day to be observed throughout the United States in May of 1798 "as a day of solemn humiliation, fasting, and prayer[.]"[12] He proclaimed: "the safety and prosperity of nations ultimately and essentially depend on the protection and the blessing of Almighty God, and the national acknowledgment of this truth is . . . an indispensable duty which the people owe to Him[.]"[13] Jefferson

---

[7] George Washington, *First Inaugural Address* (Apr. 30, 1789), *available at* The Avalon Project, https://avalon.law.yale.edu/18th_century/wash1.asp [https://perma.cc/9TNC-H3FH].

[8] *Id.*

[9] *Id.*

[10] George Washington, *Thanksgiving Proclamation of 1789* (Oct. 3, 1789), *available at* Founders Online, https://founders.archives.gov/documents/Washington/05-04-02-0091.

[11] *History & Culture*, National Park Service, https://www.nps.gov/wamo/learn/historyculture/index.htm [https://perma.cc/35EH-RVM9].

[12] John Adams, *Proclamation of Day of Fasting, Humiliation and Prayer* (Mar. 23, 1798), *available at* Univ. of Va. Miller Ctr., https://millercenter.org/the-presidency/presidential-speeches/march-23-1798-proclamation-day-fasting-humiliation-and-prayer [https://perma.cc/MG7Y-8J7T].

[13] *Id.*

concluded his second inaugural address by inviting his audience to pray: "I shall need, too, the favor of that Being in whose hands we are . . . and to whose goodness I ask you to join with me in supplications, that he will so enlighten the minds of your servants[.]"[14] Jefferson also drafted Virginia's statute for religious freedom, which began by acknowledging that "Almighty God hath created the mind free" and "all attempts to influence it by temporal punishment or burthens, or by civil incapacitations . . . are a departure from the plan of the Holy author of our religion[.]" Virginia Statute for Religious Freedom, Va. Code § 57-1 (1786). Jefferson's belief that "[t]he [G]od who gave us life gave us liberty," [15] is still displayed on his eponymous Memorial.[16] Madison, in his first inaugural address, likewise placed his confidence in "the guardianship and guidance of that Almighty Being whose power regulates the destiny of nations, whose blessings have been so conspicuously dispensed to this rising Republic, and to whom we are bound to address . . . our fervent supplications and best hopes for the future."[17]

The tradition continued after the founding era. During the Civil War, in response to a Senate resolution, President Abraham Lincoln issued a proclamation setting a national day of prayer and fasting, in which he recognized the "duty of nations as well as of men, to own their dependence upon the overruling power of God . . . and to recognize the sublime truth, announced in the Holy Scriptures and proven by all history, that those nations only are blessed whose God is the Lord."[18] In the proclamation, he lamented that "we have forgotten God . . . . Intoxicated with unbroken success, we have become too self-sufficient

[14] Thomas Jefferson, *Second Inaugural Address* (Mar. 4, 1805), *available at* The Avalon Project, https://avalon.law.yale.edu/19th_century/jefinau2.asp [https://perma.cc/L9R5-6X9L].

[15] Thomas Jefferson, *Draft of Instructions to the Virginia Delegates in the Continental Congress* (July 1774), *available at* Founders Online, https://founders.archives.gov/documents/Jefferson/01-01-02-0090.

[16] *Quotations on the Jefferson Memorial*, Thomas Jefferson Encyclopedia, https://www.monticello.org/encyclopedia/quotations-jefferson-memorial (last visited Aug. 21, 2026).

[17] James Madison, *First Inaugural Address* (Mar. 4, 1809), *available at* The Avalon Project, https://avalon.law.yale.edu/19th_century/madison1.asp [https://perma.cc/HNR6-SKHM].

[18] Abraham Lincoln, *Proclamation Appointing a National Fast Day* (Mar. 30, 1863), *available at* Abraham Lincoln Online, https://www.abrahamlincolnonline.org/lincoln/speeches/fast.htm [https://perma.cc/39UR-6XN6].

to feel the necessity of redeeming and preserving grace, too proud to pray to the God that made us!"[19] Then, in his second inaugural address, Lincoln quoted two bible verses: Matthew 18:7 ("The Almighty has His own purposes. 'Woe unto the world because of offenses'") and Psalm 19:9 ("[F]ervently do we pray, that this mighty scourge of war may speedily pass away. Yet, if God wills that it continue . . . so still it must be said 'the judgments of the Lord are true and righteous altogether.'").[20] The text of the address, including the bible quotations, appears on the Lincoln Memorial.

Later, during World War II, then-General Dwight D. Eisenhower issued an order to encourage Allied soldiers taking part in the D-Day invasion. He concluded the order by stating: "Good luck! And let us beseech the blessing of Almighty God upon this great and noble undertaking."[21] That night, President Franklin Delano Roosevelt led the nation in prayer over the radio.[22] He began the prayer by asking "Almighty God" to "[l]ead" "[o]ur sons, pride of our Nation," "straight and true; give strength to their arms, stoutness to their hearts, steadfastness in their faith" as they "struggle to preserve our Republic, our religion, and our civilization, and to set free a suffering humanity."[23] After acknowledging the long road ahead, he asked Americans to "devote themselves in a continuance of prayer."[24] FDR also issued a Thanksgiving Day proclamation in 1944, in which he proclaimed: "To the end that we may bear more

---

[19] *Id.*

[20] Abraham Lincoln, *Second Inaugural Address* (Mar. 4, 1865), *available at* The Avalon Project, https://avalon.law.yale.edu/19th_century/lincoln2.asp [https://perma.cc/9WDN-6LM4].

[21] General Dwight D. Eisenhower, *Order of the Day* (June 6, 1944), *available at* Nat'l Archives, https://www.archives.gov/milestone-documents/general-eisenhowers-order-of-the-day [https://perma.cc/T45F-66Z3].

[22] Franklin D. Roosevelt, *Prayer on D-Day* (June 6, 1944), *available at* The American Presidency Project, https://www.presidency.ucsb.edu/documents/prayer-d-day [https://perma.cc/7N2M-6V6H].

[23] *Id.*

[24] *Id.* Seventy years later, Congress approved a measure to add an inscription of the prayer to the World War II Memorial on the National Mall. *See* World War II Memorial Prayer Act of 2013, Pub. L. No. 113-123, 128 Stat. 1377 (2014). It did so over the objection of those who claimed that the addition "would send a strong message to those who do not share the same religious beliefs expressed in this prayer that they are excluded and 'not full members of the . . . community." Coalition Letter to the Senate Committee on Energy and Natural Resources urging opposition to the World War II Memorial Prayer Act (S.1044), ACLU (Nov. 21, 2013), https://www.aclu.org/documents/coalition-letter-senate-committee-energy-and-natural-resources-urging-opposition-world-war-ii [https://perma.cc/33WP-PWGL] (citation omitted).

earnest witness to our gratitude to Almighty God, I suggest a nationwide reading of the Holy Scriptures during the period from Thanksgiving Day to Christmas."[25] And his successor, Harry S. Truman, remarked that "[o]ur growth and our laws are founded on those originating with Hammurabi in the Mesopotamian Valley, propounded by Moses, and elaborated on by Jesus Christ, whose Sermon on the Mount is the best ethical program by which to live."[26]

Presidents continue to conclude the Presidential oath with the words "so help me God."[27] The House of Representatives and Senate open their sessions with a prayer led by official chaplains.[28] Supreme Court sessions open with the prayer "God save the United States and this Honorable Court." *Town of Greece*, 572 U.S. at 587 (citation omitted). Monuments at the Arlington National Cemetery display bible verses. The Chaplains Monument in particular bears the inscription: "Greater love hath no man than this, that a man lay down his life for his friends[,]" John 15:13.[29] Our national motto, "In God We Trust," *see* 36 U.S.C. § 302, appears on our coinage. And the Pledge of Allegiance acknowledges that we are a Nation "under God[.]" *See Lynch*, 465 U.S. at 676.

Public figures at all levels of government therefore continue to invoke the Almighty in the course of their official duties. As Justice Stevens observed, "[o]ur leaders, when delivering public addresses,

---

[25] Franklin D. Roosevelt, *Proclamation 2629—Thanksgiving Day, 1944* (Nov. 1, 1944), *available at* The American Presidency Project, https://www.presidency.ucsb.edu/documents/proclamation-2629-thanksgiving-day-1944 [https://perma.cc/TJQ6-LTVF]. Other Presidents have issued similar proclamations framing Thanksgiving in religious terms. *See, e.g.*, Proclamation No. 5098, 48 Fed. Reg. 42,801 (Sept. 15, 1983) (Ronald Reagan); Proclamation No. 4803, 45 Fed. Reg. 75,633 (Nov. 13, 1980) (Jimmy Carter); Proclamation No. 4093, 36 Fed. Reg. 21,401 (Nov. 9, 1971) (Richard Nixon); Proclamation No. 3752, 31 Fed. Reg. 13,635 (Oct. 22, 1966) (Lyndon B. Johnson); Proclamation No. 3560, 28 Fed. Reg. 11,871 (Nov. 7, 1963) (John F. Kennedy).

[26] Harry S Truman, *Remarks in Kansas City at a Luncheon for the Press* (Dec. 22, 1950), *available at* The American Presidency Project, https://www.presidency.ucsb.edu/documents/remarks-kansas-city-luncheon-for-the-press [https://perma.cc/EX2G-VPA2].

[27] *See* Frederick B. Jonassen, *Kiss the Book . . . You're President . . . : "So Help Me God" And Kissing the Book in The Presidential Oath of Office*, 20 William and Mary Bill of Rts. J. 853, 898 (2012).

[28] House and Senate Chaplains: An Overview (2026), https://www.congress.gov/crs-product/R41807 (last visited Aug. 21, 2026).

[29] *Chaplains Hill Monuments*, Arlington National Cemetery, https://www.arlingtoncemetery.mil/Explore/Monuments-and-Memorials/Chaplains-Hill (last visited Aug. 21, 2026).

often express their blessings simultaneously in the service of God and their constituents. Thus, when public officials deliver public speeches, we recognize that their words are not exclusively a transmission from the government because those oratories have embedded within them the inherently personal views of the speaker as an individual member of the polity." *Van Orden*, 545 U.S. at 723 (Stevens, J., dissenting) (emphasis omitted).

The emails of the USDA Secretary, a principal officer in the Executive Branch, fit well within this tradition, so they do not violate the Establishment Clause. For example, in her Thanksgiving email, the Secretary credited "gratitude towards a loving God" in bringing together "two peoples" "despite their differences." Compl. ¶ 31. That message is consistent with President Washington's Thanksgiving Proclamation, which proclaimed it the "duty" of all nations to be grateful to Almighty God "for His benefits[.]"[30] *See also Lynch*, 465 U.S. at 675 (recognizing that "[b]eginning in the early colonial period long before Independence, a day of Thanksgiving was celebrated as a religious holiday to give thanks for the bounties of Nature as gifts from God"). Likewise, the Secretary's July 4, 2025 message, which concluded with "May God continue to protect the United States of America and may His favor shine over all her land[,]" tracks President Adams' fast-day proclamation, which stated that "the safety and prosperity of nations ultimately and essentially depend on the protection and the blessing of Almighty God[.]"[31] And her wish that "this Easter let us too be alive with hope, full of Paschal joy, and confident in the mission each of us has been called for[,]" *see* Easter email, echoes the sentiment in General Eisenhower's order urging his troops to "beseech the blessing of Almighty God upon this great and noble undertaking."[32] More recently, the Secretary's Memorial Day email, which conveyed that "we can take comfort" in the

[30] George Washington, *Thanksgiving Proclamation* (Oct. 3, 1789), *available at* The Avalon Project, https://avalon.law.yale.edu/18th_century/gwproc01.asp [https://perma.cc/6AEA-MGUG].

[31] John Adams, *Proclamation of Day of Fasting, Humiliation and Prayer* (Mar. 23, 1798), *available at* Univ. of Va. Miller Ctr., https://millercenter.org/the-presidency/presidential-speeches/march-23-1798-proclamation-day-fasting-humiliation-and-prayer [https://perma.cc/MG7Y-8J7T].

[32] General Dwight D. Eisenhower, *Order of the Day* (June 6, 1944), *available at* https://www.archives.gov/milestone-documents/general-eisenhowers-order-of-the-day [https://perma.cc/T45F-66Z3].

words of John 10:28, evokes the Arlington National Cemetery's display of John 15:13. And her July 4, 2026 email, which quoted 2 Corinthians 3:17 ("where the Spirit of the Lord is, there is freedom"), aligns with Jefferson's view that the "God who gave us life gave us liberty[.]"[33]

Because the Secretary's emails are consistent with this deeply rooted history and tradition, they do not violate the Establishment Clause. Indeed, the Secretary's emails are even less intrusive than many of the presidential proclamations and official acts outlined above, which called upon citizens to engage in religious exercise, whereas the Secretary's emails do not.

Plaintiffs argue that at least some of the messages—the Christmas message and Easter email in particular—fall outside of this tradition due to their inclusion of "sectarian" language and themes. *See* Compl. ¶ 49 (claiming that the Secretary's message imposed "her brand of Christianity" on agency employees); *see also* Pls.' Br. at 23 (describing holiday messages from previous USDA Secretaries as "simple ecumenical greetings"); Decl. of John Ragosta ¶ 81, ECF No. 26-9 (describing Washington's and Madison's prayer proclamations as "general and nonsectarian").

But the allegedly "sectarian" nature of speech cannot render it unconstitutional. *See Town of Greece*, 572 U.S. at 577. In *Town of Greece*, the Court considered a challenge to a town board's practice of opening meetings with a prayer. Challengers took offense to references to the "death, resurrection, and ascension of the Savior Jesus Christ," and the "saving sacrifice of Jesus Christ on the cross," in several of the prayers. *Id*. They argued that prayers must be addressed "only to a generic God" to pass constitutional muster. Apart from noting the futility of "sifting sectarian from nonsectarian speech," *id.* at 582, the Court found that an "insistence on nonsectarian or ecumenical prayer as a single, fixed standard is not consistent with the tradition of legislative prayer outlined in the Court's cases[,]" *id.* at 578; *see also id.* at 579 (explaining that one of the Senate's first chaplains gave a prayer seeking "the grace of our Lord Jesus Christ"). The Court also stressed that requiring invocations to be nonsectarian would force courts "to act

[33] Thomas Jefferson, *Draft of Instructions to the Virginia Delegates in the Continental Congress* (July 1774), *available at* Founders Online, https://founders.archives.gov/documents/Jefferson/01-01-02-0090.

as supervisors and censors of religious speech," *id.* at 581, which would involve Government in religious matters to a far greater degree than our constitutional system contemplates: "Government may not mandate a civic religion that stifles any but the most generic reference to the sacred any more than it may prescribe a religious orthodoxy." *Id.* The Court cautioned against "a pattern of prayers that over time denigrate, proselytize, or betray an impermissible government purpose," *id.* at 585, but noted that "a challenge based solely on the content of a prayer will not likely establish a constitutional violation"—especially where the prayers included universal as well as sectarian themes. *Id.*

Here, too, the Secretary's emails do not establish a pattern of "denigrat[ing], proselytiz[ing], or betray[ing] an impermissible government purpose[.]" *Id.* at 585. As in *Town of Greece*, the emails include Christian references, but they also include universal themes such as gratitude for the hard work of employees on behalf of USDA. *See* Compl. ¶ 34. Contrary to Plaintiffs' conclusory allegations that the emails "proselytize," *see, e.g.*, Compl. ¶ 2, they do not on their face preach conversion, request that anyone adopt the beliefs expressed therein, or denigrate nonbelievers. Even invoking "our Creator" apparently qualifies as "proselytizing" in Plaintiffs' view, *see* Pls.' Br. at 1, 5, which would mean that the Secretary could not quote the Declaration of Independence without violating the Establishment Clause. But the Secretary's emails do not proselytize under any proper definition of the term. Rather, in the emails, the Secretary wishes employees well on major holidays and expresses her "inherently personal" beliefs with respect to those holidays. *Van Orden*, 545 U.S. at 723 (Stevens, J., dissenting). This Court should therefore decline Plaintiffs' invitation to act as a censor of the religiosity of that speech.

Because the Secretary's speech fits within deeply rooted history and tradition of religious references by public officials, it does not violate the Establishment Clause.

**2. The Secretary's Emails Are Not Coercive**

The Establishment Clause claim also fails because the Secretary's emails are not coercive. At the founding, the foremost hallmark of religious establishments that the framers sought to prohibit was coercion of religious orthodoxy. *See Kennedy*, 597 U.S. at 537; *see also Am. Legion*, 588 U.S. at 75

(Thomas, J., concurring) ("The *sine qua non* of an establishment of religion is 'actual legal coercion.'" (citation omitted)). Coercion in this context was achieved by force of law and threat of penalty. *See Am. Legion*, 588 U.S. at 75 (Thomas, J., concurring). Thus, government may not make religious observance compulsory or force citizens to engage in a formal religious exercise. *See Zorach*, 343 U.S. at 314.

But not all religious speech in a government setting is coercive. *Town of Greece* again provides an example. *See Town of Greece*, 572 U.S. at 572. There, a majority of the Court found that the town board's prayer practice was not coercive. Although the plaintiffs "stated that the prayers gave them offense and made them feel excluded and disrespected[,]" the plurality stressed that "offense" "does not equate to coercion." *Id.* at 589 (Kennedy, J. with Roberts, C.J. and Alito, J.). "Adults often encounter speech they find disagreeable; and an Establishment Clause violation is not made out any time a person experiences a sense of affront from the expression of contrary religious views in a legislative forum[.]" *Id.* The plurality also reasoned that town board members did not direct the public to participate in the prayers, single out dissidents for opprobrium, or indicate that their decisions might be influenced by a person's response to the prayer opportunity. *See id.* at 588. Justices Thomas and Scalia agreed with the plurality that the practice was not coercive but would have gone further to hold that "to the extent coercion is relevant to the Establishment Clause analysis, it is actual legal coercion that counts[.]" *Id.* at 610 (Thomas, J. with Scalia, J.).

Likewise, in *Van Orden v. Perry*, the Supreme Court held that a Ten Commandments display on the grounds of the Texas State Capitol did not violate the Establishment Clause. The Court reasoned that "[i]n no sense does Texas compel petitioner Van Orden to do anything. The only injury to him is that he takes offense at seeing the monument as he passes it" in his travels. The Court continued, "[h]e need not stop to read it or even to look at it, let alone to express support for it or adopt the Commandments as guides for his life." 545 U.S. at 694. "The mere presence of the monument along his path involves no coercion and thus does not violate the Establishment Clause." *Id.*

Against that backdrop, the Secretary's emails are not coercive. As alleged in the Complaint and Plaintiffs' motion, the Secretary sent emails to USDA employees on major holidays: the Fourth of July, Thanksgiving, Christmas, Easter, and Memorial Day. In the messages, the Secretary wished her employees a happy holiday, *see, e.g.*, Easter email ("I hope you and your loved ones have a truly blessed and happy Easter") and relayed her own inherently personal views regarding the reason for celebrating, *see id.* ("Today we celebrate the greatest story ever told, the foundation of our faith . . . Jesus has been raised from the dead"); Christmas message ("The spirit of generosity flows from the very first Christmas when God gave us the greatest gift possible, the gift of his Son and our Savior Jesus Christ"). Those messages may have offended Plaintiffs, but "offense does not equate to coercion." *Town of Greece*, 572 U.S. at 567 (opinion of Kennedy, J.). Like the Ten Commandments display in *Van Orden*, the Secretary's messages did not compel anyone to do anything, let alone express support for the beliefs contained therein or act in accordance with those beliefs. The mere presence of the emails in Plaintiffs' inboxes involves no coercion and thus does not violate the Establishment Clause. *See Van Orden*, 545 U.S. at 694. Recipients did not even have to read the emails; they could have inferred from their subject lines—i.e., "Merry Christmas from Secretary Rollins" and "Happy Easter!"—that the messages were not work-related and deleted them without consequence. Even if Plaintiffs did have to read the messages, reading an email, including one that expresses a religious viewpoint, is not in itself a religious exercise.

Nor did the emails single out dissidents for opprobrium, disparage those who do not share the beliefs of the Secretary, or indicate that work-related decisions would be influenced by an employee's reaction to the emails. *See Town of Greece*, 572 U.S. at 589. Plaintiffs offer no factual support for their "fear [of] negative consequences [for] not sharing the Secretary's religion or expressing their own different beliefs in the workplace." Compl. ¶ 7; *see also, e.g.*, Decl. of Anne Poopatanapong ¶¶ 11, 12, ECF No. 26-2 (Poopatanapong Decl.) (claiming that, as a Buddhist, the emails make Plaintiff feel as though she must hide who she is or "risk losing [her] job"). On the contrary, a memorandum signed by Secretary Rollins herself makes clear that "all USDA employees" enjoy "broad constitutional and statutory rights

to religious expression in the workplace." USDA Guidance at 1. The Guidance explicitly provides that employees have "the right to publicly express their faith without government retaliation, the ability to participate fully in society in accordance with conscience, and the freedom from government coerced religious or secular dogma." *Id.*; *see also* OPM Memorandum, Protecting Religious Expression in the Federal Workplace (July 28, 2025) ("The First Amendment to the U.S. Constitution robustly protects expressions of religious faith by all Americans—including Federal employees."). Plaintiffs' unsupported fear of "retaliation" for not adhering to the Secretary's beliefs is therefore implausible on its face.[34] Indeed, although one plaintiff avers that she told her supervisor that she does not "talk about religion" after the supervisor shared that he was Catholic, she does not claim that she faced any negative consequences for her response or that her supervisor failed to respect her desire not to discuss religion. Decl. of Jennifer Wolfe ¶ 14, ECF No. 26-5 (Wolfe Decl.).

Unlike public school children, who may be susceptible to "psychological coercion," from peers and authority figures, especially where their reaction to a religious exercise will be visible to others, Plaintiffs are adult members of the workforce. As such, they "presumably are not readily susceptible to religious indoctrination or peer pressure." *Freedom From Religion Found., Inc. v. Chino Valley Unified Sch. Dist. Bd. of Educ.*, 896 F.3d 1132, 1145 (9th Cir. 2018) (citation omitted). Indeed, most of the cases Plaintiffs cite to support their claim of coercion involved primary or secondary school children. *See* Pls.' Br. at 12, 14 (citing *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 294 (2000) (Establishment Clause challenge to policy permitting student-led, student-initiated prayer at high school football games); *Lee*, 505 U.S. at 577 (challenge to prayer at high school graduation ceremony); *Cole*, 228 F.3d at 1095 (challenge to restrictions on student speech at high school graduation); *Engel v. Vitale*, 370 U.S. 421, 424 (1962) (challenge to public school's practice of starting school day with a prayer)). But those cases were

[34] Even Plaintiff Dietrich's allegations, *see* Compl. ¶ 65; *see also* Dietrich Decl. ¶ 14, establish only that her request to be removed from agency-wide distribution lists was "not possible" and escalating it would "create trouble," not that she would face "trouble" for failing to subscribe to the Secretary's religious beliefs or dissenting religious exercise. *Id*. In any event, Plaintiff Dietrich's claims are moot since she has since retired from USDA.

informed by "heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools." *Lee*, 505 U.S. at 592. By contrast, courts have found some of those same practices non-coercive when presented to college students. *See Tanford v. Brand*, 104 F.3d 982, 985 (7th Cir. 1997) (upholding a state university's practice of including a religious invocation as part of its graduation ceremony); *Chaudhuri v. Tennessee*, 130 F.3d 232, 237 (6th Cir. 1997) (finding that "an audience of college-educated adults could [not] be influenced unduly by prayers" at graduation ceremonies).

All of the other out-of-circuit, nonbinding cases Plaintiffs rely on to support their claim that the emails are "coercive" are likewise readily distinguishable. *See* Pls.' Br. at 10–14. For example, in *Venters v. City of Delphi*, a radio dispatcher for the police department alleged that its Police Chief repeatedly lectured her on his views of appropriate Christian behavior, admonished her that "she needed to be 'saved' and faced damnation," and asked her intimate questions about her social and religious life. *Venters v. City of Delphi*, 123 F.3d 956, 970 (7th Cir. 1997). The Police Chief also threatened her job if she failed to conform with his own religious beliefs and did eventually fire her. *Id.* Here, by contrast, the Secretary has not required employees to adopt the beliefs expressed in her emails or "submit to a religious inspection of [their] own li[ves]." *Id.* at 971. The *Venters* court expressly distinguished cases, like this one, where plaintiffs "complain[] simply that [they are] uncomfortable with the religious views that [the defendant] volunteered to [them]." *Id.*

Similarly, in *Milwaukee Deputy Sheriffs Association v. Clarke*, a County Sheriff invited a Christian organization to make presentations at a mandatory department leadership conference and subsequent meetings held during work shifts. 513 F. Supp. 2d 1014, 1021 (E.D. Wis. 2007), *aff'd sub nom. Milwaukee Deputy Sheriffs' Ass'n v. Clarke*, 588 F.3d 523 (7th Cir. 2009). The presentations encouraged deputies to learn how to "impact others for Christ" and "how Christ can impact [their] life." *Id.* at 1019. At the conference, the Sheriff discussed promotion criteria and distributed written material recommending that deputies surround themselves with people of faith. *Id.* On those facts, the court found coercion present

because deputies were required to attend the leadership conference and meetings, were not advised that they could skip the presentations or dissent, and could have easily inferred that receptiveness to the group's message would increase their opportunities for advancement. Here, by contrast, Plaintiffs were not subjected to lengthy oral presentations on how religion should impact their lives. Nor could they reasonably infer—in the face of express USDA Guidance affirming their right to diverse religious exercise—that their reactions to the emails would impact their job prospects at USDA.[35]

Finally, *Anderson v. Laird* and *Mellen v. Bunting* both concerned cadets at military institutions. *See Anderson v. Laird*, 466 F.2d 283, 284 (D.C. Cir. 1972) (finding the requirement that cadets at federal military academies attend chapel services or face punishment coercive); *Mellen v. Bunting*, 327 F.3d 355, 371 (4th Cir. 2003) (noting that cadets at the Virginia Military Institute are "uniquely susceptible to coercion" because they "must submit to mandatory and ritualized activities, as obedience and conformity remain central tenets of the school's educational philosophy"). But unlike cadets, federal employees face no expectation of uniformity. *Contra, e.g.*, Poopatanapong Decl. ¶ 13 ("I fear that the Secretary will send another proselytizing email to my USDA colleagues and me for Christmas, further exacerbating the pressure I feel to conform and hide my own beliefs.").

Plaintiffs further claim that the Secretary's messages made them "feel excluded and unwelcome," Compl. ¶ 7, like "outsiders to the agency" *id.* ¶ 37. But absent coercion, whether observers subjectively feel excluded or unwelcome is no longer relevant to the Establishment Clause analysis. That inquiry was relevant to the Supreme Court's endorsement test, an outgrowth of the *Lemon* test, which asked whether a "reasonable observer" would consider the government's challenged action an "endorsement" of religion. *See County of Allegheny*, 492 U.S. at 593; *see also id.* at 625 (O'Connor, J., concurring) ("Endorsement sends a message to nonadherents that they are outsiders, not full members of the political community, and

[35] For the same reason, Plaintiffs' reliance on *Torcaso v. Watkins* and *Marrero-Mendez v. Calixto-Rodriguez* is misplaced. *See Torcaso v. Watkins*, 367 U.S. 488, 490 (1961) (invalidating a provision of the Maryland Constitution requiring declaration of belief in God as a qualification for holding public office); *Marrero-Mendez v. Calixto-Rodriguez*, 830 F.3d 38, 42 (1st Cir. 2016) (police officer relegated to worse assignment for not participating in group prayer).

an accompanying message to adherents that they are insiders, favored members of the political community." (citation omitted)). Neither *Lemon* nor the endorsement test survived *Kennedy*. *See Kennedy*, 597 U.S. at 534 ("[T]his Court long ago abandoned *Lemon* and its endorsement test offshoot.").[36] As *Kennedy* makes clear, the Establishment Clause does not contain anything like a "modified heckler's veto, in which . . . religious activity can be proscribed based on perceptions or discomfort." *Id.*

Absent any form of coercion, Plaintiffs' Establishment Clause challenge must fail.

**3. The Secretary's Emails Do Not Establish a Denominational Preference**

Plaintiffs also argue that the Secretary's emails violate the Establishment Clause because they express a denominational preference. But this is simply another version of Plaintiffs' mistaken argument that the permissibility of religious speech turns on whether it is "sectarian." While the Establishment Clause "bars . . . preferences for particular religious faiths[,]" *Elk Grove*, 542 U.S. at 53 (Thomas, J., concurring) (emphasis and citation omitted), "[l]egal compulsion is an inherent component of 'preferences' in this context." *Id.* Thus, "the government cannot privilege certain religions over others when imposing burdens or granting benefits." *Nathan v. Alamo Heights Indep. Sch. Dist.*, 173 F.4th 576, 604 (5th Cir. 2026) (en banc). Plaintiffs' principal authority, *Catholic Charities Bureau, Inc. v. Wisconsin Labor & Industry Review Commission*, 605 U.S. 238, 249 (2025), illustrates the point. And not to their benefit. There, the "denominational preference" at issue was not merely a government official's speech, but a state statute that made the applicability of a tax exemption for religious non-profits turn on theological grounds. *Id. See also* James Madison's *Memorial and Remonstrance Against Religious*

[36] The Supreme Court's unanimous decision in *Catholic Charities Bureau, Inc. v. Wisconsin Labor & Industry Review Commission*, 605 U.S. 238 (2025) is not to the contrary. There, the Court held that the Government cannot make eligibility for a tax exemption turn on theological differences between religious sects unless it satisfies strict scrutiny. The case highlights that, when the Government violates the Establishment Clause, the effect is to impede the free exercise of members of disfavored faiths and make those members feel like outsiders in the political community. *See id.* at 248. But it does not follow that feeling like an outsider in the political community establishes an Establishment Clause violation. That the Government cannot engage in unlawful religious discrimination does not mean it must "'purge from the public sphere' anything an objective observer could reasonably infer endorses or 'partakes of the religious.'" *Kennedy*, 597 U.S. at 535 (citation omitted). For the avoidance of doubt, a year after *Kennedy*, the Supreme Court unanimously described *Lemon* as "now abrogated." *Groff v. DeJoy*, 600 U.S. 447, 460 & n.7 (2023) (citing *Kennedy*, 597 U.S. at 534).

*Assessments* (opposing tax to support one religious denomination);[37] *Larson v. Valente*, 456 U.S. 228, 230 & n.23 (1982) (finding a state statute discriminatory where it imposed registration and reporting requirements on only certain religious organizations); *Epperson v. Arkansas*, 393 U.S. 97, 98 (1968) (invalidating a state law that criminalized the teaching of evolution due to the tenets of particular religious establishments).

Here, however, there is no such "denominational preference" because there is no legal compulsion. The Establishment Clause does not permit the government to levy taxes in support of one religion, or impose burdensome requirements only on certain religions, or mandate, under threat of criminal liability, that teaching and learning conform to the principles of any religious sect. *See Catholic Charities Bureau, Inc.*, 605 U.S. at 249; *Larson*, 456 U.S. at 230 & n.23; *Epperson*, 393 U.S. at 98. But the Clause does not mean that the Secretary of an agency cannot express preferences with respect to the holidays she chooses to celebrate, or that, in celebrating those holidays, she cannot relay her beliefs and those of others who celebrate in wishing her employees well. *Cf. Nathan*, 173 F.4th at 604 ("[The 'denominational discrimination'] principle has no application to government use of religious language or symbolism."). As explained above, employees were free to ignore, delete, disagree with, or otherwise respond as they saw fit to the Secretary's emails. They were not compelled to do anything.

For this reason too, the Establishment Clause claim must fail.

## II. The Remaining Preliminary Injunction Factors Weigh in Favor of the Government

The remaining preliminary injunction factors weigh in favor of the Government. Plaintiffs assert that their alleged loss of First Amendment rights constitutes irreparable injury. Pls.' Br. at 24. But to meet their burden on irreparable harm, "[a] plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary relief." *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1022 (9th Cir. 2016) (quoting

[37] James Madison, *Memorial and Remonstrance* (1785), *available at* Bill of Rts. Inst., https://billofrightsinstitute.org/primary-sources/memorial-and-remonstrance/ [https://perma.cc/TG4Y-477E].

*Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988)). Even in the First Amendment context, "[t]reating as a foregone conclusion that Plaintiffs have shown a likelihood of success is inconsistent with their burden" to establish irreparable harm. *Citizens for Quality Educ. San Diego v. Barrera*, 333 F. Supp. 3d 1003, 1029 (S.D. Cal. 2018); *see also Klein v. City of San Clemente*, 584 F.3d 1196, 1207 (9th Cir. 2009). Here, Plaintiffs have failed to establish either an injury sufficient to confer standing or a violation of their First Amendment rights, *see supra* pp. 7–10, 14–29, and thus fail to meet their burden on irreparable harm.

Plaintiffs' delay in filing suit and in moving for a preliminary injunction further undermines their claims of irreparable harm. *See Miller ex rel. NLRB v. California Pac. Med. Ctr.*, 991 F.2d 536, 544 (9th Cir. 1993), *on reh'g*, 19 F.3d 449 (9th Cir. 1994) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm." (citation omitted)). Plaintiffs waited ten months from the first challenged email on July 4, 2025 to file suit. They then waited an additional ten weeks to file their preliminary injunction motion. Because individuals concerned about a harm truly believed to be irreparable would act swiftly to protect themselves, Plaintiffs' delay belies their claims of irreparable harm.

Moreover, the balance of equities and public interest tip sharply in the Government's favor. This Nation's history and tradition affirm the importance of religion in public life. *See supra* pp. 15–22. If nothing else, that should preclude this Court from granting Plaintiffs' the extraordinary remedy of a preliminary injunction based on the de minimis "injury" of receiving unwanted emails. Even "Madison himself respected the difference between the trivial and the serious in constitutional practice[,]" *Lee*, 505 U.S. at 630 (Souter, J., concurring). The legal aphorism, *de minimis non curat lex*, "the law does not concern itself with trifles" is applicable here. If Plaintiffs did not subscribe to the views expressed in the Secretary's emails, they were free to delete them and go about their day off. Because any alleged harm to Plaintiffs pales in comparison to the importance of respecting religion's role in public life, the Court should decline Plaintiffs' invitation to act as a censor of the emails an agency head sends in celebration of

major holidays.

Plaintiffs also offer no workable standard by which the Court could prescribe emails that are acceptable to them. They challenge every holiday email from July 4, 2025 ("May God continue to protect the United States of America") to the Fourth of July of this year. In Plaintiffs' view, all of these emails are unacceptable insofar as they diverge from the "simple ecumenical greetings," of previous secretaries, *see* Pls.' Br. at 23, which, according to Plaintiffs did not contain "such overtly religious language," *see, e.g.*, Wolfe Decl.¶ 9. But those benchmarks are too vague to provide any guidance on what language the Secretary could include in her emails. And as the Supreme Court has recognized, it is not possible to sift sectarian from nonsectarian speech. *See Town of Greece*, 572 U.S. at 582. "Such uncertainty produced by [an] injunction—the violation of which would subject federal law enforcement officers to contempt—is intolerable." *Reach Cmty. Dev. v. U.S. Dep't of Homeland Sec.*, 174 F.4th 1143, 1149 (9th Cir. 2026).

**III. Any Relief Must Be Narrowly Tailored**

If the Court were inclined to issue injunctive relief, any such relief "must be [narrowly] tailored to remedy the specific harm alleged, and an overbroad preliminary injunction is an abuse of discretion." *Nat. Res. Def. Council, Inc. v. Winter*, 508 F.3d 885, 886 (9th Cir. 2007). Plaintiffs' request is overbroad because it would extend relief to employees who are neither parties to this litigation nor members of the NFFE. *See* Proposed Order Granting Pls.' Mot. for Prelim. Inj., ECF No. 26-10. But as the Supreme Court recently made clear, federal courts are not authorized to issue injunctions that are "broader than necessary to provide complete relief to each plaintiff with standing to sue." *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025). Extending injunctive relief to police the Secretary's emails to persons who are not parties to this litigation and have not demonstrated any injury would run afoul of that principle. Thus, any injunctive relief should be limited to the named Plaintiffs and the NFFE members that the Court concludes have standing.

**CONCLUSION**

For the foregoing reasons, the Court should grant Defendants' motion to dismiss and deny Plaintiffs' motion for a preliminary injunction.

Dated: August 21, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

NOAH T. KATZEN
Assistant Branch Director
Federal Programs Branch

*/s/ Elisabeth J. Neylan*
ELISABETH J. NEYLAN (NY Bar No. 6125736)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
Tel: (771) 217-8180
Fax: (202) 616-8460
E-mail: Elisabeth.J.Neylan@usdoj.gov

*Attorneys for the United States*