BRYAN SCHWARTZ LAW, P.C.
Bryan Schwartz (SBN 209903)
Sam Goity (SBN 359678)
180 Grand Avenue, Suite 1380
Oakland, CA 94612
Tel. (510) 444-9300
Fax (510) 444-9301
Email: bryan@bryanschwartzlaw.com
sam@bryanschwartzlaw.com

DEMOCRACY FORWARD FOUNDATION
Sarah Goetz*
Ayesha Khan*
Elena Goldstein*
P.O. Box 34553
Washington, D.C. 20043
Tel. (202) 448-9090
sgoetz@democracyforward.org
akhan@democracyforward.org
egoldstein@democracyforward.org

AMERICANS UNITED FOR SEPARATION OF CHURCH & STATE
Amy Tai*
Rebecca S. Markert*
Jenny Samuels*
Elias Daiute*
1310 L Street NW, Suite 200
Washington, D.C. 20005
Tel. (202) 466-3234
tai@au.org
markert@au.org
samuels@au.org
daiute@au.org

* Appearing *pro hac vice*

*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

NATIONAL FEDERATION OF FEDERAL EMPLOYEES, et al.,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF AGRICULTURE, and

BROOKE L. ROLLINS, Secretary of Agriculture, in her official capacity,

Defendants.

Case No. 3:26-cv-04406-TLT

**PLAINTIFFS' COMBINED MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND STAY UNDER 5 U.S.C. § 705**

Date: October 27, 2026
Time: 2:00 p.m.
Place: Courtroom 9 – 19th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

# TABLE OF CONTENTS

Page(s)

INTRODUCTION ..... 1

LEGAL STANDARDS ..... 1

ARGUMENT ..... 2

I. Plaintiffs' claims are justiciable. ..... 2

A. Plaintiffs have Article III standing. ..... 2

B. Plaintiff Dietrich's claims are not moot. ..... 8

II. Plaintiffs have stated a claim under the Establishment Clause and are likely to succeed on the merits of that claim. ..... 10

A. The Secretary's conduct is coercive. ..... 11

B. The Secretary's conduct expresses a denominational preference. ..... 17

C. No longstanding historical practice supports the Secretary's conduct. ..... 19

III. This Court has jurisdiction over Plaintiffs' APA claims and Plaintiffs are likely to prevail on those claims. ..... 24

A. Defendants' practice and policy is a reviewable discrete, final agency action. ..... 24

B. Defendants' practice and policy is contrary to constitutional right and arbitrary and capricious. ..... 27

IV. The remaining preliminary injunction factors weigh heavily in Plaintiffs' favor. ..... 29

A. Plaintiffs are likely to suffer irreparable harm. ..... 29

B. The balance of equities tip in Plaintiffs' favor. ..... 30

C. Plaintiffs offer a workable standard to identify impermissible communications. ..... 31

V. This Court should enjoin Defendants' conduct as to all USDA employees ..... 32

A. Plaintiffs are entitled to a stay under the APA. ..... 32

B. Plaintiffs' complete relief requires the injunction sought. ..... 33

CONCLUSION ..... 35

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Al Otro Lado, Inc. v. McAleenan*,
394 F. Supp. 3d 1168 (S.D. Cal. 2019) ........ 25

*Am. Ass'n of Univ. Professors v. Trump*,
815 F. Supp. 3d 907 (N.D. Cal. 2025),
*appeal dismissed per stipulation*, No. 26-263, 2026 WL 1049175 (9th Cir. 2026) ........ 35

*Am. Fed'n of State Cnty. & Mun. Emps. v. U.S. Off. of Mgmt. & Budget*,
807 F. Supp. 3d 1004 (N.D. Cal. 2025),
*appeal dismissed*, No. 25-7998, 2026 WL 809820 (9th Cir. Jan. 2, 2026) ........ 34

*Am. Legion v. Am. Humanist Ass'n*,
588 U.S. 29 (2019) ........ 4, 5, 12

*Arc of Cal. v. Douglas*,
757 F.3d 975 (9th Cir. 2014) ........ 29

*Aronow v. United States*,
432 F.2d 242 (9th Cir. 1970) ........ 23

*Baird v. Bonta*,
81 F.4th 1036 (9th Cir. 2023) ........ 29

*Bayer v. Neiman Marcus Grp., Inc.*,
861 F.3d 853 (9th Cir. 2017) ........ 9

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ........ 2

*Buono v. Norton*,
371 F.3d 543 (9th Cir. 2004) ........ 4

*Caldwell v. Caldwell*,
545 F.3d 1126 (9th Cir. 2008) ........ 5

*Cath. Charities Bureau, Inc. v. Wis. Lab. & Indus. Rev. Comm'n*,
545 F.3d 1126 (9th Cir. 2008) ........ 11, 17, 18, 19, 31

*Cath. League for Religious & C.R. v. City & Cnty. of S.F.*,
605 U.S. 238 (2025) ........ 3, 4

*Chaudhuri v. Tennessee*,
130 F.3d 232 (6th Cir. 1997) ........ 15

*Citizens for Quality Educ. S.D. v. Barrera*,
333 F. Supp. 3d 1003 (S.D. Cal. 2018) ........ 29

*City of New York v. U.S. Dep't of Def.*,
913 F.3d 423 (4th Cir. 2019) .......... 26

*City of Portland v. United States*,
969 F.3d 1020 (9th Cir. 2020) .......... 28

*Cnty. of Allegheny v. ACLU*,
492 U.S. 573 (1989) .......... 3

*Cole v. Oroville Union High Sch. Dist.*,
228 F.3d 1092 (9th Cir. 2000) .......... 7

*Cook, Perkiss & Liehe, Inc. v. N. Cal. Collective Serv., Inc.*,
911 F.2d 242 (9th Cir. 1990) .......... 9

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
603 U.S. 799 (2024) .......... 33

*Cuviello v. City of Vallejo*,
944 F.3d 816 (9th Cir. 2019) .......... 29

*Doe v. Santa Fe Indep. Sch. Dist.*,
168 F.3d 806 (5th Cir. 1999),
*aff'd*, 530 U.S. 290 (2000) .......... 7

*Elk Grove Unified Sch. Dist. v. Newdow*,
542 U.S. 1 (2004),
*abrogated by Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014) .......... 17, 23, 30

*Ellis v. City of La Mesa*,
990 F.2d 1518 (9th Cir. 1993) .......... 4

*Elrod v. Burns*,
427 U.S. 347 (1976) .......... 29

*Engel v. Vitale*,
370 U.S. 421 (1962) .......... 3, 12, 13

*Epperson v. Arkansas*,
393 U.S. 97 (1968) .......... 31

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) .......... 28

*Fellowship of Christian Athletes v. S.J. Unified Sch. Dist. Bd. of Educ.*,
82 F.4th 664 (9th Cir. 2023) .......... 31

*Foothills Christian Ministries v. Johnson*,
148 F.4th 1040 (9th Cir. 2025),
*cert. denied*, 224 L. Ed. 2d 831 (May 18, 2026) .......... 5

*Forest Guardians v. U.S. Forest Serv.*,
329 F.3d 1089 (9th Cir. 2003) .......... 8

*Freedom from Religion Found., Inc. v. Chino Valley Unified Sch. Dist. Bd. of Educ.*,
896 F.3d 1132 (9th Cir. 2018) .......... 14, 15

*Gonzalez v. Metro. Transp. Auth.*,
73 F. App'x 986 (9th Cir. 2003) .......... 8, 9, 10

*Immigrant Defs. L. Ctr. v. Noem*,
145 F.4th 972 (9th Cir. 2025) .......... 33

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock*,
477 U.S. 274 (1986) .......... 2

*Kennedy v. Bremerton Sch. Dist.*,
597 U.S. 507 (2022) .......... 10, 13, 15, 17, 19

*Klein v. City of San Clemente*,
584 F.3d 1196 (9th Cir. 2009) .......... 29

*Kreisner v. City of San Diego*,
1 F.3d 775 (9th Cir. 1993) .......... 4

*Kumar v. Koester*,
131 F.4th 746 (9th Cir. 2025) .......... 3, 6

*Larson v. Valente*,
456 U.S. 228 (1982) .......... 19, 31

*Lee v. Weisman*,
505 U.S. 577 (1992) .......... 4, 23

*Leite v. Crane Co.*,
749 F.3d 1117 (9th Cir. 2014) .......... 1, 2

*Loffman v. Cal. Dep't of Educ.*,
119 F.4th 1147 (9th Cir. 2024) .......... 2, 15

*Louisiana ex rel. Murrill v. Food & Drug Admin.*,
175 F.4th 310 (5th Cir. 2026) .......... 33

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .......... 2

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) .......... 27

*Lynch v. Donnelly*,
465 U.S. 668 (1984) .......... 3

*Make the Road N.Y. v. Noem*,
No. 25-5320, 2025 WL 3563313 (D.C. Cir. Nov. 22, 2025) .................................................. 33

*Marsh v. Chambers*,
463 U.S. 783 (1983) ........................................................................................ 8, 15, 20, 23, 31

*Massachusetts v. EPA*,
549 U.S. 497 (2007) ................................................................................................................ 3

*Matsumo v. Labrador*,
122 F.4th 787 (9th Cir. 2024) ................................................................................................. 6

*McCreary Cnty. v. ACLU of Ky.*,
545 U.S. 844 (2005) ......................................................................................................... 3, 18

*Mecinas v. Hobbs*,
30 F.4th 890 (9th Cir. 2022) ................................................................................................... 6

*Milwaukee Deputy Sheriffs Ass'n v. Clarke*,
513 F. Supp. 2d 1014 (E.D. Wis. 2007),
*aff'd*, 588 F.3d 523 (7th Cir. 2009) ...................................................................................... 13

*Nat'l TPS All. v. Noem*,
166 F.4th 739 (9th Cir. 2026) ........................................................................................ 33, 34

*Nathan v. Alamo Heights Indep. Sch. Dist.*,
173 F.4th 576 (5th Cir. 2026) (en banc),
*petition for cert. filed*, No. 26-257 (Aug. 17, 2026) ........................................................ 17-18

*Newdow v. Lefevre*,
598 F.3d 638 (9th Cir. 2010) ....................................................................................... 4, 6, 23

*Novedades Y Servicios, Inc. v. Fin. Crimes Enf't Network*,
181 F.4th 961 (9th Cir. 2026) ........................................................................................ 32, 33

*Or. Advoc. Ctr. v. Mink*,
322 F.3d 1101 (9th Cir. 2003) ................................................................................................. 8

*Reach Cmty. Dev. v. U.S. Dep't of Homeland Sec.*,
174 F.4th 1143 (9th Cir. 2026). ............................................................................................ 32

*R.I.L.-R v. Johnson*,
80 F. Supp. 3d 164 (D.D.C. 2015) ......................................................................................... 25

*Rouser v. White*,
No. CIV S-93-0767 LKK GGH P, 2008 WL 4283650 (E.D. Cal. Sept. 16, 2008) .................. 5

*Salazar v. Buono*,
559 U.S. 700 (2010) ................................................................................................................ 3

*Santa Fe Indep. Sch. Dist. v. Doe*,
530 U.S. 290 (2000) ............................................................................................... 3, 13, 18, 30

*S. Cal. Edison Co. v. FERC*,
770 F.2d 779 (9th Cir. 1985) .......... 26

*Sch. Dist. v. Schempp*,
374 U.S. 203 (1963) .......... 4, 12

*Separation of Church & State Comm. v. City of Eugene*,
93 F.3d 617 (9th Cir. 1996) .......... 4

*S.F. Herring Ass'n v. Dep't of Interior*,
946 F.3d 564 (9th Cir. 2019) .......... 27

*Smith v. Diaz*,
No. 20-cv-04335-HSG, 2022 WL 827644 (N.D. Cal. Mar. 18, 2022) .......... 9

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) .......... 2

*Suhre v. Haywood Cnty.*,
131 F.3d 1083 (4th Cir. 1997) .......... 6

*Tanford v. Brand*,
104 F.3d 982 (7th Cir. 1997) .......... 15

*Town of Greece v. Galloway*,
572 U.S. 565 (2014) .......... *passim*

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025). .......... 32, 33

*United States v. Rahimi*,
602 U.S. 680 (2024) .......... 20

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*,
454 U.S. 464 (1982) .......... 5

*Van Orden v. Perry*,
545 U.S. 677 (2005) .......... 3, 16

*Vasquez v. Los Angeles Cnty.*,
487 F.3d 1246 (9th Cir. 2007) .......... 4, 6

*Velesaca v. Decker*,
458 F. Supp. 3d 224 (S.D.N.Y. 2020) .......... 25

*Venters v. City of Delphi*,
123 F.3d 956 (7th Cir. 1997) .......... 13, 14

*Wallace v. Jaffree*,
472 U.S. 38 (1985) .......... 3

*Walsh v. Nev. Dep't of Hum. Res.*, 471 F.3d 1033 (9th Cir. 2006) .......... 9

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001) .......... 25

**Statutes & Rules**

5 U.S.C. § 551 .......... 24, 26

5 U.S.C. § 705 .......... 1, 32, 33, 35

Civ. Loc. R. 7-3 .......... 9

Fed. R. Civ. P. 8 .......... 1, 2

**Other Sources**

Harry S. Truman, *Remarks in Kansas City at a Luncheon for the Press*, The Am. Presidency Project (Dec. 22, 1950), https://www.presidency.ucsb.edu/node/230591 https://perma.cc/CSL2-JFJV .......... 22

Natalie Walker, *The Steel Strike of 1952 and Harry Truman's Declaration of National Emergency*, Truman Libr. Inst. (Jan. 14, 2019), https://www.trumanlibraryinstitute.org/harry-trumans-national-emergency/ [https://perma.cc/XBN3-LXMY] .......... 22

## INTRODUCTION

Since assuming her role as the head of USDA, Secretary Brooke Rollins has used her position of authority to send increasingly proselytizing emails to the roughly 100,000 USDA employees who she oversees, including Plaintiffs.[1] USDA employees—the Secretary's subordinates—can neither avoid nor opt out of these messages. The message is clear: there is one preferred religion at USDA, and if you don't follow it, you don't belong. Abusing her authority to subject Plaintiffs to this message causes them spiritual and material harms, violates the Establishment Clause, and is contrary to constitutional right and arbitrary and capricious under the Administrative Procedure Act, as Plaintiffs explained in their Complaint and opening brief. In response, Defendants offer no rebuttal evidence. Instead, they minimize the harms that Plaintiffs have alleged and described in sworn declarations; wrongly claim that Plaintiffs' injuries are not redressable; bypass the historical evidence that buttresses Plaintiffs' Establishment Clause arguments; and set forth a stingy view of the protections of the Establishment Clause and the reviewability of agency action under the APA.

This Court should deny Defendants' motion to dismiss and grant Plaintiffs' motion for a preliminary injunction and a stay under Section 705 of the APA barring the Secretary's proselytizing communications.

## LEGAL STANDARDS

Plaintiffs set forth the standard for granting a preliminary injunction in their opening brief. *See* Pls.' Mot. for Prelim. Inj. & Stay Under 5 U.S.C. § 705 ("Pls.' PI Br.") 6, ECF No. 26. To survive a motion to dismiss, Plaintiffs need only supply "a short and plain statement of the grounds for the court's jurisdiction," *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) (quoting Fed. R. Civ. P. 8(a)(1)), and "a short and plain statement of the claim showing that the pleader is entitled to relief,"

[1] For the purposes of this brief, when discussing the experience of USDA employees, "Plaintiffs" is used collectively to refer to the six individual plaintiffs in this action (who are not members of NFFE), as well as members of Plaintiff NFFE who are USDA employees.

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks omitted) (quoting Fed. R. Civ. P. 8(a)(2)). At this stage, the Court must "accept as true all well-pleaded factual allegations, and construe all factual inferences in the light most favorable to the plaintiff[s]." *Loffman v. Cal. Dep't of Educ.*, 119 F.4th 1147, 1158 (9th Cir. 2024) (citation omitted); *Leite*, 749 F.3d at 1121 (discussing "facial" challenges under Rule 12(b)(1)).

## ARGUMENT

### I. <u>Plaintiffs' claims are justiciable.</u>

#### A. Plaintiffs have Article III standing.

Plaintiffs have standing based on injuries to them directly (in the case of the six individual plaintiffs) or to their members (in the case of NFFE). As to both direct and associational standing, Plaintiffs have adequately alleged and shown (i) a concrete and particularized injury in fact that is actual or imminent, (ii) fairly traceable to Defendants' conduct, and (iii) judicially redressable. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citations omitted); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). For associational standing, NFFE has additionally alleged and shown that (i) "its members would otherwise have standing to sue in their own right," (ii) "the interests it seeks to protect are germane to the organization's purpose[,]" and (iii) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274, 282 (1986) (citation omitted). Defendants argue that Plaintiffs (including NFFE's members) have suffered no cognizable injury and that any injury cannot be redressed; they do not contest that, if an injury exists, it is actual or imminent, and they do not dispute traceability. Defs.' Consolidated Opp'n to Pls.' Prelim. Inj. Mot.; Notice of Cross-Mot.; & Cross-Mot. To Dismiss Pls.' Compl. ("Defs.' Br.") 7–10, ECF No. 38.

1. Plaintiffs' injuries are cognizable.

Defendants argue that Plaintiffs lack a concrete and particularized injury because they merely disagree with or are offended by the Secretary's emails. *Id.* at 8. Defendants are wrong on the facts and the law. A plaintiff may establish Article III injury in the Establishment Clause context by showing "a personal stake in the outcome of the controversy as to assure . . . concrete adverseness." *Cath. League for Religious & C.R. v. City & Cnty. of S.F.*, 624 F.3d 1043, 1048 (9th Cir. 2010) (internal quotation marks omitted) (quoting *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007)). That personal stake includes "physical injury or a pecuniary loss" as well as "'spiritual or psychological' [harm] as a result of a government action that is not neutral toward a religion." *Kumar v. Koester*, 131 F.4th 746, 755 (9th Cir. 2025) (quoting *Cath. League*, 624 F.3d at 1050, 1066). The emphasis on spiritual harm means that, in Establishment Clause cases, plaintiffs often have standing "even though nothing was affected but the religious or irreligious sentiments of the plaintiffs."[2] *Cath. League*, 624 F.3d at 1050 (collecting cases).

Supreme Court and Ninth Circuit case law reflect this view of Article III injury in the Establishment Clause context. Thus, the Supreme Court has found jurisdiction in Establishment Clause challenges to "prayer at a football game, a crèche in a county courthouse or public park, the Ten Commandments displayed on the grounds of a state capitol or at a courthouse, a cross display at a national park, school prayer, [and] a moment of silence at school." *Id.* (footnotes omitted) (collecting cases).[3] Recently, the Court proceeded to the merits without ever questioning that local residents were

[2] Neither the Supreme Court nor the Ninth Circuit has ever required, as Defendants argue, that a plaintiff's religion be specifically stigmatized for the plaintiff to have standing to bring an Establishment Clause claim. *See* Defs.' Br. 8.

[3] Those cases are: *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290 (2000); *Cnty. of Allegheny v. ACLU*, 492 U.S. 573 (1989); *Lynch v. Donnelly*, 465 U.S. 668 (1984); *Van Orden v. Perry*, 545 U.S. 677 (2005); *McCreary Cnty. v. ACLU of Ky.*, 545 U.S. 844 (2005); *Salazar v. Buono*, 559 U.S. 700 (2010); *Engel v. Vitale*, 370 U.S. 421 (1962); and *Wallace v. Jaffree*, 472 U.S. 38 (1985).

injured by the presence of a Latin cross on public land, even though their connection to the cross consisted largely of encountering it as members of the surrounding community. *See Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 43, 45–46, 48 (2019). The Ninth Circuit has likewise found injury in fact in Establishment Clause challenges to statutes requiring the inscription of "In God We Trust" on coins and currency, *Newdow v. Lefevre*, 598 F.3d 638, 642 (9th Cir. 2010), to a cross on a county seal brought by a resident and employee of the county, *Vasquez v. Los Angeles Cnty.*, 487 F.3d 1246, 1253 (9th Cir. 2007), and in numerous other similar contexts.[4] Indeed, Plaintiffs' injury is even more pronounced here than in those cases, because the religious material at issue is coerced upon a captive audience. *See Sch. Dist. v. Schempp*, 374 U.S. 203, 225 n.9 (1963) (Bible readings in public school); *see also Lee v. Weisman*, 505 U.S. 577, 584 (1992) (holding that religious invocations at graduations presented a "live and justiciable controversy").

Plaintiffs thus easily meet the requirement of establishing the requisite "personal stake in the outcome of the controversy." *Cath. League*, 624 F.3d at 1048. They not only allege spiritual harm from Secretary Rollins's conduct, *see* Compl. ¶¶ 53, 66, 70, 78, 82, 88, 94, 99; Pls.' PI Br. 5–6, 14–16, which suffices to establish Article III injury, *see Buono*, 371 F.3d at 547, but her religious emails are both proselytizing and unavoidable, Compl. ¶ 113. If that all weren't enough, Plaintiffs *also* suffer distinctly material consequences that independently satisfy Article III's injury requirement: they face potential loss of their livelihoods and other consequences in the workplace, *id.* at ¶¶ 7, 53–54, 71, 88, 104; they feel pressure to conform to the Secretary's views, *id.* at ¶¶ 52, 61, 78, 82, 91; and they feel that they are no longer welcome at USDA, *id.* at ¶¶ 7, 51, 69, 77, 80, 85.

The Ninth Circuit has also observed that "[g]overnment action that expresses hostility towards

---

[4] *See, e.g.*, *Buono v. Norton*, 371 F.3d 543, 547–48 (9th Cir. 2004) (injury where plaintiff sought to remove a Latin cross from public land); *Separation of Church & State Comm. v. City of Eugene*, 93 F.3d 617, 619 n.2 (9th Cir. 1996) (same); *Ellis v. City of La Mesa*, 990 F.2d 1518, 1523 (9th Cir. 1993) (same); *Kreisner v. City of San Diego*, 1 F.3d 775, 778 (9th Cir. 1993) (injury where plaintiff sought to remove a religious display).

a plaintiff's religion . . . inflicts an injury that can satisfy Article III." *Foothills Christian Ministries v. Johnson*, 148 F.4th 1040, 1053 (9th Cir. 2025), *cert. denied*, 224 L. Ed. 2d 831 (May 18, 2026). Thus, plaintiffs can show a concrete and particularized injury when "the government . . . prefer[s] one religious denomination over another." *Foothills Christian Ministries*, 148 F.4th at 1053; *Rouser v. White*, No. CIV S-93-0767 LKK GGH P, 2008 WL 4283650, at *5 (E.D. Cal. Sept. 16, 2008) (finding standing for Establishment Clause claim based on denominational preference). So too here. The Secretary's religious emails elevate one religion over all others, while failing to acknowledge other religious holidays, conveying hostility towards employees who do not share her religion. *See* Compl. ¶¶ 6–7, 37, 39, 50, 56, 114.

Defendants resort to case law about injury stemming from a party's mere offense—and no more—at a government's religious message. *See* Defs.' Br. 7–9 (citing *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*, 454 U.S. 464, 465 (1982); *Am. Legion*, 588 U.S. at 80 (Gorsuch, J., concurring)); *Caldwell v. Caldwell*, 545 F.3d 1126, 1133 (9th Cir. 2008)). But those cases are beside the point because Plaintiffs allege more than offense. They do not allege a mere "abstract objection to how [a government] website presents [a] subject," *Caldwell*, 545 F.3d at 1133 (internal quotation marks omitted). Nor did they learn of the Secretary's conduct "through a news release" and "roam the country in search of governmental wrongdoing," *Valley Forge*, 454 U.S. at 487. Plaintiffs here are confronted by the messages in their workplace, experience pressure to conform, and are fearful of retaliation—facts that do not feature in Defendants' cases.[5]

In any event, Defendants overstate the holdings of the cases they cite. The Ninth Circuit has repeatedly held that standing exists as long as a plaintiff is "directly affected by . . . unwelcome direct

[5] Defendants' reliance on Gorsuch's concurrence in *American Legion* is puzzling. Defs.' Br. 7 (quoting *Am. Legion*, 588 U.S. at 80 (Gorsuch, J., concurring)). As described above, *see supra* Section I.A.1, the Court adjudicated the merits of local residents' challenge to a cross on public land. Justice Gorsuch's concurrence is therefore contrary to the majority's opinion.

contact" with the Establishment Clause violation, as here. *Vasquez*, 487 F.3d at 1251 (quoting *Suhre v. Haywood Cnty.*, 131 F.3d 1083, 1086 (4th Cir. 1997)). And Defendants' reliance on *Kumar* does not move the needle because that case did not involve religious communications by the government or on a captive audience, but rather a university's inclusion of "caste" in its anti-discrimination policy. *See* 131 F.4th at 748.

Finally, Defendants argue, citing *Newdow* and *Vasquez*, that Plaintiffs have not stated a claim because there was "no . . . frequent or regular contact" with Secretary Rollins' emails. Defs.' Br. 9 n.2. But Plaintiffs have alleged that they have received multiple religious emails from Secretary Rollins over the course of a year on Christian holidays (Easter and Christmas) and national holidays. Compl. ¶¶ 30–35; *see also* Pls.' PI Br. 14. They have also alleged that the Secretary "is likely to continue the practice of sending proselytizing messages to all USDA employees to mark Christian holidays and observances." Compl. ¶ 42. And the harm that Plaintiffs suffer as a result of the Secretary's conduct is ongoing. *Id.* at ¶¶ 52–56.

2. <u>Plaintiffs' injuries are redressable.</u>

"[R]edressability is satisfied so long as the requested remedy 'would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered.'" *Matsumo v. Labrador*, 122 F.4th 787, 801 (9th Cir. 2024) (quoting *Mecinas v. Hobbs*, 30 F.4th 890, 900 (9th Cir. 2022)). Defendants assert that Plaintiffs' requested relief is not substantially likely to redress their injuries and is not within this Court's power to award, Defs.' Br. 9–10, but they are wrong on both counts.

First, enjoining Defendants from abusing their authority to communicate proselytizing religious messages to USDA employees would redress Plaintiffs' injuries. "Proselytizing" messages are those "which, by definition, are designed to reflect, and even convert others to, a particular

religious viewpoint." *Cole v. Oroville Union High Sch. Dist.*, 228 F.3d 1092, 1104 (9th Cir. 2000) (quoting *Doe v. Santa Fe Indep. Sch. Dist.*, 168 F.3d 806, 817–18 (5th Cir. 1999), *aff'd*, 530 U.S. 290 (2000)).[6] The messages challenged in the Complaint—namely, the Secretary's December 23, 2025, Christmas message and her April 5, 2026, Easter Sermon, delivered from an official channel to a captive audience over whom the Secretary wields enormous power—qualify as such, as Plaintiffs have explained elsewhere. *See* Compl. ¶¶ 33–34; PI Br. 2–4, 14–16.[7] An injunction restricting Defendants from abusing the Secretary's authority to proselytize USDA employees would stop the Secretary from using agency-wide email distribution lists to communicate the types of messages challenged in the Complaint, and thus redress Plaintiffs' injury.

Second, Plaintiffs' requested relief is within this Court's power to award. Defendants assert that it "would put this Court in the impossible position of policing the religiosity of the Secretary's speech." Defs.' Br. 9 (citing *Town of Greece v. Galloway*, 572 U.S. 565, 582 (2014)). But the concerns animating the Court in *Town of Greece* are not present here. In that case, the requested relief would have required the town to supervise *chaplains*' prayers to ensure they were "inclusive and ecumenical," "referred only to a 'generic God,'" and "would not associate the government with any one faith or belief." 572 U.S. at 572–73. Such an injunction would have required the government "to act as supervisors and censors of religious speech" and impermissibly "involve government in religious matters." *Id.* at 581. By contrast, this Court need not entangle itself "in religious matters" to grant Plaintiffs' requested relief. *Id.* at 581. The Secretary is not a chaplain or religious leader invited

---

[6] Defendants assert that to qualify as proselytizing, messages must "on their face request that recipients adopt the beliefs expressed therein or live their lives in accordance with those beliefs." Defs.' Br. 10. But neither *Cole*'s definition nor Defendants' proffered dictionary definition, *see* Defs.' Br. 10 n.4, contain such a requirement.

[7] Defendants cite the July 4, 2025, email as an example of a non-proselytizing message, *see* Defs.' Br. 10., but Plaintiffs did not characterize that email as proselytizing on its own, *see* Compl. ¶ 30 (describing the July 4, 2025, and November 26, 2025 emails as "non-denominational").

to give a prayer before a government body; her communications to USDA employees are in her official capacity as the Secretary of Agriculture and their boss. An injunction would *prevent* improper governmental involvement in religion, not create it.

In any event, Defendants misread *Town of Greece* as "imply[ing] that no constraints remain on [a prayer's] content," *id.* at 582—an interpretation that the Court expressly disavowed. Rather, *Town of Greece* explicitly recognized that "[t]he relevant constraint derives from" the context in which the prayer is delivered, whether it is supported by history and tradition, whether its tone "is solemn and respectful," and whether it "denigrate[s] nonbelievers or religious minorities, threaten[s] damnation, or preach[es] conversion." *Id.* at 582–83. Accordingly, Courts are permitted to—and regularly do—look at religious content and context to determine whether a "prayer opportunity has been exploited to proselytize or advance any one . . . faith or belief." *Marsh v. Chambers*, 463 U.S. 783, 794–95 (1983). That is precisely the type of analysis that is required here. Indeed, the Establishment Clause would be meaningless if courts could not examine the context and content of government communications.

**B. Plaintiff Dietrich's claims are not moot.**

Defendants assert that Ms. Dietrich's claims are moot because she has retired. Defs.' Br. 10 n.5. "[A] case is moot only where no effective relief for the alleged violation can be given." *Gonzalez v. Metro. Transp. Auth.*, 73 F. App'x 986, 988 (9th Cir. 2003) (quoting *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1094 (9th Cir. 2003)). "The party asserting mootness has the heavy burden of establishing that there is no effective relief remaining for a court to provide." *Id.* (quoting *Or. Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1116–17 (9th Cir. 2003)). Defendants have not met that heavy burden here.

In cases involving claims by individuals against their former employers, claims for prospective relief are moot if the employee has not shown "any interest in returning to work" for their former employer, *Walsh v. Nev. Dep't of Hum. Res.*, 471 F.3d 1033, 1037 (9th Cir. 2006), or if the employee "neither declared [their] intent to [seek employment with their former employer] nor produced any other evidence suggesting the conduct alleged as the basis for [their] claim can reasonably be expected to recur as to [them]," *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 865 (9th Cir. 2017). But a former employee's claim is *not* moot if they are "in the process of seeking . . . work from that employer," *Walsh*, 471 F.3d at 1037, or they would seek work if not for the employer's challenged conduct, *see Gonzalez*, 73 F. App'x at 988 (former employee's claim for injunctive relief against transportation authority's random drug testing policy not moot because her "sworn testimony is that she will return to California if she can work at the MTA without being subject to random drug testing").

Here, "the conduct alleged as the basis for [Ms. Dietrich's] claim can reasonably be expected to recur as to [her]." *Bayer*, 861 F.3d at 865. As Ms. Dietrich explains in her Supplemental Declaration, she has spoken with her former superiors at the Natural Resources Conservation Service about returning to work with USDA after her retirement.[8] Suppl. Decl. of Lanette Dietrich ("Dietrich Suppl. Decl.") ¶ 6 (filed Sept. 21, 2026). Going back to work with USDA in such a capacity is

[8] Plaintiffs attach Ms. Dietrich's Supplementary Declaration pursuant to Civil Local Rule 7-3, which provides that opposition and reply briefs "may include . . . declarations." Civ. Loc. R. 7-3(a), (c). In considering mootness, this Court may look outside the four corners of the complaint. *See Smith v. Diaz*, No. 20-cv-04335-HSG, 2022 WL 827644, at *4 (N.D. Cal. Mar. 18, 2022). In fact, the Court must do so to consider Defendants' mootness argument in the first instance, because Ms. Dietrich was employed by USDA at the time the Complaint was filed. Compl. ¶ 13. If this Court determines that it may not properly consider Ms. Dietrich's Supplemental Declaration in evaluating whether her claims are moot, Plaintiffs respectfully seek leave to file an Amended Complaint. *Cf. Cook, Perkiss & Liehe, Inc. v. N. Cal. Collective Serv., Inc.*, 911 F.2d 242, 247 (9th Cir. 1990) ("[I]n dismissals for failure to state a claim, a district court should grant leave to amend . . . unless it determines that the pleading could not possibly be cured by the allegation of other facts.").

appealing to Ms. Dietrich because she loved her work at USDA and is an expert in it, and she would have more flexibility with her schedule and the ability to telework. *Id.* at ¶ 8. Despite these many benefits of returning to work with USDA, however, Ms. Dietrich is reluctant to pursue these opportunities because she would still have a USDA.gov email address and would therefore still be subject to the Secretary's proselytizing communications. *Id.* at ¶¶ 9–11. If Ms. Dietrich were assured that the Secretary's proselytizing communications would stop, she would continue pursuing a return to USDA. *Id.* at ¶ 11. Hence, an injunction "against [Defendants' unlawful communications] would be effective relief as to" Ms. Dietrich, *Gonzalez*, 73 F. App'x at 988, and her claims are not moot.

## II. Plaintiffs have stated a claim under the Establishment Clause and are likely to succeed on the merits of that claim.

As Plaintiffs explained in their opening brief, Pls.' PI Br. 7–19, the Secretary's proselytizing messages run afoul of the Establishment Clause for two independent reasons: they are coercive and they express an official denominational preference, two hallmarks of religious establishment. The parties agree generally on the relevant test: "[T]he Establishment Clause must be interpreted by reference to historical practices and understandings." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 535 (2022) (citation modified); Defs.' Br. 14. "The line that courts and governments must draw between the permissible and the impermissible has to accord with history and faithfully reflect the understanding of the Founding Fathers." *Kennedy*, 597 U.S. at 535–36 (citation modified). As such, courts look at the principles at the founding and what the Founders would have understood to be indicia of "religious establishments the framers sought to prohibit when they adopted the First Amendment." *Id.* at 537. Government coercion of religion was "among the foremost hallmarks of religious establishment." *Id.* And "[t]he clearest command of the Establishment Clause is that the

government may not officially prefer one religious denomination over another." *Cath. Charities Bureau, Inc. v. Wis. Lab. & Indus. Rev. Comm'n*, 605 U.S. 238, 247 (2025) (citation modified).

Defendants, however, argue that that the Secretary's conduct does not "share the historical characteristics of an established religion," and that "the Secretary's emails fit within an unbroken tradition of religious invocations by public figures dating back to the founding." Defs.' Br. 15. Defendants contend that when "history shows that the specific [challenged] practice . . . is permitted," there is no Establishment Clause violation. *Id.* (quoting *Town of Greece*, 572 U.S. at 577). But while a longstanding historical practice of the government action at issue may inform what the Founders would have understood to be a hallmark of religious establishment, the Supreme Court has emphasized that "a practice that would amount to a constitutional violation if not for its historical foundation" is nevertheless impermissible. *Town of Greece*, 572 U.S. at 576.

Here, the Secretary's conduct—abusing her official authority to send proselytizing emails that promote and favor Christianity to a captive audience of USDA subordinates—crosses that constitutional line. Her conduct would have been understood by the Founders as impermissible coercion of religion and denominational preference. And there is no longstanding historical practice of federal government officials abusing their authority to proselytize or promote and favor one religion over others to their employees. Defendants' arguments to the contrary misread the case law and fail to rebut the historical evidence that Plaintiffs have marshaled.

### A. The Secretary's conduct is coercive.

Plaintiffs have adequately alleged that the Secretary's conduct of sending proselytizing messages from her position of considerable authority to a captive audience is unconstitutionally coercive. Defendants argue that the Secretary's conduct is not coercive because "the Secretary's messages did not compel anyone to do anything" or "express support for the beliefs contained therein

or act in accordance with those beliefs." Defs.' Br. 24. Relying on a concurring opinion by Justice Thomas that holds no precedential value, Defendants argue that coercion requires "'actual legal coercion[]' . . . achieved by force of law and threat of penalty." *Id.* at 23 (quoting *Am. Legion*, 588 U.S. at 75 (Thomas, J., concurring)). In other words, Defendants contend that "government may not make religious observance compulsory or force citizens to engage in a formal religious exercise," *id.* (citation omitted), and "reading an email . . . is not a religious exercise," *id.* at 24. The protections of the Establishment Clause are not so circumscribed.

As an initial matter, reading the Secretary's emails does amount to religious exercise. "[R]eading of [Bible] verses, even without comment, possesses a devotional and religious character and constitutes in effect a religious observance." *Schempp*, 374 U.S. at 210 (citation omitted). Moreover, the Secretary need not literally command Plaintiffs to share in her religion for her conduct to be unconstitutionally coercive. As Plaintiffs have already explained, the Founders understood that "[t]he Establishment Clause . . . does not depend upon any showing of direct governmental compulsion and is violated by the enactment of laws which establish an official religion whether those laws operate directly to coerce nonobserving individuals or not." *Engel*, 370 U.S. at 430. "When the power, prestige and financial support of government is placed behind a particular religious belief, the indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion is plain." *Id.* at 431. The Founders viewed even indirect forms of government coercion to be impermissible because they understood that when government throws its weight behind a particular religious view, it inherently exerts coercive pressure to conform to that view. Decl. of John A. Ragosta ("Ragosta Decl.") ¶¶ 14–15, 67–75, 77, ECF No. 26-9 (filed July 22, 2026); Pls.' PI Br. 7–9.

Accordingly, courts evaluate the context of any given government action to determine whether it is religiously coercive. *See* Pls.' PI Br. 9–15. This is a "fact-sensitive [inquiry] that considers both

the setting in which the prayer arises and the audience to whom it is directed." *Town of Greece*, 572 U.S. at 587. Courts consider whether the speaker occupies a position of power. *See, e.g*, *Engel*, 370 U.S. at 431; *Milwaukee Deputy Sheriffs Ass'n v. Clarke*, 513 F. Supp. 2d 1014, 1021 (E.D. Wis. 2007), *aff'd on other grounds*, 588 F.3d 523 (7th Cir. 2009). They consider whether there is a captive audience. *See, e.g.*, *Kennedy*, 597 U.S. at 542. And they consider whether there are heightened social pressures. *See, e.g.*, *Santa Fe*, 530 U.S. at 312. Here, the power imbalance between the Secretary and her employees, and the fact that her employees are a captive audience create perfect conditions to pressure Plaintiffs to conform to the Secretary's religious beliefs. *See* Pls.' PI Br. 9–15.

Despite their own official guidance on religious expression emphasizing that context matters, Defendants completely ignore these three factors, which is fatal to their argument regarding the Secretary's coercive conduct. USDA guidance instructs agency employees that an "[i]mportant [b]oundar[y]" in engaging in "religious expression in the workplace" is that they "[c]annot use official authority to pressure subordinates." Decl. of Elias Daiute ("Daiute Decl."), Ex. D, ECF No. 26-1 (filed July 22, 2026) (USDA Secretary's Memorandum 1078-019). With good reason: employer-employee relationships are inherently coercive, and government employees are "particularly vulnerable to employer coercion given their strict chain of command." *Clarke*, 513 F. Supp. 2d at 1021.

Defendants ignore these power dynamics and argue instead that the employment cases that Plaintiffs cite are distinguishable because "the Secretary has not required employees to adopt the beliefs expressed in her emails," Defs.' Br. 26, "submit to a religious inspection of [their] own li[ves]," *id.* (quoting *Venters v. City of Delphi*, 123 F.3d 956, 971 (7th Cir. 1997)), or endure "lengthy oral presentations on how religion should impact their lives," *id.* at 27. Defendants miss the point. While the factual scenarios vary, the cases referenced convey that an employer engages in religious coercion when it exploits a power imbalance to pressure subordinates to share in its religious beliefs.

Here, the Secretary is the most powerful person at USDA, reports directly to the President, and sits at the top of Plaintiffs' chain of command with control over their livelihoods at a time where federal workers' jobs are precarious. Compl. ¶¶ 27–28, 46; Pls.' PI Br. 11 n.26. She is using the Office of the Secretary to promote her religious beliefs to a captive audience of subordinates who are expected to read her emails. Compl. ¶¶ 2, 43, 49, 123. In fact, the Secretary very recently reiterated her goal of conversion when she stated, "I do use this platform [as the Secretary of Agriculture]. I believe in making disciples of all nations." *See* Suppl. Decl. of Elias Daiute ("Daiute Suppl. Decl."), Ex. A (filed Sept. 21, 2026). Thus, the Secretary is not merely "relay[ing] her own inherently personal views." Defs.' Br. 24. Rather, exploiting her "platform" as the Secretary, she is exerting coercive pressure on Plaintiffs to conform to her favored religion, which USDA's own guidance prohibits. *See* Daiute Decl., Ex. D. As in *Venters*, Plaintiffs' case "does not rest on allegations of mere discomfort with religious views . . . , but upon allegations that [their superior] used his office to impose his religious views on . . . his subordinate." 123 F.3d at 977. And as in *Clarke*, the Secretary exploited her "access to a captive audience of government employees." 513 F. Supp. 2d at 1021–22.

Defendants next assert that only children—and not adults—may be "susceptible to religious indoctrination or peer pressure" or "psychological coercion." Defs.' Br. 25 (quoting *Freedom from Religion Found., Inc. v. Chino Valley Unified Sch. Dist. Bd. of Educ.*, 896 F.3d 1132, 1145 (9th Cir. 2018)). That argument is ahistorical and not supported by the case law. *See, e.g.*, *Lund v. Rowan Cnty.*, 863 F.3d 268, 286–87 (4th Cir. 2017) (finding legislative prayers led by commissioners to adult members of the public violated Establishment Clause). The Founders' concerns about psychological coercion were simply not limited by age. They believed that "[i]ndirect coercion from government embracing a religion . . . create[d] a psychological burden on those who did not join in the preferred belief"—full stop, regardless of age. Ragosta Decl. ¶ 71.

Moreover, age is hardly the only factor in assessing coercion, as Defendants' own cases explain. For example, in *Freedom from Religion Foundation*, the "prayer audience" at a school board meeting was different from the audience of legislators and constituents in cases like *Marsh* and *Town of Greece* "not only in age but also in its relationship with the [government] body." 896 F.3d at 1146. And the legislative prayers in *Marsh* and *Town of Greece* were noncoercive in part because "legislators and constituents hold equal status as adult members of the political community," but also because "constituents may feel free to exit or voice dissent in response to a prayer at a legislative session." *Id.* at 1147. Likewise, in *Tanford v. Brand*, 104 F.3d 982, 985 (7th Cir. 1997), and *Chaudhuri v. Tennessee*, 130 F.3d 232, 239 (6th Cir. 1997), Defs.' Br. 26, the plaintiffs were not required to attend the university events at which prayer was taking place and could leave at any time.

Here, Plaintiffs do not "hold equal status" to the Secretary, who is their employer. *Freedom from Religion Found.*, 896 F.3d at 1147. Plaintiffs are a captive audience who cannot avoid the proselytizing messages "broadcast or recited" to them by the Secretary over the agency's email system. *See Kennedy*, 597 U.S. at 542. Defendants nevertheless protest that Plaintiffs need not read incoming messages from the Secretary and "could have inferred from their subject lines . . . that the messages were not work-related and deleted them without consequence." Defs.' Br. 24. The Court should disregard this unsupported factual assertion: For purposes of Defendants' motion to dismiss, this Court must accept the facts alleged in the Complaint as true, *see Loffman*, 119 F.4th at 1158, and for purposes of Plaintiffs' motion for preliminary injunction, Defendants supply no evidence to rebut Plaintiffs' evidence.

Plaintiffs allege and have shown that they are expected to read *all* communications from the Secretary because she is the top of their chain of command and sends emails containing important information relevant to their jobs. Compl. ¶¶ 43–48, 68, 73, 79, 84, 90, 96, 98; Pls.' PI Br. 12–13.

Ignoring emails from the Office of the Secretary risks Plaintiffs missing substantively important information. Unlike adults who can leave a public meeting or university event, or someone walking by a religious display who "need not stop to read it or even to look at it," *Van Orden*, 545 U.S. at 695 (Thomas, J., concurring), Plaintiffs *do* need to stop to read the Secretary's emails.

What is more, Plaintiff Dietrich *did* attempt to stop receiving the Secretary's religious communications. Not only was she told by the Director of the Policy and Accountability Division at the Natural Resources Conservation Service that *it was not possible* to do so, she was threatened that elevating her request to the Chief of the Natural Resources Conservation Service would "create trouble" for her. Compl. ¶ 65; Decl. of Lanette Dietrich ("Dietrich Decl.") ¶ 14, ECF No. 26-6 (filed July 22, 2026). Despite Ms. Dietrich having experienced her superior's response as a threat, Compl. ¶ 65; Dietrich Decl. ¶ 16, Defendants dismiss her experience as a technical foible, Defs.' Br. 25 n.34. But the record says otherwise. Ms. Dietrich merely asked for a written decision reflecting what her superior said—not a complicated request. Dietrich Decl. ¶ 14. Even taking Defendants' explanation on its face, the fact that it is apparently "not possible" to be removed from a list to avoid receiving religious messages only underscores that Plaintiffs may not escape the Secretary's proselytizing messages. The Secretary has rewritten her agency's own "[i]mportant boundar[y]" to "stop [engaging in religious expression] if a colleague asks you to stop," Daiute Decl., Ex. D, and has effectively made confronting such messages a condition of Plaintiffs' employment, *see* Dietrich Suppl. Decl. ¶¶ 9–11; Compl. ¶¶ 73, 79, 84, 90, 96, 98.

Finally, Defendants rely on their guidance on religious expression in the workplace to assert that it is "implausible" that Plaintiffs fear retaliation for not conforming to the Secretary's religious beliefs. Defs.' Br. 25. Again, this Court must accept Plaintiffs' allegations as true and should ignore Defendants' unsupported speculation that is at odds with the record evidence that Plaintiffs have

supplied regarding their fear of retaliation. And in any event, Defendants' argument makes little sense. By abusing her authority to send proselytizing messages, the Secretary has made a dead letter of the agency's guidance that USDA officials "[c]annot use official authority to pressure subordinates" and "[m]ust stop if a colleague asks [them] to stop," Daiute Decl., Ex. D, so that guidance is cold comfort to Plaintiffs. Her disregard of her own guidance conveys, at a minimum, that the Secretary's proselytizing messages are uniquely permissible. Compl. ¶ 41. Indeed, when Ms. Dietrich referenced the Secretary's prior guidance to her superior, her superior was not even aware of it and told Ms. Dietrich that the Secretary may "elect not to implement policy in an elective nature." Dietrich Decl., Ex. A.

**B. The Secretary's conduct expresses a denominational preference.**

Plaintiffs have properly alleged an Establishment Clause claim and, as discussed in Plaintiffs' opening brief, are likely to succeed on their claim because the Secretary's conduct would have been understood by the Founding Founders to express a denominational preference, another indicum of "religious establishments the framers sought to prohibit." *Kennedy*, 597 U.S. at 537; *Cath. Charities*, 605 U.S. at 247; Pls.' PI Br. 7–9, 15–17. Relying again on a concurrence from Justice Thomas, Defendants claim that "[l]egal compulsion is an inherent component of 'preferences' in this context." Defs.' Br. 28 (quoting *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 53 (2004) (Thomas, J., concurring), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)). But legal compulsion is not required to show an impermissible denominational preference.

Although the denominational preference cases that have been decided by the Supreme Court have involved state laws, the Supreme Court has never held that a denominational preference violation requires or is limited to the "impos[ition of] burdens or granting benefits." *Id.* at 28 (quoting *Nathan*

*v. Alamo Heights Indep. Sch. Dist.*, 173 F.4th 576, 604 (5th Cir. 2026) (en banc), *petition for cert. filed*, No. 26-257 (Aug. 17, 2026)). Nor has it held that the "principle has no application to government use of religious language or symbolism." *Id.* at 29 (quoting *Nathan*, 173 F.4th at 604). Rather, the Supreme Court's most recent discussion of denominational preference, in *Catholic Charities*, suggests that the principle applies beyond explicit legal preferences, and prohibits *any* "[g]overnment action[] that favor[s] certain religions" because such actions "convey to members of other faiths that 'they are outsiders, not full members of the political community.'" *Cath. Charities*, 605 U.S. at 248 (quoting *Santa Fe*, 530 U.S. at 309); *see also McCreary Cnty.*, 545 U.S. at 878 ("[T]here is also evidence supporting the proposition that the Framers intended the Establishment Clause to require governmental neutrality in matters of religion, including neutrality in statements acknowledging religion."). Defendants are wrong in arguing that whether one, "absent coercion," "feel[s] excluded or unwelcome is no longer relevant to the Establishment Clause analysis." Defs.' Br. 27. As alleged in the Complaint and discussed in Plaintiffs' opening brief, the Secretary's preaching about Jesus Christ and specific tenets of Christianity[9] has conveyed to Plaintiffs that "USDA's mission now is to be Christian and that to survive as part of 'Team USDA,' USDA employees should be Christian," Compl. ¶ 64; *see also id.* at ¶¶ 69, 74, 80, 86, 107, and has "caused [Plaintiffs] to feel coerced, unwelcome, excluded, and like outsiders to the agency," Compl. ¶¶ 37, 56, 67, 69–70, 77, 80–81, 83, 85–87, 92; Pls.' PI Br. 15–17.

Defendants argue that the Establishment Clause does not prohibit the Secretary from "express[ing] preferences with respect to the holidays she chooses to celebrate" or "relay[ing] her beliefs and those of others who celebrate in wishing her employees well." Defs.' Br. 29. But this case

[9] Defendants argue that *Town of Greece* stands for the proposition that sectarian language is permissible, but, as discussed above, *see supra* Section I.A.2, *Town of Greece* prohibited proselytization, advancing one faith, and "betray[ing] an impermissible government purpose," 572 U.S. at 585. Further, the communications here are from government officials, not invited chaplains, and are to a captive audience, not the public.

is not about the Secretary's private expression of religious beliefs. Unlike the public-school football coach who prayed privately by himself after games in *Kennedy*, 597 U.S. at 525, the Secretary is using the Office of the Secretary's official email to publicly preach to "All USDA Employees" about "*our* Savior Jesus Christ, who came to free *us* from *our* sins," Compl. ¶ 33 (emphasis added), and Jesus's resurrection as "the foundation of *our* faith," *id.* at ¶ 34 (emphasis added), all while neglecting even to acknowledge, at Christmas and Easter time, that many USDA employees observe Hanukkah and Passover instead, *id.* at ¶ 39. The Secretary has also laid bare that she was not merely "celebrating those holidays" or "wishing her employees well," Defs.' Br. 29, but proselytizing USDA employees. Over a month after Easter, she posted on her official X account in response to the filing of this action, "It's just another opportunity to remind *everyone*: He is Risen." Daiute Decl., Ex. B (emphasis added). And more recently, the Secretary told the press that she uses her "platform" as USDA Secretary to proselytize about her religious beliefs and will "never stop talking about Jesus." Daiute Suppl. Decl., Ex. A.

As Defendants have officially expressed a denominational preference, they must show that their conduct "is closely fitted to further a compelling government interest." *Cath. Charities*, 605 U.S. at 248 (quoting *Larson v. Valente*, 456 U.S. 228, 251 (1982)). They cannot meet this heavy burden and have not even attempted to do so.

**C. No longstanding historical practice supports the Secretary's conduct.**

There is no longstanding historical practice of federal government officials abusing their authority to proselytize or promote and favor one religion over others to their employees. Defendants argue more broadly that "the Secretary's emails fit within an unbroken tradition of religious invocations by public officials in all three branches of government," Defs.' Br. 15, but the relevant history does not support that argument either. And in any event, history alone is not sufficient to show

that the Secretary's conduct does not violate the Establishment Clause. *See Marsh*, 463 U.S. at 790 ("Standing alone, historical patterns cannot justify contemporary violations of constitutional guarantees."); *see also United States v. Rahimi*, 602 U.S. 680, 738 (2024) (Barrett, J., concurring) ("[E]vidence of 'tradition' unmoored from original meaning is not binding law.").

Defendants refer to presidential inaugural addresses, proclamations, monuments, and Jefferson's Virginia Statute for Religious Freedom, as well as legislative prayers, our national motto, and the Pledge of Allegiance. Defs.' Br. 16–21. They also reference an order to Allied soldiers during World War II and presidential remarks at a luncheon for press during the Cold War. *Id.* at 18–19. None of these examples is even analogous to, let alone justifies, the Secretary's proselytizing communications to Plaintiffs.

Fundamentally, none of these examples involves government officials addressing federal employees. The closest example is General Dwight D. Eisenhower's address to members of the Allied Expeditionary Force, which included troops from multiple countries, during World War II. *Id.* at 18. That none of the examples is between a high-level government official and their subordinate employees is a crucial distinction, given the special circumstances and power imbalance in the workplace. It also illustrates that there is no such longstanding historic practice. Even Plaintiffs who have worked for decades at USDA under the leadership of multiple administrations attest to not having prior cabinet secretaries abuse their power to send proselytizing messages that favor one religion to employees. *See, e.g.*, Dietrich Decl. ¶ 6; Decl. of Thomas MaGee ("MaGee Decl.") ¶ 9, ECF No. 26-7; Decl. of Anne Poopatanapong ("Poopatanapong Decl.") ¶ 9, ECF No. 26-2.

Defendants cite presidential proclamations and inaugural addresses that they say support their historical argument. Defs.' Br. 16–21. But the presidential proclamations from the founding era, to the extent presidents issued them (Jefferson and Monroe did not), were largely non-denominational,

using general references to a deity or religion. Ragosta Decl. ¶¶ 15, 70, 80; Suppl. Decl. of John A. Ragosta ("Ragosta Suppl. Decl.") ¶ 1 (filed Sept. 21, 2026). Even the proclamations and inaugural addresses Defendants cite illustrate the generic religious language used: "God," "Him," Being," "Holy," "Almighty God," "Almighty Being," and "His divine." Defs.' Br. 16–17. Avoiding Christian-specific idiom was intentional; founding-era presidents did not want to unduly influence the public or express a denominational preference. Ragosta Decl. ¶¶ 79–81, 83; Ragosta Suppl. Decl. ¶¶ 1–5. Washington made this clear in his second thanksgiving proclamation addressed to "all religious societies and denominations, and to all persons whomsoever, for which he was criticized for his omission of Christian idiom." Ragosta Decl. ¶ 81; Ragosta Suppl. Decl. ¶ 2. While Madison did issue prayer proclamations, he was "always careful to make [them] absolutely indiscriminate, and merely recommendatory." Ragosta Decl. ¶ 79. Even still, he later concluded that "they impl[ied] a religious agency, making no part of the trust delegated to political rulers." *Id.* at ¶ 77. Even John Adams' prayer proclamations, which were the most overtly religious of the founding presidents, generally avoided sectarian preferences. *Id.* at ¶ 83; Ragosta Suppl. Decl. ¶ 5. Notably, when Adams was not reelected, he attributed it to "the Unpopularity of national Fasts and Thanksgivings, Nothing is more dreaded than the National Government meddling with religion." Ragosta Decl. ¶ 84.

Similarly, a comparison of the language of resolutions issued by the Continental Congress and Congress under the Constitution reveals that prior to the Constitution, the Continental Congress "regularly used Christian idiom and often specifically used first person pronouns, stating that Christianity was 'our' religion." Ragosta Suppl. Decl. ¶ 6. In contrast, Congress under the Constitution used more generic language that avoided Christian idiom. *Id.* at ¶ 7 (providing examples comparing resolutions). This distinction is consistent with the language of the prayer proclamations issued by presidents in the founding era, and it bolsters Plaintiffs' point that the Founders understood

the Establishment Clause to prohibit federal officials from issuing proselytizing or denominationally preferential messages.

Defendants' post-founding-era examples of official proclamations and prayers also do not establish a longstanding historical practice that would support the Secretary's conduct. In the first example—a proclamation issued by Abraham Lincoln during the Civil War—Lincoln's religious references do use more specific religious language and Christian idiom. *See* Defs.' Br. 17–18. But a single presidential action, almost one hundred years after the founding, does not amount to a longstanding practice, much less evince the Founders' understanding of the Establishment Clause. *Cf. Town of Greece*, 572 U.S. at 576 (concluding that the fact that the First Congress both approved the First Amendment and authorized legislative prayer was evidence that the Framers thought that legislative prayer was not prohibited by it). In contrast, Defendants' World War II-era examples—the religious references by President Franklin Delano Roosevelt and then-General Dwight D. Eisenhower in an order to Allied troops—tend to be general and non-denominational. Defs.' Br. 18–19.

Defendants also rely on Harry S. Truman's remarks at a luncheon for press on December 22, 1950, Defs.' Br. 18 n.26, just days after he declared a national emergency "under the perceived threat of communism spreading through the globe via North Korean forces."[10] Truman's remarks were (wrongly) premised on the notion that U.S. law was founded on Christian ideals and were used by him to make a comparison with communists—"the people we are in controversy with do not believe in any of those things."[11] In other words, the political circumstances were a particular moment in

[10] Natalie Walker, *The Steel Strike of 1952 and Harry Truman's Declaration of National Emergency*, Truman Libr. Inst. (Jan. 14, 2019), https://www.trumanlibraryinstitute.org/harry-trumans-national-emergency/ [https://perma.cc/XBN3-LXMY].

[11] Harry S. Truman, *Remarks in Kansas City at a Luncheon for the Press*, The Am. Presidency Project (Dec. 22, 1950), https://www.presidency.ucsb.edu/node/230591 [https://perma.cc/CSL2-JFJV].

American history but not representative of a longstanding historic tradition. Nor were the remarks presented to an audience that sat below him in an employment hierarchy.

Defendants' reliance on presidential oaths that conclude with "so help me God," our national motto, and the Pledge of Allegiance, *see* Defs.' Br. 19, also does not help them. In upholding them as constitutional, the Supreme Court and the Ninth Circuit have characterized these practices as "ceremonial deism." *See Elk Grove*, 542 U.S. at 37 (O'Connor, J., concurring). They are "patriotic or ceremonial [in] character" and have no "theological . . . impact." *Newdow*, 598 F.3d at 646 (quoting *Aronow v. United States*, 432 F.2d 242, 243–44 (9th Cir. 1970)). Monuments are also not relevant here because they can be avoided and are erected in a public space and directed to the general public rather than to a captive and subordinate audience.

Finally, the history of legislative prayers, which has been an "unbroken practice for two centuries in the National Congress," *Marsh*, 463 U.S. at 795, does not mitigate the Secretary's unconstitutional conduct because no such longstanding historical practice exists between high-level government officials and federal employees, Ragosta Decl. ¶ 68. Unlike the Secretary's authority over USDA employees, the chaplains delivering legislative prayers in *Town of Greece* and *Marsh* did not have authority over the legislators and the public, and legislators and members of the public were "free to enter and leave." *Town of Greece*, 572 U.S. at 590 (quoting *Lee*, 505 U.S. at 597). Further, legislators are likely "acquainted with this tradition [of legislative prayer at the beginning of a meeting] and understand[] that its purposes are to lend gravity to public proceedings," *id.* at 567, whereas federal government employees expect their employer "would not engage in religious proselytization and would not promote one religion over others," Compl. ¶ 103. One NFFE member, who previously experienced religious trauma in her youth and had worked for private employers "who infused their workplaces with religion and promoted Christian beliefs," expected not to have religion

imposed on her by her federal government employer. *Id.* at ¶¶ 102–03. That "was an important and motivating factor for her to take a job in public service." *Id.* at ¶ 103. Similarly, Plaintiff Miller is a public servant who "took an oath to uphold the U.S. Constitution and to serve the American people, regardless of their religious beliefs." *Id.* at ¶ 76. They did not expect that their employer—the federal government—would "turn[] USDA's mission to serve the American people into a mission to serve Christ." *Id.* at ¶ 74.

In short, Defendants' fail in their attempt to characterize the Secretary's proselytizing conduct as consistent with historical practices or traditions. History counsels that the Secretary's abuse of power to impose deeply theological statements, such as "our savior Jesus Christ" and Jesus's resurrection as "the foundation of our faith," on government employees violates the Establishment Clause.

## III. <u>This Court has jurisdiction over Plaintiffs' APA claims and Plaintiffs are likely to prevail on those claims.</u>

### A. Defendants' practice and policy is a reviewable discrete, final agency action.

As Plaintiffs explained in their opening brief, this Court has jurisdiction because the Secretary's practice and policy of abusing her authority to send proselytizing religious messages to the entirety of the USDA workforce from the Office of the Secretary's official account is a discrete, final agency action. Pls.' Br. 19–22. Defendants' arguments to the contrary are unavailing.

1. <u>Defendants' conduct amounts to agency action.</u>

Under 5 U.S.C. § 551's broad reach, Defendants' conduct amounts to an "agency action." Defendants mischaracterize the action that Plaintiffs challenge as merely "the Secretary's unsolicited emails wishing recipients a happy holiday." Defs.' Br. 11. In fact, Defendants have pursued a policy of misusing the official apparatus of the Secretary's office to send proselytizing messages to all USDA

employees. The proselytizing messages sent to the approximately 100,000 members of USDA's workforce are evidence of that unwritten policy, and the Court may "infer[] from [this] course of agency conduct that the agency has adopted a general policy, even in the face of agency denials of such policies existing." *Velesaca v. Decker*, 458 F. Supp. 3d 224, 237 n.7 (S.D.N.Y. 2020) (collecting cases); *see also Al Otro Lado, Inc. v. McAleenan*, 394 F. Supp. 3d 1168, 1206–08 (S.D. Cal. 2019) (inferring existence of asylum policy based on statements from high-level government officials and record of asylum seekers turning back along the border); *R.I.L.-R v. Johnson*, 80 F. Supp. 3d 164, 174–76, 184–85 (D.D.C. 2015) (inferring policy of considering deterrence in making custody determinations). Defendants have departed sharply from prior administrations' practices and adopted a new policy of commemorating holidays with religious proselytizing. *See, e.g.*, Compl. ¶¶ 125–26; Dietrich Decl. ¶ 6; MaGee Decl. ¶ 9; Decl. of Ashley Miller ("Miller Decl.") ¶ 8, ECF No. 26-3; Poopatanapong Decl. ¶ 9; Decl. of Ethan Roberts ("Roberts Decl.") ¶ 10, ECF No. 26-4; Decl. of Jennifer Wolfe ("Wolfe Decl.") ¶ 9, ECF No. 26-5. That policy is the agency action that Plaintiffs challenge.

Defendants also argue that their conduct "do[es] not fall into any category of agency action." Defs.' Br. 11. But Defendants rest on an overly rigid, cramped reading of the statutory terms—a mode of interpretation that courts have repeatedly cautioned against in assessing agency action for purposes of APA reviewability—in arguing that the Secretary's proselytization policy is neither "rule," nor "order," nor "sanction." Defs.' Br. 11–12. As Plaintiffs explained in their opening brief, Pls.' PI Br. 20, "[t]he bite in the phrase 'final action' . . . is not in the word 'action,' which is meant to cover comprehensively every manner in which an agency may exercise its power," *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001).

And regardless, the policy *is* a "rule."[12] The definition of "rule" under § 551(4) encompasses more than just actions that "create law or explain existing laws," Defs.' Br. 11—a "rule" is "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency," 5 U.S.C. § 551(4). Defendants' policy of religious proselytization is a rule under § 551 because it applies generally to the entire USDA workforce, it is ongoing and has future effect, and it prescribes how the Secretary will convey proselytizing religious messages to her subordinates. The case on which Defendants rely for a narrow meaning of "rule" does not even consider whether a particular agency action was reviewable agency action, but whether it was a substantive rule required to have been promulgated through notice and comment rulemaking—a standard that does not apply here. *See* Defs.' Br. 11 (citing *S. Cal. Edison Co. v. FERC*, 770 F.2d 779, 783 (9th Cir. 1985)).

Defendants have no answer for the case law explaining that agency decisions that mark a departure from previous agency policy and implicate the legal rights of agency employees is reviewable agency action, *see* Pls.' Br. 21–22, and there is none.

2. Plaintiffs challenge a discrete policy.

Defendants' policy is sufficiently discrete. The APA's discreteness requirement ensures that courts are not "forced either to enter a disfavored 'obey the law' injunction" or "to engage in day-to-day oversight of the executive's administrative practices" stemming from a challenge to an agency's workaday managerial decisions. *City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019). But Plaintiffs do not ask for broad, programmatic relief that would require the Court to manage USDA's day-to-day operations or entangle the Court in abstract policy questions. Plaintiffs challenge

[12] Plaintiffs do not contend that the Secretary's proselytization policy is an "order," "license," or "sanction," so Defendants' arguments on that score are beside the point.

a specific action—a dramatic shift in agency policy, conveyed from the Secretary herself, to use her office to send proselytizing messages to commemorate holidays. The Secretary's emails are examples of the policy in action, as described above. Defendants' new policy is not mere shorthand for the ongoing operations of USDA; it is a specific policy "applying some particular measure across the board" that "can of course be challenged under the APA." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 n.2 (1990). The relief Plaintiffs ultimately seek under the APA—vacatur of the policy—is the sort of relief that courts issue every day.

3. Defendants' policy constitutes final agency action.

The policy is final agency action because it marks the consummation of the agency's decision-making and determines legal rights or obligations and creates legal consequences. *See* Pls.' PI Br. 21–22; *see also S.F. Herring Ass'n v. Dep't of Interior*, 946 F.3d 564, 577–78 (9th Cir. 2019) (ongoing course of agency conduct demonstrated finality without any written policy). Defendants barely contest finality. They restate the legal standard and summarily assert that Plaintiffs' arguments about legal consequences presuppose their prevailing on the merits. *See* Defs.' Br. 13. As explained elsewhere, Plaintiffs are likely to prevail on the merits of their First Amendment claim, and in any event Defendants offer no authority to counter Plaintiffs' showing that an agency action that violates Plaintiffs' constitutional or statutory rights carries legal consequences. *See* Pls.' PI Br. 22.

**B. Defendants' practice and policy is contrary to constitutional right and arbitrary and capricious.**

First, for the reasons explained above and in Plaintiffs' opening brief, Defendants' policy violates the Establishment Clause of the First Amendment and is therefore contrary to constitutional right under the APA. *See* Pls.' PI Br. 24.

Second, Defendants' policy is arbitrary and capricious for four different reasons: the policy departs without any explanation from the agency's previous policy; the policy violates USDA's own guidance on religious expression in the workplace; Defendants failed to consider the Secretary's obligation not to violate her employees' Establishment Clause rights; and Defendants failed to consider USDA employees' reliance interests on the former policy. *See* Pls.' PI Br. 22–24. Defendants do not address the Secretary's failure to consider the Establishment Clause or USDA employees' reliance interests, *see generally* Defs.' Br., so they have waived those arguments. Defendants' sole argument on the Secretary's departure from longstanding policy is that the actions of former secretaries are "irrelevant," Defs.' Br. 14—a position manifestly wrong and inconsistent with precedent, *see, e.g.*, *City of Portland v. United States*, 969 F.3d 1020, 1037 (9th Cir. 2020) ("[W]here [an agency] is departing from prior policy, we look to see if it acknowledged that it was changing positions, and gave 'good reasons for the new policy.'" (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009))). That leaves only Defendants' departure from their own guidance.

Defendants argue that the Secretary's practice of disseminating proselytizing messages from the Office of the Secretary's email account to the entire USDA workforce—who are obligated to open and read those messages—is merely the Secretary's personal religious expression and exerts no coercive pressure on the USDA employees who serve under her. Defs.' Br. 13–14. Plaintiffs have already explained why that is not so. *See* Pls.' PI Br. 9–15, 23; *supra* Sections II.A–II.B. While Defendants reprimand Plaintiffs for "marching straight to federal court" without asking the Secretary to stop sending the proselytizing emails, Defs.' Br. 14, at least one Plaintiff *did* ask to stop receiving the messages—and her request was denied, *see* Pls.' PI Br. 23. The Secretary's policy is inconsistent with USDA's own guidance and is arbitrary and capricious in the other respects described above.

**IV. <u>The remaining preliminary injunction factors weigh heavily in Plaintiffs' favor</u>.**

**A. Plaintiffs are likely to suffer irreparable harm.**

Plaintiffs have met their burden to demonstrate that they are "likely to suffer irreparable harm" in the absence of preliminary relief. *See Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023). Defendants overstate Plaintiffs' burden on this factor, Defs.' Br. 29–30, but even their own cited cases explain that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Klein v. City of San Clemente*, 584 F.3d 1196, 1207–08 (9th Cir. 2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Citizens for Quality Educ. S.D. v. Barrera*, 333 F. Supp. 3d 1003, 1043 (S.D. Cal. 2018). Plaintiffs have established an injury sufficient to confer standing, *see supra* Section I, and are likely to succeed on the merits of their First Amendment claim, *see supra* Section II, and thus have established that they will likely suffer irreparable harm, *see Citizens for Quality Educ.*, 333 F. Supp. 3d at 1043.

Further, contrary to what Defendants argue, there was no "long delay," Defs.' Br. 30, that fatally undermines Plaintiffs' showing of irreparable harm. For one thing, "'delay is but a single factor to consider in evaluating irreparable injury'; indeed, 'courts are loath to withhold relief solely on that ground.'" *Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019) (quoting *Arc of Cal. v. Douglas*, 757 F.3d 975, 990 (9th Cir. 2014)). And a purported delay in seeking preliminary relief "is not particularly probative in the context of ongoing, worsening injuries," as here. *Id.* (quoting *Arc of Cal.*, 757 F.3d at 990).

Plaintiffs did not "wait[] ten months from the first challenged email" to file suit. Defs.' Br. 30. Although Secretary Rollins did send religious messages to all USDA employees on July 4, 2025, and November 26, 2025, *see* Compl. ¶¶ 30–31, Plaintiffs do not assert that those emails—standing alone—were proselytizing or otherwise violative of Plaintiffs' First Amendment rights, *see id.* at ¶ 30

(explaining that "[t]he [Secretary's] religious messages appeared to be non-denominational at first"). Instead, these early messages demonstrate that "Secretary Rollins has engaged in an *escalating pattern* of subjecting all USDA employees to proselytizing Christian messaging," culminating, most egregiously, in her Easter Sermon. *Id.* at ¶¶ 29, 34 (emphasis added). Defendants' conduct since the Easter Sermon has only worsened Plaintiffs' injuries. They have: told at least one employee that she could not opt out of the religious communications and that elevating her objections would "create trouble," Dietrich Decl. ¶ 14; doubled down on the proselyting nature of the communications after Plaintiffs filed suit, Daiute Decl., Exs. A, B; continued to send religious emails quoting scripture, Miller Decl., Exs. E, F; and made plain that the Secretary will continue to use her official "platform" to "mak[e] disciples of all nations," and to "never stop talking about Jesus," despite being "sued a couple of times for [it]," Daiute Suppl. Decl., Ex. A. Defendants have made it abundantly evident that they will not stop proselytizing. As Plaintiffs' injuries are likely to recur at the next major Christian holiday, which is Christmas, Plaintiffs filed their preliminary-injunction motion in time to obtain a ruling before this holiday.

**B. The balance of equities tip in Plaintiffs' favor.**

Defendants assert that the balance of equities and public interest "tip sharply in the Government's favor" because Plaintiffs suffer only the "de minimis 'injury' of receiving unwanted emails." Defs.' Br. 30. But "[t]here are no de minimis violations of the Constitution—no constitutional harms so slight that the courts are obliged to ignore them." *Elk Grove*, 542 U.S. at 36–37 (O'Connor, J., concurring). And discounting Plaintiffs' injuries as merely "receiving unwanted emails" ignores "what [the Plaintiffs] understand[] clearly," *Santa Fe*, 530 U.S. at 315—that the Secretary's proselytizing communications are about using her position of authority over a captive audience to pressure USDA employees to conform to her preferred religion or risk facing professional

repercussions, *see, e.g.*, Poopatanapong Decl. ¶ 12; Miller Decl. ¶ 14; Roberts Decl. ¶ 14; Wolfe Decl. ¶ 10; Dietrich Decl. ¶ 16; MaGee Decl. ¶ 11; Decl. of Yvette Piacsek ("Piacsek Decl.") ¶¶ 16, 20, 22, ECF No. 26-8.

Defendants' supposed countervailing public interest in "respecting religion's role in public life," Defs.' Br. 30, is undermined, not advanced, by the Secretary's conduct. "That is because the 'fullest realization of true religious liberty requires that government' refrain from 'favoritism among sects.'" *Cath. Charities*, 605 U.S. at 248 (quoting *Larson*, 456 U.S. at 246). When the government places its weight behind one favored religion, using its power to pressure conformance, that is an affront to this nation's founding commitment to protecting religious pluralism—and a violation of the Establishment Clause. Preventing this constitutional violation from recurring serves the public interest because "it is always in the public interest to prevent the violation of a party's constitutional rights." *Fellowship of Christian Athletes v. S.J. Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 695 (9th Cir. 2023) (citation omitted).

**C. Plaintiffs offer a workable standard to identify impermissible communications.**

Finally, Defendants are incorrect that Plaintiffs "offer no workable standard," Defs.' Br. 31, to identify impermissible communications. Plaintiffs seek to enjoin "Defendants from sending or otherwise communicating messages that proselytize, promote, or favor any particular religion to USDA employees." Pls.' Proposed Order 1, ECF No. 26-10. This injunction uses simple terms that are consistent with case law. *See Town of Greece*, 572 U.S. at 583 (prayer practice must not be "exploited to proselytize" (quoting *Marsh*, 463 U.S. at 794)); *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968) (government may not "promote one religion or religious theory against another"); *Cath. Charities*, 605 U.S. at 248 (proscribing "[g]overnment actions that favor certain religions"). And, as explained above, the required analysis to determine whether conduct crosses the constitutional line is

permissible and routine. *See supra* Section I.A.2; *see also Town of Greece*, 572 U.S. at 582–83 (clarifying that "the Court does not imply that no constraints remain on [a prayer's] content" and describing "[t]he relevant constraint[s]," which would require a court to look at the prayer's content and context). Defendants' only other authority is irrelevant because, to state the obvious, Plaintiffs' requested injunction does not rely on weather-dependent "guesswork" or "presume federal control over nature's elements." *Reach Cmty. Dev. v. U.S. Dep't of Homeland Sec.*, 174 F.4th 1143, 1148–49 (9th Cir. 2026).

**V. <u>This Court should enjoin Defendants' conduct as to all USDA employees</u>.**

Under *Trump v. CASA, Inc.*, injunctive relief issued pursuant to a court's authority under the Judiciary Act of 1789 must be limited to what is "necessary to provide complete relief to each plaintiff with standing to sue." 606 U.S. 831, 861 (2025). Defendants argue that "[e]xtending injunctive relief . . . to persons who are not parties to this litigation . . . would run afoul of that principle," and ask this Court to limit any injunctive relief to the named Plaintiffs and NFFE members. Defs.' Br. 31. But *CASA* "does not narrow the scope of the injunctive relief possible under the APA," *Novedades Y Servicios, Inc. v. Fin. Crimes Enf't Network*, 181 F.4th 961, 982 (9th Cir. 2026). And regardless, an injunction barring unlawful communications only to Plaintiffs would not provide Plaintiffs complete relief.

**A. Plaintiffs are entitled to a stay under the APA.**

Courts have "authority under 5 U.S.C. § 705 ("Section 705") of the APA to postpone the effective date of unlawful agency actions nationwide." *Novedades Y Servicios*, 181 F. 4th at 981. As the Ninth Circuit has recently held, this authority to grant nationwide relief was not limited by *CASA*. *Id.* at 982. That is because "*CASA*'s holding turned on the Judiciary Act's source of equitable authority," not authority derived from other sources, like the APA. *Id.* (citation omitted); *see also,*

*e.g.*, *CASA*, 606 U.S. at 847 n.10 (specifically declining to address the "distinct question" of scope of relief under the APA); *id.* at 869 (Kavanaugh, J., concurring) ("[I]n cases under the [APA], plaintiffs may ask a court to preliminarily set aside a new agency rule." (citation modified)); *Louisiana ex rel. Murrill v. Food & Drug Admin.*, 175 F.4th 310, 323 (5th Cir. 2026) (*CASA* did not affect "remedies under the APA," including Section 705 stays); *Make the Road N.Y. v. Noem*, No. 25-5320, 2025 WL 3563313, at *34–35 (D.C. Cir. Nov. 22, 2025) (holding that "CASA does not control the scope of relief available under Section 705" and noting that "there is good reason to think that Congress did not intend to incorporate 'background equitable principles' into the APA" (quoting *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 838 (2024) (Kavanaugh, J., concurring))).[13] Plaintiffs are entitled to a stay of the Secretary's conduct under Section 705.

**B. Plaintiffs' complete relief requires the injunction sought.**

A Plaintiff-only injunction under the Court's equitable authority would not provide Plaintiffs complete relief. Indeed, "Plaintiffs complain of 'injuries for which it is all but impossible for courts to craft relief that is complete and benefits only the named [P]laintiffs.'" *Nat'l TPS All. v. Noem*, 166 F.4th 739, 767 (9th Cir. 2026) (quoting *CASA*, 606 U.S. at 852 n.12).

As an initial matter, Defendants' own actions suggest that a limited injunction is not feasible. When Ms. Dietrich requested to opt out of receiving the Secretary's religious messages, she was told it was not possible because the listserv that Secretary Rollins uses to communicate with USDA employees "does not have a preference setting to be able to check which communications you receive from it, your email is either part of that distribution email list or not." Dietrich Decl., Ex. A. In a follow-up meeting regarding Ms. Dietrich's complaint, the USDA's Director of the Policy and

[13] The Ninth Circuit initially intimated that *CASA* "provides some useful guidance" on the appropriate scope of relief under Section 705 of the APA, *see Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 995 (9th Cir. 2025), but has subsequently clarified that *CASA* did not affect the scope of relief available under the APA, *Novedades Y Servicios*, 181 F.4th at 982.

Accountability Division at the Natural Resources Conservation Service and a USDA Human Resources specialist confirmed that "there is no mechanism to opt out of messaging distributed through the current system." *Id.*; Dietrich Decl. at ¶ 14. If it was impossible for the USDA to opt *one* employee out of Secretary Rollins' proselytizing messages, it is not clear how it would be possible for the USDA to manage an opt-out system for the individual Plaintiffs and the more than 19,000 USDA employees—roughly a fifth of the Agency's workforce—represented by Plaintiff NFFE. Piacsek Decl. ¶ 3. Even if such an opt-out system were technologically possible, managing a two-track communication system would raise significant, if not insurmountable, administrative challenges. For example, how would Defendants continuously and contemporaneously track NFFE's fluctuating membership? *See Nat'l TPS All.*, 166 F.4th at 768.

Moreover, the Secretary's emails often contain important information about USDA programs and structure, policy updates, announcements about early dismissals, and other information that is critical for Plaintiffs to carry out their job duties. Poopatanapong Decl. ¶¶ 4, 6; Miller Decl. ¶¶ 4, 9; Roberts Decl. ¶¶ 4, 6; Wolfe Decl. ¶¶ 4, 6; Dietrich Decl. ¶¶ 3, 13; MaGee Decl. ¶¶ 4, 6. Maintaining separate listservs could easily lead to Plaintiffs missing key information from leadership, which would make it more difficult for them to do their jobs. *See Am. Fed'n of State Cnty. & Mun. Emps. v. U.S. Off. of Mgmt. & Budget*, 807 F. Supp. 3d 1004, 1044 (N.D. Cal. 2025) (rejecting "piecemeal injunction that only applies to certain employees" because it "would be unworkable" and "cause plaintiffs' members to have increased workloads"), *appeal dismissed*, No. 25-7998, 2026 WL 809820 (9th Cir. Jan. 2, 2026).

Finally, and critically, a Plaintiff-only injunction would do nothing to address the coercive environment and social pressure caused by the Secretary's proselytizing communications. Under the Plaintiff-only injunction proposed in the alternative by Defendants, all USDA employees except

Plaintiffs would continue to receive the Secretary's proselytizing communications. The Secretary would continue broadcasting and elevating her preferred religious beliefs, conveying that USDA has a favored religion and that "to survive as part of 'Team USDA,' USDA employees should be Christian." Dietrich Decl. ¶ 12; *see also* Wolfe Decl. ¶ 14; Miller Decl. ¶ 11; Roberts Decl. ¶ 12; MaGee Decl. ¶ 12; Piacsek Decl. ¶ 12; Poopatanapong Decl. ¶ 10. Thus, even if Plaintiffs were to stop receiving the communications directly, they would still be subject to the chilling effects and pressure that those communications inflict on Plaintiffs' chain of command, colleagues, and the USDA culture generally. To provide Plaintiffs complete relief, it is necessary to enjoin the Secretary's unlawful communications altogether. *See Am. Ass'n of Univ. Professors v. Trump*, 815 F. Supp. 3d 907, 978 (N.D. Cal. 2025) (holding that "the entirety of the coercive practice must be enjoined" because "Plaintiffs have shown that Defendants are coercing the [workplace] as a whole . . . in order to stamp out their members' disfavored speech"), *appeal dismissed per stipulation*, No. 26-263, 2026 WL 1049175 (9th Cir. 2026); *Am. Fed'n of State Cnty. & Mun. Emps.*, 807 F. Supp. 3d at 1044 (explaining that plaintiff-only injunction would not provide complete relief because plaintiffs would continue to suffer injuries resulting from government's conduct towards plaintiffs' coworkers).

**CONCLUSION**

For the foregoing reasons, this Court should deny Defendants' Motion to Dismiss and grant Plaintiffs' motion for a preliminary injunction and a stay under 5 U.S.C. § 705.

Dated: September 21, 2026

Respectfully submitted,

*/s/ Amy Tai*

Amy Tai*
Jenny Samuels*
Elias Daiute*
Rebecca S. Markert*^
AMERICANS UNITED FOR SEPARATION OF CHURCH & STATE
1310 L Street NW, Suite 200
Washington, D.C. 20005
Tel. (202) 466-3234
tai@au.org
samuels@au.org
daiute@au.org
markert@au.org

Sarah Goetz*
Ayesha Khan*
Elena Goldstein*
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
Tel. (202) 448-9090
sgoetz@democracyforward.org
akhan@democracyforward.org
egoldstein@democracyforward.org

Bryan Schwartz (SBN 209903)
Sam Goity (SBN 359678)
BRYAN SCHWARTZ LAW, P.C.
180 Grand Avenue, Suite 1380
Oakland, CA 94612
Tel. (510) 444-9300
Fax (510) 444-9301
bryan@bryanschwartzlaw.com
sam@bryanschwartzlaw.com

* Appearing *pro hac vice*.
^ Admitted to practice in Wisconsin; not a member of the D.C. bar.

*Attorneys for Plaintiffs*