UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

NATIONAL FEDERATION OF FEDERAL EMPLOYEES, et al.,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF AGRICULTURE, et al.,

Defendants.

Case No. 26-cv-04406-TLT

**ORDER: GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND DENYING DEFENDANTS' CROSS MOTION TO DISMISS**

Re: Dkt. No. 26, 38

To paraphrase the Supreme Court in its landmark 1992 ruling *Lee v. Weisman*, the good faith intentions of the Secretary are not the issue here. 505 U.S. 577, 588−89 (1992). Neither is the role of religion in public life. Thirty years before *Lee*, the Supreme Court recognized that "[t]he history of man is inseparable from the history of religion." *Engel v. Vitale*, 370 U.S. 421, 433 (1962). Expressions of worship unquestionably play an important role in the spiritual life of millions of Americans. This Court's judgment says nothing about the value of prayer or those who believe in its power. Precisely because the tradition of worship and prayer is so personal and so cherished, protecting private devotion and spiritual reflection from government influence comes to the fore. The wisdom of the Founders was in recognizing that independence requires freedom of conscience. The command of the Establishment Clause, thus, is to prohibit the government from using its authority to try to sway an individual's decision about whether and how to practice their faith.

In recent years, a sister-court in the Seventh Circuit commented that "[i]n the best of times, people may pray as a way of expressing joy and thanks; during times of grief, many find that prayer provides comfort. Others may pray to give praise, seek forgiveness, ask for guidance or

find the truth. 'And perhaps it is not too much to say that since the beginning of th[e] history [of humans] many people have devoutly believed that "More things are wrought by prayer than this world dreams of."'" *Freedom From Religion Found., Inc. v. Obama*, 705 F. Supp. 2d 1039, 1042–43 (W.D. Wis. 2010), *vacated and remanded*, 641 F.3d 803 (7th Cir. 2011) (citing *Engel,* 370 U.S. at 433). Though the court's ultimate judgement was remanded with instructions for dismissal for want of a standing, the court elegantly captured the intimacy of matters concerning worship and prayer. This Court is keenly aware of the sensitivities present in this action. The parties need look no further than James Madison's "Memorial and Remonstrance Against Religious Assessments" to find the maxim informing this Court's ruling: "The Religion . . . of every man must be left to the conviction and conscience of every man."[1]

Having considered the parties briefs, the record, the relevant legal authority, and for the reasons below, the Court **GRANTS** Plaintiffs' motion for preliminary injunction with respect to Plaintiffs' constitutional claim only, **GRANTS** Defendants' motion to dismiss Plaintiffs' APA claims, and **DENIES** Defendants' motion to dismiss Plaintiffs' constitutional claim.

The Court **ORDERS** that the Secretary must recognize certain boundaries when communicating religious messages. She "[m]ust stop if a colleague asks [her] to stop," she "[c]annot create a hostile work environment through persistent unwelcome advances," and she "[c]annot use official authority to pressure subordinates." USDA Secretary's Memorandum 1078-019. She may "[d]iscuss [her] religious beliefs with interested colleagues," "[s]hare why [her] faith is meaningful to [her]," "[p]olitely invite coworkers to religious services or events," "[e]xpress religious viewpoints during appropriate conversations." *Id.* This Court expresses no view whatsoever on what the Secretary can and cannot do in her personal capacity.

## I. BACKGROUND

### A. Procedural History

Plaintiffs filed this action on May 13, 2026. ECF 1. Plaintiffs bring three claims: (1) violation of the Establishment Clause of the First Amendment to the United States Constitution,

---

[1] James Madison, "Memorial and Remonstrance Against Religious Assessments, [ca. 20 June] 1785," https://founders.archives.gov/documents/Madison/01-08-02-0163.

(2) violation of the Administrative Procedure Act—5 U.S.C. § 706(2)(A) Arbitrary and Capricious, and (3) violation of the Administrative Procedure Act—5 U.S.C. § 706(2)(B) Contrary to Constitutional Right.

On July 22, 2026, Plaintiff filed a motion for preliminary injunction and stay under 5 U.S.C. § 705. ECF 26. Defendants filed a cross-motion to dismiss and opposition to Plaintiff's preliminary injunction motion on August 21, 2026. ECF 38. Plaintiffs opposed Defendant's motion and filed their reply brief on September 21, 2026. ECF 39. Defendant's Reply was filed on October 5, 2026. ECF 44.

The Court held a hearing on the motions on October 27, 2026.

**B. Factual Background**

Plaintiffs are the National Federation of Federal Employees ("NFFE") and six employees of the United States Department of Agriculture ("USDA"): Lanette Dietrich, Thomas MaGee, Ashley Miller, Anne Poopatanapong, Ethan Roberts, and Jennifer Wolfe. NFFE represents approximately 110,000 federal employees, including more than 19,000 USDA employees. The individual plaintiffs work in several USDA components and locations and are not NFFE members. Defendants are USDA and Secretary of Agriculture Brooke L. Rollins, sued in her official capacity. Compl. ¶¶ 11–20, 43 n.2.

Secretary Rollins assumed office on February 13, 2025, as the head of an agency employing approximately 100,000 civil servants, all of whom report to her directly or indirectly. *Id.* ¶¶ 27–28.

On July 4, 2025, Secretary Rollins sent an email from her official email account celebrating Independence Day. *Id.* ¶ 30. The message was sent to all USDA employees. *Id.* Her message concluded with a written statement, "May God continue to protect the United States of America and may His favor shine over all her land." *Id.*

On November 26, 2025, Rollins sent a Thanksgiving message from her official email account to all USDA employees, attributing the first Thanksgiving in part to "gratitude towards a loving God." *Id.* ¶¶ 30–31.

The complaint identifies two subsequent communications as expressly promoting



United States District Court
Northern District of California

United States District Court
Northern District of California

Christianity. On December 23, 2025, Rollins emailed USDA employees a Christmas message containing a video in which she stated that "The spirit of generosity flows from the very first Christmas when God gave us the greatest gift possible, the gift of his Son and our Savior Jesus Christ, who came to free us from our sins and open the door to eternal life. This is the reason for the season. . . ." *Id.* ¶ 33.

On April 5, 2026, she sent an Easter email addressed to "All USDA Employees" which read:

> Team USDA,
>
> Happy Easter – He is Risen indeed!
>
> Today we celebrate the greatest story ever told, the foundation of our faith, and the abiding hope of all mankind.
>
> From the foot of the Cross on Good Friday to the stone rolled away from the now empty tomb, sin has been destroyed. Jesus has been raised from the dead. And God has granted each of us victory and new life. And where there is life — risen life— there is hope.
>
> No matter the very real trials and hardships we face, fear and sin and death do not get the last word. Because on Easter morning, "Hell took a body, and discovered God. It took earth, and encountered Heaven. It took what it saw, and was overcome by what it did not see." Now that is reason to rejoice!
>
> And so, like the very first disciples to encounter our risen Lord in the Upper Room almost two thousand years ago, this Easter let us too be alive with hope, full of Paschal joy, and confident in the mission each of us has been called for.
>
> Please know how amazed and grateful I am for the hard work each of you do to support our shared mission here at USDA. I hope you and your loved ones have a truly blessed and happy Easter. May God continue to bless you, your families, and our exceptional country, One Nation, Under God.

*Id.* ¶ 34. At the top of the email, Secretary Rollins included an illustration of a stone rolled away from Jesus' tomb with the words "Christ is Risen" written above the illustration. *Id.* ¶ 35.

Plaintiffs allege that Rollins has not sent comparable messages acknowledging other religions' holidays. *Id.* ¶ 39. They contrast her communications with USDA's November 20, 2025 guidance on religious expression, which provides that officials "[c]annot use official authority to pressure subordinates" regarding religious beliefs and "[m]ust stop if a colleague asks [them] to stop." *Id.* ¶¶ 40–41. They further allege that Rollins defended the Easter message

publicly and is likely to send similar communications marking future Christian holidays. *Id.* ¶ 42.

Each individual plaintiff received and read the challenged messages. *Id.* ¶ 48. Plaintiffs allege that they are expected to read communications from the Secretary because those communications may contain consequential workplace information. Other messages have addressed agency reorganization, employee relocation, changes to USDA's civil rights program, shutdown planning, and the Deferred Resignation Program; holiday messages have historically included administrative-leave announcements. *Id.* ¶¶ 43–47.

The individual plaintiffs allege that the messages convey a preference for employees who share the Secretary's Christian beliefs, make them feel excluded, and pressure them to conceal their own beliefs or appear to share hers. They fear workplace disfavor and retaliation for objecting; the complaint also alleges that supervisors have warned that objections would result in "trouble." *Id.* ¶¶ 49–56. Plaintiff Poopatanapong alleges that she no longer feels safe discussing a Buddhist holiday she celebrates; Roberts, an atheist, feels silenced; and Wolfe, a Pagan, feels pressure to appear Christian to advance professionally. *Id.* ¶¶ 82, 88, 91–95. NFFE alleges that its USDA members likewise received the messages, felt compelled to read them, and experienced pressure to accept the Secretary's beliefs while withholding their own. *Id.* ¶¶ 98–110.

Plaintiffs challenge the alleged messaging policy and practice under the Establishment Clause and the Administrative Procedure Act. They seek declaratory relief, vacatur of the alleged policy, and an injunction against further proselytizing communications to USDA employees. *Id.* ¶¶ 111–135.

## II. LEGAL STANDARD

### A. Preliminary Injunction

Plaintiffs are entitled to a preliminary injunction and a stay under Section 705 of the APA if they show that: (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm absent the preliminary injunction," (3) "the balance of equities tips in [their] favor," and (4) "a preliminary injunction is in the public interest." *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (citing *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)); *Immigrant Defs. Law Ctr. v. Noem*, 145 F.4th 972, 995–96 (9th Cir. 2025) (same factors govern issuance of a

preliminary injunction and a Section 705 stay). "Where the government is a party to a case in which a preliminary injunction is sought, the balance of the equities and public interest factors merge." *Roman v. Wolf*, 977 F.3d 935, 940–41 (9th Cir. 2020). The Ninth Circuit applies a "sliding scale" approach such that "[w]hen the balance of equities 'tips sharply in the plaintiff's favor,'" as it does here, "the plaintiff must raise only 'serious questions' on the merits—a lesser showing than likelihood of success." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 684 (9th Cir. 2023) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32, 1135 (9th Cir. 2011)).

**A. Motion to Dismiss – Rule 12(b)(1)**

Under Rule 12(b)(1), a party may move to dismiss a claim based on subject matter jurisdiction, including a lack of standing. *Chandler v. State Farm Mut. Auto Ins. Co.*, 598 F.3d 1115, 1121–22 (9th Cir. 2010). "On a motion to dismiss for a lack of standing, a district court must accept as true all material allegations in the complaint, and must construe the complaint in the nonmovant's favor." *Id.* (citing *Bernhardt v. Cnty. of Los Angeles*, 279 F.3d 862, 867 (9th Cir. 2002)). The party asserting federal subject matter jurisdiction bears the burden of establishing that it is present. *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994).

"The constitutional minimum of standing" requires three elements. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). First, the plaintiff must prove that "an injury-in-fact, *i.e.*, a concrete and particularized, actual or imminent invasion of a legally protected interest." *Id.* at 555. Second, there must be a "causal connection" between the injury and the conduct. *Id.* at 560. The injury must be "traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court." *Id.* (cleaned up). Finally, the plaintiff must show that the injury "will likely be redressed by a favorable decision." *Chandler*, 598 F.3d at 1122.

**B. Motion to Dismiss – Rule 12(b)(6)**

Pursuant to Rule 12(b)(6), a party may move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To overcome a motion to dismiss, a Plaintiffs' "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a

plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014) (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)). The Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). However, "conclusory allegations of law and unwarranted inferences are insufficient to avoid a Rule 12(b)(6) dismissal." *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009).

A plaintiff's obligation to provide the grounds of his entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Rather, the allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Id.* A motion to dismiss should be granted if the complaint does not proffer enough facts to state a claim for relief that is plausible on its face. *Id.* at 558–59. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint has not shown that the pleader is entitled to relief. *Iqbal*, 556 U.S. at 679.

## III. DISCUSSION

### A. Standing

The Court first addresses Defendants' argument that Plaintiffs' lack Article III standing to bring these claims. The doctrine of Article III standing, which stems from the Constitution's case-or controversy limitation on judicial power, requires the party invoking federal jurisdiction to plausibly allege (i) an injury-in-fact (ii) that is fairly traceable to the conduct of the party sued and (iii) judicially redressable. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Plaintiffs bear the burden of demonstrating that they meet those requirements "for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). Claims analyzed in the context of the Establishment Clause require distinct considerations.

> We acknowledge that "[c]ourts regularly have noted that it can be difficult to determine whether an Establishment Clause plaintiff has alleged an 'injury in fact' for purposes of Article III standing." *Cath. League for Religious & C.R. v. City & County of San Francisco*, 624 F.3d 1043, 1065 (9th Cir. 2010) (en banc) (Graber, J., dissenting).

> "Unlike most other types of cases, in which the plaintiff suffers a physical injury or a pecuniary loss, the plaintiff in an Establishment Clause case usually does not suffer those types of harm." *Id*. at 1066. Instead, Establishment Clause injury is often "spiritual or psychological" as a result of a government action that is not neutral toward a religion. *See id*. at 1050 (majority opinion).

*Kumar v. Koester*, 131 F.4th 746, 754–55 (9th Cir. 2025). Other circuits find that "[a]n alleged Establishment Clause injury is sufficiently concrete and particularized when the plaintiff sees or hears a government-sponsored religious display or speech that offends his or her beliefs." *Spadone v. McHugh*, 864 F. Supp. 2d 181, 190–91 (D.D.C. 2012) (citing *Newdow v. Roberts,* 603 F.3d 1002, 1014 (D.C.Cir.2010) (Kavanaugh, J., concurring). The Supreme Court has found jurisdiction in Establishment Clause challenges to "prayer at a football game, a crèche in a county courthouse or public park, the Ten Commandments displayed on the grounds of a state capitol or at a courthouse, a cross display at a national park, school prayer, [and] a moment of silence at school." *Cath. League for Religious & C.R. v. City and Cnty. of San Francisco* ("*Catholic League*"), 624 F.3d 1043, 1050 (9th Cir. 2010).

Here, Plaintiffs allege spiritual harm from Secretary Rollins's conduct, *see* Compl. ¶¶ 53, 66, 70, 78, 82, 88, 94, 99 as well as an injury under Article III based on the Secretary's emails being both proselytizing and unavoidable, Compl. ¶ 113. Plaintiffs also allege that they suffer concrete consequences that independently satisfy Article III's injury requirement: they face potential consequences in the workplace, *id*. at ¶¶ 7, 53–54, 71, 88, 104; they feel pressure to conform to the Secretary's views, *id*. at ¶¶ 52, 61, 78, 82, 91; and they feel that they are no longer welcome at USDA, *id*. at ¶¶ 7, 51, 69, 77, 80, 85. "[T]he Establishment Clause is primarily aimed at protecting non-economic interests of a spiritual, as opposed to a physical or pecuniary nature." *Vasquez v. Los Angeles Cnty.*, 487 F.3d 1246, 1250–51 (9th Cir. 2007). Thus, where, as here, Plaintiffs allege "exclusion or denigration on a religious basis within the political community," they have alleged a sufficiently cognizable psychological, spiritual or emotional injury. *Catholic League*, 624 F.3d at 1052.

Plaintiffs' injuries are redressable, because the Court can enjoin the Secretary from using her official email to disseminate the types of messages challenged in the Complaint, and which

cause the harms alleged by Plaintiffs. *Matsumo v. Labrador*, 122 F.4th 787, 801 (9th Cir. 2024) (quoting *Mecinas v. Hobbs*, 30 F.4th 890, 900 (9th Cir. 2022)) ("[R]edressability is satisfied so long as the requested remedy 'would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered.'").

Moreover, Plaintiff Dietrich's claims are not moot because she intends to return to the USDA. Where a former employee "neither declared [their] intent to [seek employment with their former employer] nor produced any other evidence suggesting the conduct alleged as the basis for [their] claim can reasonably be expected to recur as to [them]," *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 865 (9th Cir. 2017), a former employee's claims may be moot. However, a former employee's claim may not be moot if they have expressed an "interest in returning to work for the . . . Department," are "in the process of seeking reinstatement to their former positions, or seeking work from that employer," *Walsh v. Nev. Dep't of Hum. Res.*, 471 F.3d 1033, 1037 (9th Cir. 2006), or they would seek work if not for the employer's challenged conduct, *see Gonzalez v. Metro. Transp. Auth.*, 73 F. App'x 986, 988 (9th Cir. 2003) (plaintiff overcoming mootness objection by submitting sworn testimony that she would return to work at the department she left if she would not be subject to the challenged practice). Ms. Dietrich attests that she has spoken with her former superiors at the Natural Resources Conservation Service about returning to work with USDA after her retirement, should she be able to work free from the Secretary's religious communications. Decl. of Lanette Dietrich ("Dietrich Suppl. Decl.") ¶¶ 6, 9–11. "[A] case is moot only where no effective relief for the alleged violation can be given." *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1094 (9th Cir.2003). As this Court may afford Plaintiff Dietrich the relief she seeks, her claims are not moot.

Accordingly, the Court finds that each Plaintiff satisfies the injury, traceability, and redressability prongs of the standing test.

**B. Likelihood of Success – Establishment Clause Claim**

Next, the Court addresses the merits of this action, beginning with Plaintiffs' constitutional claim. The Establishment Clause prohibits governments from making any "law respecting an establishment of religion." U.S. Const. amend. I. The Supreme Court has affirmed that the

United States District Court
Northern District of California

prohibitions proscribed by the First Amendment apply to actions taken not only by the states, but also by federal government. *McCreary County, Kentucky v. American Civil Liberties Union of Kentucky,* 545 U.S. 844, 877 (2005) ("To that end, we have held that the guarantees of religious freedom protect citizens from religious incursions by the States as well as by the Federal Government."); *see also School District of Abington Township, Pennsylvania v. Schempp,* 374 U.S. 203, 222 (1963) ("[T]he Establishment Clause prohibits ... [the] official support of the State or Federal Government be[ing] placed behind the tenets of one or of all orthodoxies."). Thus, the force of the First Amendment applies as much to each state as it does to the Secretary.

The Establishment Clause protects religious freedom by "command[ing] a separation of church and state." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 558–59, (2022) (citing *Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005). At its core, this means forbidding "sponsorship, financial support, and active involvement of the sovereign in religious activity." *Walz v. Tax Comm'n of City of New York*, 397 U.S. 664, 668 (1970). As the Supreme Court acknowledged in *Kennedy v. Bremerton Sch. Dist.*, the Establishment Clause does not "'compel the government to purge from the public sphere' anything an objective observer could reasonably infer endorses or 'partakes of the religious.'" 597 U.S. at 535 (citing *Van Orden v. Perry*, 545 U.S. 677, 699 (2005) (Breyer, J., concurring in judgment)). However, courts must be cautious to ensure that "what might begin as a tolerant expression of religious views" does not "end in a policy to indoctrinate and coerce." *Lee,* 505 U.S. at 591–92.

To determine whether government action violates the Establishment Clause, the Court must "focus[ ] on original meaning and history" of the First Amendment. *Kennedy*, 597 U.S. at 536, (citing *Town of Greece v. Galloway*, 572 U.S. 565, 575 (2014)). That is, this Court's must be guided by "historical practices and understandings" of the relationship between government and religion in America. *See Kennedy*, 597 U.S. at 535 ("In place of *Lemon* and the endorsement test, this Court has instructed that the Establishment Clause must be interpreted by reference to historical practices and understandings."). Pursuant to this approach, any practice that was "accepted by the Framers and has withstood the critical scrutiny of time and political change" does not violate the Establishment Clause. *Town of Greece*, 572 U.S. at 577; *Kennedy*, 597 U.S. at 510

(noting that a practice must "accord with history and faithfully reflect[s] the understanding of the Founding Fathers."). The analysis does not end merely because a practice has been observed in the past. The history and tradition test requires this Court to look to the "uninterrupted practice" of law in our nation's traditions. *Kennedy*, 597 U.S. at 536 (quoting *Walz*, 397 U.S. at 680).

Traditionally, the hallmark of government conduct violative of the Establishment Clause is the presence of some form of coercion upon its citizens. *Shurtleff v. City of Boston*, 596 U.S. 243, 286 (2022) (Gorsuch, J., concurring) (citing *Lee v. Weisman*, 505 U.S. at 587). ("Beyond a formal declaration that a religious denomination was in fact the established church, . . . founding-era religious establishments often bore certain telling traits," most of which involved "forms of 'coercion' regarding 'religion or its exercise."); *Lee,* 505 U.S. at 591–92 ("The explanation lies in the lesson of history that was and is the inspiration for the Establishment Clause, the lesson that in the hands of government what might begin as a tolerant expression of religious views may end in a policy to indoctrinate and coerce.").

Thomas Jefferson and James Madison, the two Founders most instrumental in the drafting and ratification of the Religion Clauses of the First Amendment, ECF 26-9. ¶¶ 58–66, articulated a founding-era concern broader than direct, compelled sectarian practices. Madison, for example, expressed concern that even instances of governmental "recommendation[]" concerning religion "naturally terminate[] in a conformity to the creed of the majority []." *Id.* ¶ 77. Jefferson expressed concern about indirect forms of coercion such as conduct which might invite "some degree of proscription perhaps in public opinion." *Id.* ¶ 71. Most fitting, in his "Memorial and Remonstrance Against Religious Assessments" drafted in 1785, Madison questioned the ends sought by the promotion of a sectarian underpinning to our country's political foundation: "Who does not see that the same authority which can establish Christianity, in exclusion of all other Religions, may establish with the same ease any particular sect of Christians, in exclusion of all other Sects?" His guidance, contained in the same writings: "Such a Government will be best supported by protecting every Citizen in the enjoyment of his Religion with the same equal hand which protects his person and his property; by neither invading the equal rights of any Sect, nor suffering any Sect to invade those of another." The Founders may have lacked the foresight to

account for contemporary technological advances, but the principles embedded in our First Amendment ring as true today. As difficult as the task may be, below, this Court faithfully applies the founding-era's understanding of the Establishment Clause to the modern-day circumstances giving rise to this litigation.

**i. The Secretary's Messaging Contains the Hallmarks of a Traditional Establishment Clause Violation**

Plaintiffs argue that the Secretary's emails are unconstitutionally coercive because, in the presence of the power imbalance between her and her subordinates, the Secretary abuses her position of authority over a captive audience and weaponizes social pressure to send proselytizing messages. ECF 26 at 17–18. Defendants argue that the Secretary's emails are not coercive because she merely relayed her own personal views regarding the reason for celebrating certain holidays, rather than participate in any religious exercise, let alone compel conformity. ECF 38 at 34.

While the Supreme Court "has disagreed on what exactly qualifies as impermissible coercion in light of the original meaning of the Establishment Clause," *Kennedy* 597 U.S. at 536–37, many cases help guide this Court analysis. In *Engel v. Vitale*, the Supreme Court stated that "[w]hen the power, prestige and financial support of government is placed behind a particular religious belief, the indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion is plain." 370 U.S. 421, 431 (1962). There, the plaintiffs successfully challenged a public school's practice of starting school day with a prayer. *Id.* In *Santa Fe Independent School Dist. v. Doe*, the Supreme Court held that a school district violated the Establishment Clause by broadcasting a prayer "over the public address system" before each football game. 530 U.S. 290, 294 (2000). In reaching that conclusion, the Court observed that, while students generally were not required to attend games, attendance was required for "cheerleaders, members of the band, and, of course, the team members themselves" which undermined the argument that participation was voluntary. *Id.* at 311. The Supreme Court in *Lee v. Weisman,* found coercion in requiring students to stand in a group or maintain respectful silence during the invocation and benediction at their school's graduation ceremony. 505 U.S. 577, 591–92 (1992). The Fourth Circuit in *Lund v. Rowan Cnty*. found coercion in Rowan County city

official's practice of legislative prayer before proceeding with the meeting, in part, because the city officials "characterize[ed] the political community as a Christian one, and urg[ed] adherents of other religions to embrace Christianity as the sole path to salvation." 863 F.3d 268, 286–87 (4th Cir. 2017). Conversely, in *Town of Greece v. Galloway*, the Court held that legislative prayers at the beginning of town board meetings were not coercive to members of the public because "[n]othing in the record suggests that members of the public are dissuaded from leaving the meeting room during the prayer." 572 U.S. 565, 590 (2014). And in *Kennedy*, the Supreme Court held that a football coach's prayers after a game were not coercive because they "were not publicly broadcast or recited to a captive audience." 597 U.S. at 542.

After reviewing and weighing the Establishment Clause jurisprudence, the Court finds that Secretary Rollins appears to exploit her position of authority to convey a religious message beyond mere holiday wishes and amounting to coercion. Here, three factors inform the Court's conclusion that the Secretary's conduct was coercive: (1) her position of authority, (2) the use of her official email to send messages to all USDA employees, and (3) the alienating language contained in the emails to employees who did not share her religious tenets.

**a. The Secretary's Position of Authority Weighs in Favor of Finding Coercion**

USDA guidance instructs agency employees that an "[i]mportant [b]oundar[y]" in engaging in "religious expression in the workplace" is that they "[c]annot use official authority to pressure subordinates." Decl. of Elias Daiute ("Daiute Decl."), Ex. D, ECF No. 26-1 (USDA Secretary's Memorandum 1078-019). The agency's guidance also states that employees have a right to a workplace "free[] from government coerced religious or secular dogma" and that such messaging "[m]ust stop if a colleague asks [them] to stop." *Id*. As the head of the USDA, the Secretary wields significant (actual and persuasive) authority over her employees. The conduct Secretary Rollins demonstrates sets the tone for the USDA workforce. USDA Secretary's Memorandum 1078-019 itself cites to the First Amendment, Title VII of the Civil Right Act of 1964, *Kennedy v. Bremerton School District*, 597 U.S. 507 (2022) and *Groff v. DeJoy*, 143 S. Ct. 2279 (2023) as the legal foundation for the findings and guidance contained therein. This Court



United States District Court
Northern District of California

fully endorses those legal sources and finds the Secretary's guidance reasoned. Under USDA Secretary's Memorandum 1078-019, for example, an employee likely could not send out an unsolicited all-staff email (including to those who wished not to receive such messages) encouraging employees to fast during the month of Ramadan or attend a synagogue. Why should the Secretary be exempt from her own rules? The buck stops with Secretary Rollins. In fact, her position of authority warrants greater concern as she sits atop the agency hierarchy. *See, e.g, Engel*, 370 U.S. at 431.

Unlike in *Kennedy*, where the Supreme Court highlighted the fact that Mr. Kennedy's prayers were not "recited to a captive audience," 597 U.S. at 542, here subordinates are expected to read the Secretary's emails. Plaintiffs' claim "does not rest on allegations of mere discomfort with religious views . . . , but upon allegations that [their superior] used [her] office to impose [her] religious views on . . . [her] subordinate." *Venters v. City of Delphi*, 123 F.3d 956, 977 (7th Cir. 1997). The Secretary's power as a cabinet secretary is significant; she reports directly to the President of the United States. The Court cannot ignore these dynamics. *See, e.g., Milwaukee Deputy Sheriffs Ass'n v. Clarke*, 513 F. Supp. 2d 1014, 1021 (E.D. Wis. 2007) ("[C]oercion [cases] typically deal with populations over which government exercises particularly strong control[, such as] . . . public employees.")

The weight of authority and the record before the Court suggest that the Secretary's position of authority favors finding her conduct constitutes coercion in violation of the Establishment Clause.

**b. The Means and Method of Communication Favor Finding an Establishment Clause Violation**

Next, the Secretary's use of her official email to disseminate department-wide religious emails (to welcoming and unwelcoming recipients alike) is worrisome. An Establishment Clause violation is more likely where "subtle coercive pressures exist" and where an employee has "no real alternative which would have allowed her to avoid the fact or appearance of participation." *Lee*, 505 U.S. at 588; *see also Cole v. Oroville Union High Sch. Dist*., 228 F.3d 1092, 1101–04 (9th Cir. 2000). Defendants' assertion that recipients of the email may simply not read the

messages is unavailing. As discussed above, employees are expected to read the Secretary's emails. Even holiday messages may sometimes contain important work-related administrative information, such as leave policy. The Founders certainly did not contemplate the degree of compulsion a public employee may experience when they receive an email from the head of their agency, but the Court's constitutional analysis must account for the modern environment in which government employees live and work. In the modern era, where remote work and telecommunications are ubiquitous, the Court cannot overlook contemporary societal practices. Secretary Rollins use of her official email for department-wide messages about plans to reorganize much of the agency and require employees to relocate; significant changes to USDA's civil-rights program; closure of a USDA building; plans for a government shutdown; and the Deferred Resignation Program, which offered many employees an exit from federal service. ECF 26 at 21. In *Van Orden v. Perry*, the Supreme Court held that a Ten Commandments display on the grounds of the Texas State Capitol did not violate the Establishment Clause because "[i]n no sense does Texas compel petitioner Van Orden to do anything. The only injury to him is that he takes offense at seeing the monument as he passes it" in his travels. 545 U.S. at 694. The Court continued, "[h]e need not stop to read it or even to look at it, let alone to express support for it or adopt the Commandments as guides for his life." *Id*. Here, on the contrary, USDA employees are expected to read the Secretary's religious message. To suggest that Plaintiffs may choose at their discretion which of the Secretary's emails to read and which to ignore defies logic.

Moreover, the record reflects that some employees were prevented from opting out of receiving such messages. Plaintiff Dietrich alleges she was told that it was "not possible" to be removed from the distribution list, Dietrich Decl. ¶ 14, and that she would "create trouble" for herself if she continued to raise concerns. *Id.* As the USDA Secretary's Memorandum 1078-019 makes clear, employees should have the option to stop receiving the Secretary's religious messages. In *Town of Greece v. Galloway*, the Court held that legislative prayers at the beginning of town board meetings were not coercive to members of the public because "[n]othing in the record suggests that members of the public are dissuaded from leaving the meeting room during the prayer." 572 U.S. at 590. Where, as here, the persuasive force tilts towards, rather than away

United States District Court
Northern District of California

from, engagement with the religious message, the record favors finding the Secretary's manner of communicating her religious message favors finding coercive conduct.

**c. The Alienating Language Contributed to the Coercive Pressure**

Finally, the alienating language contained in the emails contributes to the coercive nature of the messaging. Indeed, the Supreme Court has held that "[t]he touchstone for [the Court's] analysis is the principle that the 'First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion.'" *McCreary County, Ky. v. ACLU*, 545 U.S. 844, 860 (2005) (quoting *Epperson v. Arkansas*, 393 U.S. 97, 104, (1968)). "[S]ponsorship of a religious message is impermissible because it sends the ancillary message to members of the audience who are nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community." *Santa Fe Independent School Dist*, 530 U.S. at 309–10; *see Larson v. Valente*, 456 U.S. 228, 244 (1982) (interpreting the establishment clause to mean that "one religious denomination cannot be officially preferred over another"); *Engel v. Vitale*, 370 U.S. 421, 431 (1962) ("When the power, prestige and financial support of government is placed behind a particular religious belief, the indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion is plain.").

The Secretary's use of "we," "us," and "our," along with her failure to recognize other religious holidays or acknowledge that other employees may have different beliefs, expresses a culture and environment within the USDA which ostensibly universally conforms with the Secretary's beliefs. Any recipient of the Secretary's email is assumed to subscribe to the same Christian beliefs as the Secretary. For example, the Secretary writes about "*our* Savior Jesus Christ, who came to free *us* from *our* sins," and discusses Jesus's resurrection as "the foundation of *our* faith." (emphasis added). Given the inclusion of first-person plural pronouns, there is no way of reading the challenged messages other than ascribing the Secretary's particular religious view among all its recipients (that is, all USDA staff). Plainly, "[w]hen the government associates one set of religious beliefs with the state and identifies nonadherents as outsiders, it encroaches upon the individual's decision about whether and how to worship." *McCreary County,* 545 U.S.

at 883, (O'Connor, J., concurring). By comparing federal employees to "the very first disciples to encounter our risen Lord in the Upper Room almost two thousand years ago" and calling on those employees to carry out "the mission each of us has been called for" with "Paschal joy," the Secretary is portraying the agency's work as a mission to serve her particular Christian views. The Secretary's goals are no secret: "I do use this platform [as the Secretary of Agriculture]. I believe in making disciples of all nations. . . . I have been sued a couple of times for, they say, talking about Jesus too much, but I'll never stop talking about Jesus." *See* Suppl. Decl. of Elias Daiute ("Daiute Suppl. Decl."), Ex. A (filed Sept. 21, 2026). This is thy type of conduct the Framers sought to protect against. *See McCreary County,* 545 U.S. at 876 ("The Framers and the citizens of their time intended not only to protect the integrity of individual conscience in religious matters, but to guard against the civic divisiveness that follows when the government weighs in on one side of religious debate."). It makes no difference that the emails did not single out dissidents, disparage those who did not share the Secretary's beliefs, or indicate work-related decisions would be influenced by an employees' reaction to the emails. The Supreme Court has repeatedly recognized that "immense social pressure" can result in a finding of coercion. *Santa Fe*, 530 U.S. at 311; *id.* at 312 ("'[T]he government may no more use social pressure to enforce orthodoxy than it may use more direct means.'" Such pressure is demonstrated here.

* * *

While social pressure alone is not state coercion because "mature adults ... presumably are not readily susceptible to religious indoctrination or peer pressure." *Galloway*, 572 U.S. at 590, the totality of the circumstances here demonstrates such immense pressure to amount to coercion. Thus, the hallmarks of traditional establishment clause violations discussed above has been sufficiently shown by the Plaintiffs.

### C. The Remaining *Winter* Factors Favor Relief

Plaintiffs have met their burden to demonstrate that they are "likely to suffer irreparable harm" in the absence of preliminary relief, *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023), as "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Klein v. City of San Clemente*, 584 F.3d 1196, 1207–08 (9th Cir.

2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

Moreover, "the government 'cannot suffer harm from an injunction that merely ends an unlawful practice.'" *Thakur v. Trump*, 176 F.4th 1187, 1205 (9th Cir. 2026) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)). Instead, the public interest will be well-served by an injunction because "it is always in the public interest to prevent the violation of a party's constitutional rights." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 695 (9th Cir. 2023) (citation modified).

### D. Plaintiffs' Fail to Identify a Final Agency Action for their APA Claims

As the Court noted in its tentative ruling, Plaintiffs' APA claims likely fail because the emails do not constitute a final agency action. An agency action is final if it (1) "mark[s] the consummation of the agency's decisionmaking process" and (2) is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). The Secretary's messages are not a "rule" because they do not create law or explain existing law. *See S. California Edison Co. v. FERC*, 770 F.2d 779, 783 (9th Cir. 1985) (explaining that substantive rules create law by imposing "extra statutory obligations pursuant to authority properly delegated by Congress" and interpretive rules clarify existing law or regulations). Nor are the emails an "order" because they do not finally dispose of agency matters. Accordingly, the Court grants Defendants' motion to dismiss Plaintiffs' APA claims.

## IV. CROSS-MOTION TO DISMISS

Legal scholars and federal courts across the country recognize that the showing required for a movant to obtain preliminary injunctive relief is higher than that required to survive a motion to dismiss. *de Jesus Santos v. Mullin*, 839 F. Supp. 3d 39, 52 (D. Mass. 2026) ("A movant's burden on a motion for preliminary injunction requires a "greater showing" than the standard for defeating a motion to dismiss."); *Washington v. United States Dep't of Homeland Sec.*, 598 F. Supp. 3d 1051, 1077 (E.D. Wash. 2020) (noting that Rule 12(b)(6) sets a "lesser standard than the preliminary injunction standard"); *Stewart v. Metro. Transportation Auth.*, 566 F. Supp. 3d 197, 213 (E.D.N.Y. 2019) ("[T]o obtain preliminary injunctive relief Plaintiffs must clear a much higher hurdle" than that required to survive a motion to dismiss.); *Earls v. N. Carolina Jud.*

*Standards Comm'n*, 703 F. Supp. 3d 701, 719 (M.D.N.C. 2023) ("[T]he burden placed upon Plaintiff[ ] to show that each requirement of a preliminary injunction is met is high. Consequently, merely 'providing sufficient factual allegations to meet the Fed. R. Civ. P. 12(b)(6) standard . . . does not show a likelihood of success on the merits."); *see also* 11A Charles Alan Wright et al., Federal Practice & Procedure § 2949 (3d ed. 2013) (noting that "[e]vidence that goes beyond the unverified allegations of the pleadings and motion papers must be presented to support or oppose a motion for a preliminary injunction"). This Court is in accord. It necessarily follows that where, as here, the movants have met the higher standard of likelihood of success on the merits, they have also met the standard for stating a claim upon which relief can be granted. Accordingly, for the reasons discussed above, the Court denies Defendants' motion to dismiss Plaintiffs' Establishment Clause claim

## V. SCOPE OF RELIEF

This Court acknowledges that the relief granted "must be [narrowly] tailored to remedy the specific harm alleged, and an overbroad preliminary injunction is an abuse of discretion." *Nat. Res. Def. Council, Inc. v. Winter*, 508 F.3d 885, 886 (9th Cir. 2007). As the Supreme Court recently reiterated, federal courts may grant relief only to the extent "necessary to provide complete relief to each plaintiff with standing to sue." *Trump v. CASA*, Inc., 606 U.S. 831, 861 (2025). However, an injunction that protects non-parties may be appropriate if necessary to afford complete relief to the parties in the case. In *CASA*, the Court gave an example of a nuisance case seeking to prevent someone from playing their music too loud. *Id.* at 851–52. This Court's ruling fits neatly within the tradition of injunctive relief exercised by federal courts historically and recognized as appropriate by the Supreme Court in *CASA*. In order to afford the named Plaintiffs relief in this matter, the Court must enjoin the Secretary's use of her official platform in a manner that also prevents non-parties from receiving constitutionally violative messages. Because Defendants do not offer an opt-out opportunity for employees receiving the Secretary's emails, this Court must enjoin the dissemination of such emails consistent with the Court's conclusion below. As "Plaintiffs complain of 'injuries for which it is all but impossible for courts to craft relief that is complete and benefits only the named [P]laintiffs,'" *Nat'l TPS All. v. Noem*, 166 F.4th

739, 767 (9th Cir. 2026) (quoting *CASA*, 606 U.S. at 852 n.12), this Court's injunctive remedy is within its authority.

## VI. CONCLUSION

The Court does not purport to regulate the religiosity of the Secretary—nor could it. "A relentless and all-pervasive attempt to exclude religion from every aspect of public life could itself become inconsistent with the Constitution." *Lee*, 505 U.S. at 598. Nor does this Court generally condemn the expression of religious sentiments. *Vernon v. City of Los Angeles*, 27 F.3d 1385, 1396 (9th Cir. 1994) ("[T]he Establishment Clause is . . . violated as much by government disapproval of religion as it is by government approval of religion."). Instead, this Court requires the Secretary to observe her own directives. USDA Secretary's Memorandum 1078-019. The April 5, 2026, and December 23, 2025, messages go too far. They suggest acquiescence that amounts to coercive pressure; a pressure of conformity sufficient to raise an Establishment Clause violation.

For the reasons discussed above, the Court **GRANTS** Plaintiffs' motion for preliminary injunction with respect to Plaintiffs' constitutional claim only, **GRANTS** Defendants' motion to dismiss Plaintiffs' APA claims, and **DENIES** Defendants' motion to dismiss Plaintiffs' constitutional claim.

The Court **ORDERS** that the Secretary must recognize certain boundaries when disseminating messages which convey religious content: She "[m]ust stop if a colleague asks [her] to stop," she "[c]annot create a hostile work environment through persistent unwelcome advances," and she "[c]annot use official authority to pressure subordinates." USDA Secretary's Memorandum 1078-019. She may "[d]iscuss [her] religious beliefs with interested colleagues," "[s]hare why [her] faith is meaningful to [her]," "[p]olitely invite coworkers to religious services or events," "[e]xpress religious viewpoints during appropriate conversations." *Id.* Again, this Court expresses no view whatsoever on what the Secretary can and cannot do in her personal capacity.



United States District Court
Northern District of California

A further case management conference is set for **December 17, 2026, 2:00 p.m. via videoconference**. A joint case management statement is due December 10, 2026. All other dates are hereby maintained.

This Order resolves ECF 26 and 38.

IT IS SO ORDERED.

Dated: November 19, 2026

TRINA L. THOMPSON
United States District Judge

United States District Court
Northern District of California